# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                                  No. CR 11-2292 JB

OLADIPO ALABI and
KEHINDE OGUNTOYINBO,

       Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on: (i) Defendant Kehinde Oguntoyinbo's Motion to Suppress, filed January 23, 2013 (Doc. 95)("Motion to Suppress"); and (ii) Agreed Order to Join in Defendant Oguntoyindo's [sic] Motion to Suppress, filed March 4, 2013 (Doc. 109).[1]  The Court held an evidentiary hearing on February 26, 2013.  The primary issues are: (i) whether the warrantless reading of magnetic strips on the backs of credit and debit cards by United States Secret Service agents violates the Fourth Amendment of the United States Constitution's prohibition against unreasonable searches and seizures; (ii) if the warrantless reading of the magnetic strips violates the Fourth Amendment, whether the evidence discovered by reading the cards fits within the inevitable-discovery doctrine's exception to the exclusionary rule; and (iii) given that the information discovered from the reading was used in a search

---

[1] Co-Defendant Oladipo Alabi moved, unopposed, to join in Oguntoyinbo's Motion to Suppress on February 27, 2013.  See Unopposed Motion to Join in Defendant Oguntoyindo's [sic] Motion to Suppress, filed February 27, 2013 (Doc. 107).  The Court granted the order on March 4, 2013, ordering that "Alabi is joined in Mr. Oguntoyin[b]o's Motion, citations of law, and arguments."  Agreed Order to Join in Defendant Oguntoyindo's [sic] Motion to Suppress at 1.  To the extent that this Memorandum Opinion and Order refers to an argument in the Procedural Background section as made by either Oguntoyinbo or Alabi, or both, the argument is thus imputed to both Defendants.

warrant application, whether the warrantless reading of the magnetic strips requires the Court to exclude the evidence found in execution of the search warrant as fruit of the poisonous tree. The Court will deny the Motion to Suppress. The Secret Service agent's scan of the magnetic strip on Defendants Oladipo Alabi's and Kehinde Oguntoyinbo's credit and debit cards to read the electronically stored account information contained in the strips, when the agent already physically possessed the cards, did not violate the Defendants' Fourth Amendment rights. Scanning the credit and debit cards' magnetic strips to read the account information was not a government invasion of a constitutionally protected area and thus not a Fourth Amendment search under the trespass-based search analysis, which the Supreme Court of the United States used in its two most Fourth Amendment search cases: Florida v. Jardines, 133 S. Ct. 1409 (2013), and United States v. Jones, 132 S. Ct. 945 (2012). The government's scan of credit and debit cards' magnetic strips is also not a Fourth Amendment search under the reasonable-expectation-of-privacy approach in Katz v. United States, 389 U.S. 347 (1967), because, given that the financial institutions which issue credit and debit cards encode the same information on all credit and debit cards -- account information identical to the account information embossed on the card's exterior -- and given that the electronically stored account information is necessarily disclosed to private parties when credit and debit cards are used as intended, the scan does not implicate a legitimate privacy interest. Regardless whether the scan violated the Fourth Amendment, however, the evidence that the Secret Service found in the cards' scan is admissible under the inevitable-discovery doctrine. Moreover, because the evidence was derived from an independent source as there was probable cause without information gleaned from the credit and debit cards' scan, and because the officers' objectively reasonable reliance on the search warrant

brings the search under the good-faith exception to the exclusionary rule, the Court will not exclude the evidence that law enforcement discovered while executing the search warrant.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the court is not bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in ruling on a motion to suppress.  See United States v. Merritt, 695 F.2d at 1269 ("The purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it,

notwithstanding the hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)("We need not resolve whether Crawford[ v. Washington, 541 U.S. 36 (2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression hearings, because even if we were to assume this protection does apply, we would conclude that the district court's error cannot be adjudged 'plain.'");[3] United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay statements made in suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention hearings").[4]

---

[2] Crawford v. Washington stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness. See 541 U.S. at 53-54.

[3] United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266 (10th Cir. 2005). The Court finds that United States v. Garcia, United States v. Ramirez, 388 F. App'x 807 (10th Cir. 2010), United States v. Reed, 195 F. App'x 815 (10th Cir. 2006), and United States v. Sanders, 43 F. App'x 249 (10th Cir. 2002), the other unpublished opinions on which the Court relies in this Memorandum Opinion and Order, have persuasive value with respect to material issues, and will assist the Court in its disposition of this memorandum opinion and order.

[4] The Defendants do not raise any arguments under Crawford v. Washington against any evidence in this case; the Court, therefore, need not decide whether Crawford v. Washington

1.     New Mexico State Police Officer Chester Bobbitt was patrolling Interstate 40 near Tucumcari, New Mexico, on April 6, 2011, at 8:20 a.m. when he saw a 2010 Toyota Camry with expired California license plates driving eastbound.   See Motion to Suppress at 1; Government's Memorandum in Opposition to Defendant Oguntoyinbo's Motion to Suppress at 1, filed February 7, 2013 (Doc. 96)("MTS Response"); Transcript of Hearing at 25:13-26:10 (taken Feb. 26, 2013)(Kochersberger, Vela)("Tr.")(both parties proffer as factual evidence the factual background provided in their briefs and agree that, except for the locations where the state police officer is alleged to have found the cards, the facts are undisputed).[5]

2.     The Defendants were traveling in a rental car, the Toyota Camry, eastbound on Interstate Highway 40 near Tucumcari, New Mexico.  See Motion to Suppress at 1.

3.     The rental agreement was in Oguntoyinbo's name alone.  See MTS Response at 2.

4.     At approximately 8:20 a.m., Bobbitt initiated a traffic stop of Oguntoyinbo's

---

applies to suppression hearings.  The Court notes, however, that no court has held Crawford v. Washington applies to suppression hearings, and the courts that have decided the issue have found that Crawford v. Washington does not apply to suppression hearings.  See Ebert v. Gaetz, 610 F.3d 404, 414 (7th Cir. 2010)(right of confrontation does not apply at a suppression hearing); United States v. Garcia, 324 F. App'x. 705, 708 (10th Cir. 2009)(unpublished)("There is no binding precedent from the Supreme Court or this court concerning whether Crawford applies to pretrial suppression hearings.  To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").  Cf. United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that Crawford v. Washington does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); United States v. Saneaux, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that Crawford v. Washington does not apply to determining whether a statement is admissible under the coconspirators hearsay exception, "because the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial").

[5] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers.

vehicle.  See Motion to Suppress at 1; MTS Response at 1.

5.      Bobbitt engaged his lights and siren, and pulled Oguntoyinbo's vehicle over.  See MTS Response at 1.

6.      There were two men in the Toyota Camry.  See MTS Response at 1.

7.      Oguntoyinbo was the driver.  See MTS Response at 1.

8.      Alabi was the passenger.  See MTS Response at 1.

9.      Oguntoyinbo presented a driver's license and the rental agreement for the vehicle to Bobbitt.  See MTS Response at 1-2.

10.     Bobbitt gave Oguntoyinbo a traffic warning and told him that he was free to leave.  See MTS Response at 2.

11.     At some point during this routine traffic stop, Bobbitt obtained Oguntoyinbo's limited consent to search his rental vehicle and luggage.  See Motion to Suppress at 1-2.

12.     Alabi also consented to the search of the vehicle and luggage.  See MTD Response at 2.

13.     As a result of the search, Bobbitt seized, among other things, thirty-one credit and debit cards from the Defendants possession.  See Motion to Suppress at 2; MTS Response at 2 ("Officer Bobbitt found that, between the two defendants, they possessed approximately 31 credit and debit cards.").

14.     Bobbitt also seized: (i) approximately sixty-seven Wal-Mart cash cards valued at $ 1,650.00; (ii) approximately $5,673.00 in cash; (iii) two laptop computers; (iv) six cellular telephones; (v) a bundle of paperwork which contained a list of approximately 500 names with birth dates, Social Security numbers, addresses, and telephone numbers; and (vi) two Louis

Vuitton bags.  See Search Warrant and Search Warrant Application at 9, filed February 7, 2013 (Doc. 96-1)("Search Warrant Application").

15.     Bobbitt then arrested the Defendants on state charges related to identity theft.  See MTS Response at 2.[6]

16.     The Defendants were then transported to the New Mexico State Police station located in Tucumcari, where they were detained.  See Motion to Suppress at 2; MTS Response at 2 ("Bobbitt transported Oguntoyinbo and Alabi to a New Mexico State Police facility to process their arrests and to conduct an inventory search.").

17.     Following the Defendants' arrest, Bobbitt relinquished custody of the credit/debit cards to the Department of Homeland Security, Immigration, and Custody Senior Special Agent Christine Brital.  See Motion to Suppress at 2; MTS Response at 2-3.

18.     Brital then transported the credit/debit cards to the United States Secret Service Albuquerque Regional Office and gave the credit/debit cards to Special Agent Nick Jonte.  See Motion to Suppress at 2; MTS Response at 3.

19.     It was not until April 7, 2011, that Jonte proceeded to scan and search each of the individual credit and debit cards to obtain the electronic information on the magnetic strips.  See Motion to Suppress at 2; MTS Response at 3.

20.     Credit/debit cards contain information on the fronts of the cards, usually including the institution which issued the card, and embossed lettering and numbering indicating the cardholder's name, the card number, and the expiration date.  See MTS Response at 3 (noting

---

[6] Plaintiff United States of America represents that the state charges against Oguntoyinbo and Alabi were dismissed after the federal indictment was unsealed.  See MTS Response at 3 n.2.

that a "name, account number and name of issuing financial institution [i]s embossed on the front of the card.").

21.     Credit/debit cards also generally contain a magnetic strip on the back of the card containing data.  See Tr. at 19:1-4 (Kochersberger, Vela)(Q: "The magnetic strips that you were demonstrating on the machine those are contained on credit cards as you demonstrated right?" A: "Yes, sir."); Wikipedia entry for Magnetic Stripe Card at 3-4, printed February 25, 2013 (United States' Hearing Exhibit 3); Tr. at 18:5-6 (Court)(admitting into evidence United States' Hearing Exhibits 1-5).

22.     Driver's licenses also generally include the magnetic strip used on the back of credit/debit cards.  See Tr. at 19:5-12 (Kochersberger, Vela)(Q: "And you also demonstrated they are contained on most driver's licenses these days, right?"  A: "[T]o the best of my knowledge just [what] the instruction manual said[:] in California . . . ." Q "There was a magnetic strip on the back of your New Mexico driver['] license as well?" A: "That's correct."); Wikipedia entry for Magnetic Stripe Card at 5 ("The data stored on magnetic stripes on American driver's licenses is specified by the American Associate of Motor Vehicle Administrators. . . .  Not all states use a magnetic stripe on their driver's licenses . . . .").

23.     The magnetic strip on the back of a credit/debit card contains three tracks on which data may be stored.  See Model 5607 Magnetic Stripe Card Reader/Verifier Instruction Manual at 1 (United States' Hearing Exhibit 2); Wikipedia entry for Magnetic Stripe Card at 2, 3.

24.     The magnetic strip on the back of a credit/debit card generally contains two tracks of stored data, which includes, among other information, the following: (i) the primary account

number; (ii) the card-owner's name; and (iii) the expiration date.  See Tr. at 7:12-14 (Vela); id. at 14:20-15:2 (Vela adopting, under oath during direct examination, proffer of evidence before he was sworn in).  See also Wikipedia entry for Magnetic Stripe Card at 3-4.

25.     The electronically-stored information in the magnetic strip that appears on the Model 5607 Magnetic Stripe Card Reader/Verifier's display is identical to the information on the front of the credit card, reflecting the cardholder's name, account number, and the card's expiration date.  See Tr. at 8:19-19:1 (Vela, Gerson); id. at 14:16-19 (Gerson, Vela).

26.     The Card Reader/Verifier is used to verify that the information on a card's magnetic stripe is the same as the information on the outside of the credit/debit card.  See Tr. at 11:20-12:3 (Court, Vela); id. at 14:20-15:2 (Vela adopting, under oath during direct examination, his testimonial evidence given before he was sworn in); Model 5607 Magnetic Stripe Card Reader/Verifier Instruction Manual at 1.

27.     The Card Reader/Verifier is able to read and display on its screen alphanumeric data contained on a card's magnetic strip as long as the data fit within the Card Reader/Verifier's character limitations.  See Tr. at 98:21-99:8 (Court, Gerson).[7]

28.     Because credit and debit cards use only two of the three available lines for data

---

[7] The Court asked the United States if it is correct to "say[] that the reader could read anything that's on [the first two data lines of the magnetic strip]," Tr. at 98:23-24 (Court), and the United States responded:

> [T]he card reader is going to have a limit on how much information it can have in it, but assuming that what was encoded on it was within the limits of what the card's able to hold and was recognized by the machine, the machine would be able to read much of what was on the card.

Tr. at 99:4-8 (Gerson).

storage, the Card Reader/Verifier and card readers at stores do not read the third line of data.  See Tr. at 89:13-18 (Court, Gerson)("[I]f I understand the mechanics of this [magnetic strip and card reader] you can put some information on there that would not be read by the card reader."  A: "I believe that's correct yes. . . .  And so it would be a good place to store some information that you wanted to keep from people because they would not . . . thin[k] to look there.").

29.     Cash registers at stores use a different card reader which scans the information off of the back of the magnetic strip each time a card is swiped through the reader to facilitate the financial transaction by sending that information to the card-issuer so that the issuer can charge the cardholder's account.  See Tr. at 47:1-13 (Gerson)(noting that "the clerk at Albertson's" grocery store uses a card scanner to scan information, and "when we use credit cards in everyday life to conduct a financial transaction . . . we . . . slide it through some kind of a reading device," which "read[s] one or another of the lines that are on the back of that card . . . and then send[s] information to the financial institution that is the supposed issuer of that card in order to find out if there's money in the account . . . .").

30.     When a person makes a purchase at a store using a credit or debit card, the card information that is printed on the credit or debit card receipt is the information scanned from the card's magnetic strip.  See Tr. at 47:15-23 (Gerson)("[T]he clerk who's using a machine like this . . . would still be able to see that information . . . printed out on the receipt that comes out . . . independent of the transaction . . . .").

31.     Driver's licenses for the State of New Mexico contain a magnetic stripe on the back.  See Tr. at 19:10-12 (Kochersberger, Vela)(Q: "There was a magnetic strip on the back of your New Mexico drivers licenses as well?"  A: "That's correct.").

32.     Driver's licenses for the State of California have magnetic stripes on the back, which contain information that the Model 5607 Card Reader/Verifier is capable of reading.  See Tr. at 20:5-8 (Kochersberger, Vela)(Q: "The California one is capable of being program[med]; is that correct?"  A: "Fr[om] what the instruction . . . [manual] said here that the California DMV [] will read it, so [yeah].");  Model 5607 Magnetic Stripe Card Reader/Verifier Instruction Manual at 2.

33.     The information contained on the magnetic stripe is programmable, meaning that the information was programmed and stored there electronically.   See Tr. at 20:18-21:7 (Kochersberger, Vela)(discussing the various magnetic stripes that are encoded with different information, such as information on the back of a hotel room key that allows entrance into a particular room, or a security card that allows access to a particular building or room in a building).

34.     With an appropriate device, the information programmed on a magnetic stripe can be "reencoded" -- programmed with different information.  Tr. at 21:17-25 (Kochersberger, Vela)(Q: "[I]f you have the appropriate device you can actually erase that information from the credit [card and] put other information on it, right?"  A: "To my knowledge you could do that, you could it's called reencoding."  Q: "[T]hat's the issue in this case is that some of the cards you believe were reencoded with information different than how it came from the issuer right?" A: "That is correct.").

35.     To enable a person to commit credit card theft/fraud, the original information on the back of a credit or debit card is replaced with the data taken from another person's card's magnetic strip, so that the card is still able to be processed by a card reader, but is processed to a

person's account other than the cardholder identified on the front of the reencoded card.  See Tr.
at 73:14-74:16 (Gerson)(explaining that a person presents a credit card to a store clerk, then if
the clerk asks for identification, the person will show his or her own license, which contains the
same name as embossed on the front of the card, and then "the clerk would then run the credit
card through a reader that sends the billing information off to the bank.  The bank doesn't see
what's on the front of the credit card nor what's [on] the driver's license," so it can charge the
purchase to a person different from the cardholder named on the front of the card).

36.     Out of the thirty-one credit/debit cards found in the Defendants' possession, nine
cards contain different information on the magnetic strips than reflected on the fronts of those
cards.  See MTS Response at 4; Spreadsheet of Card-swipe Verification Results at 1 (United
States' Hearing Exhibit 4); Tr. at 18:5-6 (Court)(admitting into evidence United States' Hearing
Exhibits 1-5); Tr. at 15:20-16:9 (Gerson, Vela)(Q: "[Is Exhibit 4] a the spreadsheet that you or
other Secret Service agents created to compare what was on the front of the credit cards in the
case to what was on the magnetic strip on the back of the credit cards?"  A: "That is correct."  Q:
"And does this spreadsheet also identify by highlighting which cards had a discrepancy between
what was embossed on the front of the card and the information that was encoded on the
magnetic strip?"  A: "That is correct.").

37.     There is no evidence that any of the thirty-one credit and debit cards found in the
Defendants' possession have been used.  See Tr. at 43:10-15 (Samore)(noting that the factual
allegations in the case are "that the credit cards were taken off the person of each gentleman and
had never been used . . . .")

38.     The information obtained from the magnetic strips was later included in the

Search Warrant Application to obtain a search warrant for the search of four cellular telephones and two laptop computers seized in the initial search of the rental vehicle. <u>See</u> Motion to Suppress at 2; MTS Response at 4-5; Search Warrant Application at 10.

39.     The other items obtained in the search of the rental vehicle, along with descriptions where the items were found, were also included in the Search Warrant Application. <u>See</u> Search Warrant Application at 9.

40.     The search was not necessary to protect the officer's safety or preserve evidence at the scene.

## PROCEDURAL BACKGROUND

The Defendants move the Court for an order suppressing all evidence discovered as a result of the April 7, 2011, warrantless search of electronic information stored on the magnetic stripes on the thirty-one credit and debit cards seized from Oguntoyinbo's vehicle.  <u>See</u> Motion to Suppress at 1; Agreed Order to Join in Defendant Oguntoyindo's [sic] Motion to Suppress at 1.  In his motion, Oguntoyinbo asserts that the United States Secret Service agents' warrantless reading of magnetic stripes on the backs of credit and debit cards violated the Fourth Amendment's prohibition against unreasonable searches and seizures, and that the Court should suppress all the evidence derived from reading the magnetic stripes.  <u>See</u> Motion to Suppress at 1.

Oguntoyinbo argues that he possessed an expectation of privacy in the information electronically stored on his credit cards' magnetic strips.  <u>See</u> Motion to Suppress at 2.  He asserts that Jonte violated his privacy rights by searching the magnetic strips on the backs of the cards with the card reader, contending that "[s]earching a credit card's magnetic strip is no

different than searching any device that saves or stores digital data."  Motion to Suppress at 2-3.

He asserts that Jonte needed a search warrant to scan for this data, because the magnetic strips on

the backs of credit and debit cards are capable of storing a person's most private and sensitive

personal information, including, for example, a name, address, or social security number: "As an

electronic repository for personal data, the Defendant clearly had a reasonable expectation of

privacy in his credit cards and the information stored on them."   Motion to Suppress at 3.

Oguntoyinbo notes that he was not able to locate any binding or persuasive authority, but points

to a case from the United States District Court for the Southern District of Florida from 2009, in

which a United States Magistrate Judge opined that there is no reasonable expectation of privacy

in a credit card number, which, he asserts, provides little help here.  See Motion to Suppress at 3

n.1 (citing United States v. Medina, 2009 WL 3669636, at **10-11 (S.D. Fla. Oct. 24, 2009),

rev'd on other grounds sub nom. United States v. Duarte, 2009 WL 3669537 (S.D. Fla. Nov. 4,

2009)).

Oguntoyinbo argues that Jonte's warrantless search is invalid and unconstitutional, as it

cannot be justified by any exception to the warrant rule.  See Motion to Suppress at 3.  He asserts

that the search-incident-to-arrest exception to the warrant requirement cannot justify the search,

because the circumstances here clearly indicate that mining the data stored on the cards'

magnetic strips cannot reasonably be said to be consistent with the "purposes of protecting

arresting officers and safeguarding any evidence of the offense of arrest that an arrestee might

conceal or destroy."   Motion to Suppress at 3 (quoting Arizona v. Gant, 556 U.S. 332, 338

(2009)).  Oguntoyinbo contends that, in light of this exception's purposes, the exception cannot

justify the warrantless search of the data on the cards, because "the exception cannot be used to

justify the warrantless search of personal property when that property is already in the exclusive control of the government because officer safety and destruction of evidence are no longer valid concerns at that point." Motion to Suppress at 4 (citing United States v. Rollins, 190 F. App'x 739, 743 (10th Cir. 2006)(unpublished)). Oguntoyinbo argues that there are two circumstances here that clearly preclude finding that scanning the magnetic strips on the back of the cards was a search incident to his arrest: (i) that the search was not contemporaneous, as it occurred over twenty-four hours after the cards had been taken into the government's possession; and (ii) unlike a cellular telephone or a pager, the information on a magnetic strip is relatively permanent, as it can only be altered by the intentional act of one with physical possession of the card. See Motion to Dismiss at 5. Oguntoyinbo thus asks the Court to find the search in which the United States scanned the information from the magnetic strips on the backs of the cards per se unreasonable and invalid, and suppress all evidence obtained as a result of the search. See Motion to Dismiss at 5.

On February 7, 2013, the United States filed the MTS Response, asking that the Court deny the Motion to Suppress. See Doc. 96. The United States asserts:

> [T]he government asks the Court to find that the reading of the magnetic strips on the backs of the credit and debit cards obtained from the defendants did not constitute a Fourth Amendment search at all. In the alternative, the government asks the Court to find that, if reading the backs of the cards was a search, doing so without a warrant was reasonable. Moreover, . . . the Court should find that the evidence derived from reading the cards should not be suppressed, because it would in any event have inevitably been discovered. Finally, the Court should find that, even if the information about the magnetic strips were struck from the search warrant application, the application would have amply made out probable cause, such that the fruits of the warrant should not be suppressed, either.

MTS Response at 5-6.  The United States argues that reading the magnetic strips did not constitute a search for Fourth Amendment purposes, because, they assert, it lawfully came to possess the cards, and because, "[w]hen physical objects come lawfully into the hands of law enforcement, no warrant is necessary before the police may subject them to examination."  MTS Response at 5 (citing Josh Goldfoot, The Physical Computer and the Fourth Amendment, 16 Berkeley J. Crim. L. 112 (2011)).  The United States uses blood as an example of a physical object which, once lawfully in the government's possession, can be further examined without a warrant.  See MTS Response at 7.  It refers the Court to the United States Court of Appeals for the Ninth Circuit's decision in United States v. Snyder, 852 F.2d 471, 474 (9th Cir. 1988), in which the Ninth Circuit held that "the seizure and separate search of the blood was a single event for Fourth Amendment purposes," even though the blood was tested two days after it was seized.  MTS Response at 7.  The United States asserts: "Blood is not a special case.  The same rule -- permitting officers to forensically examine lawfully seized objects -- applies to camera film, clothing, cars, carpet fibers, purses, paper, videotapes, [and] the defendant's hands . . . ."  MTS Response at 8-9.  The United States points to Kyllo v. United States, 533 U.S. 27 (2001), to support its position that its scan of the information from the cards' magnetic strips did not violate the Constitution, as the Supreme Court of the United States in Kyllo v. United States does not implicate the use of technology which is "in 'general public use'" and also because Kyllo v. United States involved the search of a home, and the Supreme Court "'ha[s] said that the Fourth Amendment draws a firm line at the entrance to the house.'"  MTS Response at 9 (quoting Kyllo v. United States 533 U.S. at 40).  The United States contends that "[t]he device used by the Secret Service agents is one that is in general public use, as it is used by practically all merchants

who accept payment by credit or debit cards . . . .  Moreover, the reading of the magnetic strips revealed no details of Oguntoyinbo's home (or anyone else's)."  MTS Response at 10.

The United States argues that, even if the government's reading the information from the cards' magnetic strips constitutes a search, Oguntoyinbo lacks standing to object to the search, because he had no reasonable expectation of privacy in the "thing or the place searched."  MTS Response at 11.  The United States contends that, to show standing, Oguntoyinbo must demonstrate that he had a subjective privacy in the area search and that his subjective expectation must be one that society is prepared to recognize as reasonable, and he can demonstrate neither.  See MTS Response at 11 (citing United States v. Anderson, 154 F.3d 1225, 1229 (10th Cir. 1998)).  First, it argues that Oguntoyinbo lacks a subjective expectation of privacy, because the magnetic strip's purpose is to be read by credit card processing readers, which is the act that the United States performed here.  See MTS Response at 11 (citing, as a comparison, United States v. Bermudez, 2006 WL 3197181, at *13 (S.D. Ind. June 30, 2006)).  Second, the United States contends that, regardless whether Oguntoyinbo had some subjective expectation of privacy, it is not one that society would recognize as reasonable, because, as the information contained in the magnetic strip -- if unaltered -- is the same as that on the front of the card, society would not recognize as reasonable an expectation of privacy in information that is publicly disclosed unless criminally altered.  See MTS Response at 12 (citing United States v. Medina, 2009 WL 3669636, at *10-11)  The United States also asserts that, because many cardholder agreements provide that the card remains the property of the issuing financial institution and/or prohibit using the card for any illegal transaction, society cannot recognize as

reasonable an owner's expectation of privacy in information contained in a card's magnetic strip. See MTS Response at 13.

The United States takes issue with Oguntoyinbo's assertion "that 'searching a credit card's magnetic strip is no different than searching any device that saves or stores digital data,'" MTS Response at 14 (quoting Motion to Suppress at 2-3), asserting: "This claim is factually incorrect. . . . '[T]he magnetic strip on the back of a credit card, unlike a hard drive or an external electronic storage device, is designed simply to record the same information that is embossed on the front of the card.'" MTS Response at 14 (quoting United States v. Medina, 2009 WL 3669636, at *10).

The United States argues that, if the Court determines that there was a search, and that Oguntoyinbo has standing to allege a Fourth Amendment violation, the Court should find that a warrant was not required, because the search was reasonable. See MTS Response at 15-16. According to the United States, the search was reasonable, because, on the one hand, the intrusion into a person's individual privacy in scanning the back of their card to glean information printed on the front is minimal, while, on the other hand, the government's legitimate interest in preventing and prosecuting credit card fraud is substantial. See MTS Response at 16. The United States additionally asserts that, although in this case there was likely enough information on which the United States could have obtained a warrant to scan the cards before doing so, in many cases,

> requiring law enforcement officials to obtain a warrant before doing so would come at the cost of using a scanner to develop probable cause in credit card cases. Imposition of a warrant requirement would accordingly impose a significant impediment to the government's legitimate interest in investigating and prosecuting access device fraud.

MTS Response at 16.

The United States argues that, should the Court conclude that the scan of the cards was a search that violated Oguntoyinbo, although information obtained from the scan was used in the search warrant application, the Court should nevertheless find the search warrant sufficient without this information.  See MTS Response at 17.  The United States points out that, apart from the information obtained by the scanning the credit and debit cards, the state trooper, pursuant to the Defendants' consensual search of the vehicle, found in the car's trunk: "approximately 67 Wal-Mart cash cards valued at approximately $1650.00; approximately $5673.00 in cash; two laptop computers; and a bundle of paperwork which contained a list of approximately 500 names with birth dates, Social Security numbers, addresses, and telephone numbers."  MTS Response at 17.  It asserts that the application would have demonstrated probable cause without including the information gleaned from the cards' scans:

> The application would have established the defendants' possession of a list of the birth dates, Social Security numbers, addresses, and phone numbers of approximately 500 people, multiple WalMart cash cards, and a large quantity of credit cards, not all of which were in their own names. The application also set out the experience of the investigator that white collar criminals store financial records in their electronic devices.

MTS Response at 18.  The United States asserts that the Court should therefore deny the Motion to Suppress to the extent that it requests the Court to suppress any other evidence seized during the warrant's execution.  See MTD Response at 18 (citing United States v. Kennedy, 131 F.3d 1371, 1377 (10th Cir. 1997)).

The United States argues that the search warrant was obtained in good faith, as Vela had no reason to believe that scanning the credit and debit cards was a Fourth Amendment search, or

that a warrant was necessary to perform the scan.  See MTS Response at 18.  It asserts: "His inclusion of this information in the warrant application was done in good faith, and his execution of the warrant was done in the honest belief that the warrant was duly issued upon a proper showing of probable cause."  MTS Response at 18.  The United States contends that, under the good-faith exception to the warrant requirement that the Supreme Court articulated in United States v. Leon, 468 U.S. 897 (1984), even if the Court finds that the search warrant stripped of the information gleaned from the cards' scans is insufficient for probable cause, the Court should not suppress the fruits of the warrant.  See MTS Response at 19.  According to the United States, the information gleaned from the cards' scan would have inevitably been discovered, because "[h]ad the government known that a warrant was required to conduct this examination, it would have included the cards among the items to be searched listed in the warrant application," and, because there was probable cause for the search warrant to issue without this information, the cards would have been scanned along with the search of the laptop and cellular telephones pursuant to the warrant.  MTS Response at 19-20 (citing United States v. Morales-Ortiz, 376 F. Supp. 2d 1131 (D.N.M. 2004)(Browning, J.)).  The United States argues that, if the Court were to conclude otherwise, the Court would violate the "reasoning behind [the inevitable-discovery] exception to the exclusionary rule . . . [as] the exclusionary rule was never intended to place law enforcement officers and prosecutors in a worse position than they would have been had the unlawful search not occurred."  MTS Response at 20.  The United States thus asks the Court to find that the information is admissible under the inevitable-discovery doctrine's exception to the Fourth Amendment warrant requirement.  See MTS Response at 20-21.

On February 22, 2013, Oguntoyinbo filed his Defendant Kehinde Oguntoyinbo's Reply in Support of Defendant's Motion to Suppress. See Doc. 105 ("MTS Reply"). Oguntoyinbo contends that he possessed an expectation of privacy in the information stored on the credit and debit cards that the United States searched, and that the warrantless search of those cards was "per se" unreasonable unless justified by an exception to the warrant requirement, none of which apply. MTS Reply at 1. He argues that he has standing to assert the Fourth Amendment violation, because he had a reasonable expectation of privacy "in the personal information electronically stored on the magnetic strips of his credit cards." MTS Reply at 1. Oguntoyinbo asserts that a person has a reasonable expectation of privacy "in an electronic repository for personal data," whether owned or borrowed, and his credit cards were an electronic repository for personal data. MTS Reply at 2 (quoting United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139). He contends that, regardless whether the credit and debit cards were his property or the issuing financial institution's property, he had a reasonable expectation that the "items would be free from governmental invasion . . . ." MTS Reply at 3 (citing United States v. Chan, 830 F. Supp. 531, 534-35 (N.D. Cal. 1993)). According to Oguntoyinbo, society recognizes this privacy interest in the information stored on magnetic strips as reasonable, which is evidenced through the protections society accords to this information, by requiring the person using the card, rather than the store clerk or merchant, to scan the card. See MTS Reply at 3. Additionally, he points out: "Online merchants pay large sums of money to guarantee the highest degree of security to their customers during the checkout process over the internet, and often advertise the level of encryption they offer to customers." MTS Reply at 3.

Oguntoyinbo argues that the high-tech process used to scan the information in the magnetic strip on the back of the cards constitutes a search for Fourth Amendment purposes, and the Court should reject the United States' argument it is not, because it flies in the face of established law.  See MTS Reply at 4.  He contends:

> The Government's classification of the scanning and reading of the . . . cards seized from the Defendant as merely an "examination" rather than a "Fourth Amendment search" is both inaccurate and contrary to established legal principles.  The Government's contention, taken to its logical end, would mean that a warrant would never be required to retrieve digitally stored information from private cell phones, pagers, hard drives, or any other electronic storage device, a proposition which is simply not true.

MTS Reply at 4 (citing Katz v. United States, 389 U.S. 347, 357 (1967)).  Oguntoyinbo asserts that the case law that the United States cites in support of its contention that the government does not need a search warrant to examine physical objects when those objects are legally in its possession are inapposite, as they are based on the courts' holdings that "a second warrant" is not required to examine objects already obtained via a first search warrant.  MTS Reply at 4-5 & n. 3 (quoting United States v. Snyder, 852 F.2d at 474; State v. Petrone, 468 N.W.2d 676, 681 (Wis. 1991); People v. Patterson, 841 N.E.2d 889, 908 (Ill. 2005)).  He argues that, to equate the high-tech scan of a card's magnetic strip to obtain personal information with conducting a blood test or developing a film roll "ignores the realities of electronic storage and the quantity and variety of information that can be stored on such devices."  MTS Reply at 5.  He points out that "[t]he Tenth Circuit has explicitly addressed concerns with oversimplifying the connection between electronically stored information and other physical objects when applying the Fourth Amendment."  MTS Reply at 5-6 (citing United States v. Carey, 172 F.3d 1268, 1275 (10th Cir. 1999); United States v. Walser, 275 F.3d 981, 986 (10th Cir. 2001)).  Oguntoyinbo argues that

Kyllo v. United States, rather than supporting a finding that there was not an unreasonable search, supports a finding that the United States' scan of the cards here was an unreasonable search, because "an electronic repository for personal information is more akin to a virtual warehouse of private information."  MTS Reply at 6.  He asserts that, whereas the Supreme Court in Kyllo v. United States was concerned with technology breaking the barrier between a person's serious privacy interest in the contents of their home, so here, according to Oguntoyinbo, scanning the personal information contained within the cards' magnetic strips uses technology to invade otherwise very personal private information.  See MTS Reply at 6.

Oguntoyinbo argues that no exception to the general rule requiring a warrant justifies the warrantless search of the credit and debit cards, and the search is invalid.  See MTS Reply at 7.  He reasserts that the search does not fit within the search-incident-to-arrest warrant exception, because the United States cannot reasonably contend that its scan of the cards was "required to prevent the destruction of evidence."  MTS Reply at 7-9 (citing United States v. Park, 2007 WL 1521573, at **8-9 (N.D. Cal. May 23, 2007)).  Oguntoyinbo contends that neither can the scan fit into the inventory search exception, because the policy behind the inventory search is to protect against allegations of theft while the arrestee is detained.  He contends that the information contained on a card's magnetic strip is not reasonably subject to theft unless the card itself is physically stolen.  See MTS Reply at 9 (citing United States v. Park, 2007 WL 1521573, at *10).  He asserts that, whereas the United States argues that the search of the information stored on the cards need only be reasonable, this test is not the standard under Fourth Amendment.  See MTS Reply at 10.  According to Oguntoyinbo, "[t]he Supreme Court has made clear a warrantless search is presumed invalid and 'per se unreasonable under the Fourth

-23-

Amendment, unless it can be justified by one of the limited exceptions to the warrant requirement.'"  MTS Reply at 10 (quoting Katz v. United States, 389 U.S. at 356).  He contends that, because the search does not fit under one of the limited exceptions, the Court should suppress all evidence relative to the search.  See MTS Reply at 10.

Oguntoyinbo next argues that the United States failed to satisfy the inevitable discovery doctrine's requirements to allow for the evidence's admission.  See MTS Reply at 10. Oguntoyinbo contends that the United States must show that the evidence would have been lawfully discovered and that the lawful means to discover the evidence were being actively pursued before the illegal conduct occurred.  See MTS Reply at 10 (citing United States v. Souza, 223 F.3d 1197, 1199 (10th Cir. 2000)).  He asserts:

> To assist this determination, the Tenth Circuit adopted the following factors: 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause.

MTS Reply at 10 (quoting United States v. Cunningham, 413 F.3d 1199, 1203-04 (10th Cir. 2005)).  According to Oguntoyinbo, the United States' contention that, if it would have known it needed a warrant to scan the cards, it would have gotten a warrant, is inapposite.  He asserts that the United States cannot meet its burden to show inevitable discovery, because it is uncontested that the government did not seek a warrant for the information stored on the cards' magnetic strips before it searched them, and thus cannot show that it was pursuing lawful means to obtain the evidence at the time it unlawfully discovered information.  See MTS Reply at 11. Oguntoyinbo thus asserts: "The Defendant's Fourth Amendment rights were violated by the

government when it initiated a warrantless search of the Defendant's personal data stored on the magnetic strips of each of his credit/debit cards. Consequently, all evidence obtained as a result of the illegal search must be suppressed."  MTS Reply at 11.

At the hearing on the Motion to Suppress, Oguntoyinbo asserted that "[t]he Government within the standing argument gets bogged down on the fact . . . [that the magnetic strip on a credit card] only contains the information that you can see with your eyes on the front of the credit card."  Tr. at 28:16-20 (Kochersberger).  His position, he stated, "is that the . . . magnetic strip on the credit card is no different than any other form electronic storage media, and that could be your laptop computer, the computer on your desk.  That's a more complex storage media, but that is electronic . . . storage media as well."  Tr. at 28:21-29:2 (Kochersberger).  The Court asked whether it makes a difference that a person takes their credit card and hands it to a cashier for the express purpose that the cashier's machine will read the information stored on the magnetic strip, whereas people do not take their personal computers to multiple other places, and hand them to multiple other people with the expectation that those people will then read the personal information stored inside the computer.  See Tr. at 29:3-13 (Court).  Oguntoyinbo responded that he agrees with the Court that there is a difference in a person's ordinary credit card, but that if a person changes the use to which that person puts his or her credit card, and changes the information stored on the credit card to reflect something other than what the issuer originally put on the magnetic strip, and if that person no longer gives that particular card to others, that person now maintains a reasonable expectation of privacy in that particular card, just as they would a personal computer holding electronically stored information.  See Tr. at 29:14-30:4 (Oguntoyinbo).  The Court asked, while there may be people that have a credit card that

they do not use, whether it would be proper or wise to draw a constitutional line designed for that rare person carrying around a credit card for purposes other than the regular and intended use of a credit card in commerce.  See Tr. at 30:5-12 (Court).  Oguntoyinbo responded that he did not think a constitutional line should be drawn at credit cards, because the magnetic strip on the backs of credit cards is virtually identical to the magnetic strip on driver's licenses and other cards.  See Tr. at 30:13-22 (Kochersberger).  The Court asked how drawing a line that treats all credit cards as the same, regardless whether the person intended it to be personal or used it normally in the stream of commerce, is distinguished from how the Fourth Amendment draws many such lines with regard to property.  The Court noted, for example, that a person who has tinted his or her car windows, so that it is very difficult to see into the vehicle, still has the same expectation of privacy in the interior of their car as does one who drives a convertible.  See Tr. at 30:23-31:10 (Court).  Oguntoyinbo responded that, while such a rule "makes sense," drawing the line and saying that there is no reasonable expectation of privacy in the information contained in the magnetic strip on one's credit card forecloses for the future what may be a very good way to store personal information that a person may want to conceal, such as an e-mail account password, because it is a place very few people would think to look for such sensitive information.  Tr. at 31:11-32:1 (Kochersberger).  In response to the Court's inquiry what information a person could store on a magnetic strip, given its limitations, Oguntoyinbo responded that, just as the strip is able to hold a person's name, account number, expiration date, and some other alphanumeric data, a person could store their computer passwords, their social security number, or other sensitive alphanumeric information that one may need or forget.  See Tr. at 33:9-34:5 (Kochersberger).

-26-

Oguntoyinbo asserted that the storage medium is not the important issue on which to focus, but rather the law draws a distinction at the user's intention in storing the information: once a person electronically stores information on electronic storage media, that person has a reasonable expectation of privacy in that storage medium.  See Tr. at 34:15-35:7 (Kochersberger).  The Court asked whether the rule for which Oguntoyinbo is advocating makes the situation analogous to implementing a rule that, as long as a person did not store anything on his or her cellular telephone with the intention to keep it private, then it would be permissible for the government to search the telephone, but if that person intentionally stored personal information, the government could not.  See Tr. at 35:22-36:7 (Court).  Oguntoyinbo responded that is not the rule for which he is advocating.  See Tr. at 36:8-9 (Kochersberger).  He added that, whereas a person loses any privacy interest in their cellular telephone call and cellular number when they make a call, the evidence in the case establishes that he had not used any of the thirty-one cards that the United States scanned.  See Tr. at 37:6-7 (Kochersberger).  The Court asked Oguntoyinbo whether he would be making the same expectation of privacy argument if he had used one of the cards.  See Tr. at 37:8-12 (Court).  He responded that he would be making the same argument.  See Tr. at 37:13-15 (Kochersberger). He noted that, because society and the financial industry treat the information stored on cards' magnetic strips so sensitively and restrictively, there is a reasonable expectation of privacy in the information. Oguntoyinbo also noted that is not the main issue in this case, as there is no evidence that he used any of the cards that the United States scanned in this case.  See Tr. at 37:13-38:4 (Kochersberger).  The Court asked whether it would then be a breach of privacy if a cashier at the grocery store had a credit card and was able to check when swiping the card that the information in the magnetic strip

-27-

matched the information on the front of the card.  See Tr. at 39:5-13 (Court, Kochersberger).

Oguntoyinbo responded:

> I think that when you give the card to the cashier you would expect that the cashier is going to put it through some device that's going to read the information on the card, and I think insofar as your relationship with the cashier and with the merchant goes I think you're giving up that privacy to that merchant, but I think it's . . . reasonable to expect that it stops there with the with respect to the credit card transaction given all of the regulation involved with the privacy of those type of numbers.

Tr. at 39:16-24 (Kochersberger).  The Court asked whether Fourth Amendment law distinguishes between different third-parties -- whether a person can have a reasonable expectation of privacy only from the government, but not from other persons.  See Tr. at 39:25-40:11 (Court). Oguntoyinbo responded only that the Court should consider the extent of the disclosure of information, noting that there is a different expectation of privacy in a credit card in one's wallet when compared with a credit card that someone may have posted to the internet for viewing by anyone that might wish to view the information.  See Tr. at 40:12-22 (Kochersberger). Oguntoyinbo asserted that the scope of a person's disclosure of information in which the person holds a reasonable expectation of privacy is important to analyzing the scope of the expectation of privacy.  See Tr. at 40:19-41:5 (Kochersberger).

In response to the Court's question whether he had anything else to add to the standing argument, Oguntoyinbo responded that, whereas he believes the United States is arguing that a person does not have a reasonable expectation of privacy in a credit card's account number, he is arguing that a person has a reasonable expectation of privacy in electronically stored information contained on an electronic storage medium, including the magnetic strip on a card.  See Tr. at 41:15-41:24 (Kochersberger).  He added that a person's reasonable expectation of privacy does

not change if the property in which the electronic information is stored is borrowed.  See Tr. at 41:25-42:9 (Kochersberger).  He asserted that, although a credit or debit card's magnetic strip typically does not hold personal information, it can, and that it is a medium on which a person can store personal information electronically supports finding a reasonable expectation of privacy in the information stored there.  See Tr. at 42:12-17 (Kochersberger).

Alabi added that he agrees with all of the points that Oguntoyinbo raised and believes that it is important the cards had not ever been used before the police seized them.  See Tr. at 43:10-14 (Samore).  He asserted that, even if the Court finds that a person does not have a reasonable expectation of privacy in the information stored on a credit or debit card's magnetic strip, because this information is disclosed as soon as a card is used, it makes even more important that the cards in this case had never been used, as it shows that the Defendants had not disclosed the information stored on the cards.  See Tr. at 43:14-20 (Samore).

The Court asked the United States whether it saw a weakness in its argument that the Defendants lack standing to allege a Fourth Amendment violation, given that it was the third argument in its brief rather than the first.  See Tr. at 45:1-6 (Court).  The United States asserted that it does not believe that there is a weakness in its standing argument, but rather "prefer[s] that the court rule . . . [that] this was not a search at all and therefore we don't even need to get into the elements of standing under the Fourth Amendment."  Tr. at 45:7-11 (Gerson).  The United States asserted that, Oguntoyinbo, in contending that he had a reasonable expectation of privacy in the information contained in the cards' magnetic strips, conflates the two elements necessary for a reasonable expectation of privacy elements into one element.  See Tr. at 46:4-7 (Gerson).  It argued: "It may be that some criminal who [reencodes] a credit card may personally have a

subjective expectation that the criminally derived [information] that he's encoded into a card is confidential."  Tr. at 46:7-11 (Gerson).   The United States asserted that the Court should conclude that society would not recognize as reasonable an expectation of privacy of information stored in a manner that is used by and benefits only criminals.  See Tr. at 46:11-16 (Gerson).  It argued that the "whole point of having a credit card is to make use of it for financial transactions, and the only way that these credit cards get used nowadays . . . is for the card to get fed[] through a card reader for the purposes of facilitating whatever the financial transaction may be."  Tr. at 46:17-23 (Gerson).  The United States submitted that, because consumers widely use credit and debit cards, and because the information contained on the cards' magnetic strips is disclosed to the stores automatically each time they use them, society would not recognize as reasonable an expectation in such information's privacy.  See Tr. at 47:24-48:5 (Gerson).  According to the United States, the danger that a person may accidently use a card on which he or she stores his or her personal information, thus disclosing such sensitive information, shows the reality that the only people interested in changing the information contained on a card's magnetic strip are criminals who intend to use that information for fraudulent and criminal purposes.  See Tr. at 48:6-11 (Gerson).  The United States added that a card's magnetic strip is not a device that the Court should find is subject to privacy expectations, as it is, realistically, not at all similar to a USB drive, a CD-ROM, a DVD, a cellular telephone, or a laptop computer.[8]  See Tr. at 48:12-24

---

[8] USB stands for "Universal Serial Bus," which is "an industry standard developed in the mid-1990s that defines the cables, connectors and communications protocols used in a bus for connection, communication and power supply between computers and electronic devices." Universal Serial Bus, Wikipedia.org, http://en.wikipedia.org/wiki/USB (last visited Apr. 2, 2013).  A USB drive, also known as a "flash drive[]," is an electronic storage medium which implements a USB connection.  Universal Serial Bus, Wikipedia.org, http://en.wikipedia.org/

(Gerson).  Additionally, according to the United States, the rule for which Oguntoyinbo lobbies turns upside-down the law.  To create a rule that protects as private information on a credit card until it has been used, the United States argues, protects criminals only, as "[i]t would be perverse to say that the Fourth Amendment protects that kind of conduct, the reencoding of credit cards into other peoples['] account names   and other peoples['] account numbers, but that it does not protect the privacy of ordinary users of ordinary unreencoded credit cards."  Tr. at 50:2-12 (Gerson).  The United States pointed out that, in California at least, there is a law that allows police officers to read a third line of the data on California driver's licenses' magnetic strips, allowing officers to ensure that the cardholder is the same person to whom the state issued the card, and that if the Court were to adopt a rule precluding the government from reading the data on magnetic strips without a warrant, such a rule would likely invalidate that law.  See Tr. at 51:1-5 (Gerson).  The United States asserted that, if a person possesses a credit or debit card, which looks like a bank or other such financial institution issued the card, a person cannot have a reasonable expectation of privacy on the information contained on the magnetic strip, as that information, unless criminally altered, is encoded there by the issuing institution and is the same information reflected on the front of the card, in plain view when the person uses the card at the store or otherwise takes it out of his or her wallet.  See Tr. at 52:1-7 (Gerson).

---

wiki/USB (last visited Apr. 2, 2013).  A "CD-ROM" is a compact disk which contains data that computers can read, but one to which a computer cannot write, and stands for "Compact Disc Read-only memory."   CD-ROM, Wikipedia.org, http://en.wikipedia.org/wiki/Cd-rom (last visited Apr. 2, 2013).  "DVD is an optical disc storage format . . . . [which] offer[s] higher storage capacity than Compact Discs . . . ."  DVD, Wikipedia.org, http://en.wikipedia.org/wiki/DVD (last visited Apr. 2, 2013).

The Court asked whether it should draw the line at a card that appears to be issued by a financial institution, given that it has read about the ability to store medical records on a similar cards.  See Tr. at 52:8-16 (Court).  The United States responded that the card appearing to be one issued by a financial institution is a "critically important factor."  Tr. at 52:17-18 (Gerson).  It stated that, while a person has no reasonable expectation of privacy in the information contained on a credit or debit card, the Court should not foreclose the ability to maintain an expectation of privacy in the magnetic strips on all cards, as such a rule may encompass cards such as medical cards on which storage of information which society recognizes as reasonably private may prove beneficial and be widely used in the future.  See Tr. at 52:18-53:2 (Gerson).  The United States also pointed out that medical records stored on cards' magnetic strips are not accessible by the government using the Model 5607 Card Reader/Verifier, which was used in this case and is used by law enforcement generally, as it is only capable of reading information from credit and debit cards and driver's licenses.  See 53:2-11 (Gerson).

Oguntoyinbo responded that, while he agrees that the information which may be stored on the magnetic strip is limited, he disagrees that it is necessarily limited to only the same information that would be present on credit and debit cards and licenses.  See Tr. at 54:22-55:1 (Kochersberger).  He asserted that, if the cards at issue in the case were reencoded with the alphabet, for instance, there is no evidence that the Model 5607 Card Reader/Verifier would not be able to read the alphabet printed on the cards.  See Tr. at 55:1-12 (Kochersberger).  He noted that a person can reencode any number of things onto the back of these cards as long as it fits within the magnetic strip's alphanumeric and length restrictions.  See Tr. at 55:13-16 (Kochersberger).  He contends that, because this is true, credit and debit cards, as well as driver's

licenses, are thus electronic storage media, in which society recognizes as reasonable a person's expectation of privacy for information stored on such media.   See Tr. at 55:16-22 (Kochersberger).  Oguntoyinbo asserted:

> Making exceptions based on the label that's placed on the digital media is a difficult road to go down.  If I place all of my medical records on a DVD that has the little mermaid written on it, do I not have the reasonable expectation of privacy because I put the label of a major motion picture on the front of it even though it does contain my medical records?  If I've reused a flash drive that I got at a legal convention that has the name of a bank on it, is that flash drive [now] subject to any kinds of Government intrusion just because it has the name of a bank on it, or if I wrote on [a legal file] "nothing private here, go ahead, look at it . . . [?]"

Tr. at 55:23-56:8 (Kochersberger).  Oguntoyinbo argued, rather, that what is determinative for purposes whether society will recognize as reasonable an expectation of privacy in information stored on electronic storage media is whether the person to whom the information belongs gives out that private information.  See Tr. at 56:9-15 (Kochersberger).  He asserted:

> [If I] took my California driver's license and reencoded it with some private information I would no longer be using that card as my California driver's license, and if I were foolish enough to give that card to a law enforcement officer who asked to see my California's driver's license I certainly have no reasonable expectation anymore in the privacy of the information . . . .

Tr. at 56:25-57:5 (Kochersberger).

In regards to whether the scanning of the cards' information was a search, Oguntoyinbo first asserted that he adamantly disagrees with the United States' position that the cards were ever lawfully in the United States' possession.  See Tr. at 57:21-58:12 (Kochersberger).  He argued that the United States cannot prove that they searched the credit and debit cards' strips as a search incident to arrest or as an inventory search.  See Tr. at 58:13-59:4 (Kochersberger).  The Court asked whether Oguntoyinbo was now arguing that the United States did not

-33-

constitutionally come to possess the cards in the first place, noting the Court's belief was that he was contesting only the search of the cards' magnetic strips in this motion, and not the possession of the cards.  See Tr. at 59:5-14 (Court).  Oguntoyinbo responded that the Court is correct, and he is arguing only that the search of the magnetic strips was unconstitutional, but contended that how the United States possessed the cards is important, because of the difference between a hypothetical in which the government swipes a DWI-arrestee's credit cards as part of an inventory search, and the situation here, in which swiping the cards was part of the investigation into Oguntoyinbo's alleged crime.[9]  See Tr. at 62:6-12 (Kochersberger).  He argued that, regardless whether either a search incident to arrest or an inventory search would allow officers to search a person and take physical possession of credit cards, it cannot justify the second-tier search of the data contained within the cards.  See Tr. at 63:1-8 (Kochersberger).  Oguntoyinbo asserted that the United States' cases supporting its position that it can scan credit and debit cards once the cards are lawfully in the United States' possession are largely distinguishable, because, on the one hand, many were situations in which the courts determined that the second search was included in the scope of the warranted search, and, on the other hand, electronic storage media is treated differently than a physical search of the exterior of physical objects, such as clothes.  See Tr. at 63:24-67:21 (Kochersberger).

The United States responded to Oguntoyinbo's argument whether the information scan was a search by pointing out that it does not argue the scan was a search incident to arrest or that

---

[9] DWI abbreviates "driving while intoxicated," sometimes also referred to as driving under the influence ("DUI"), and is an abbreviation for the crime of driving a vehicle under the influence of alcohol or a drug that renders the person incapable of safely driving a vehicle.  See Driving Under the Influence, Wikipedia.org, http://en.wikipedia.org/wiki/DWI (last visited Apr. 12, 2013).  See also, N.M.S.A. 1978, § 66-8-102.

it was an inventory search.  See Tr. at 68:22-69:5 (Gerson, Court).  It noted that its argument is that the cards came lawfully into the United States' possession and that the scan was not a search once they were lawfully in its possession.  See Tr. at 69:5-9 (Gerson).  The Court asked how the scan of the magnetic strip is different from a hypothetical situation in which the government lawfully possesses a person's backpack, which is closed, and then unzips the bag, searches through it and finds marijuana in the bag.  See Tr. at 69:10-16 (Court).  The United States responded by contending that the card scan was similar to a government examination of a backpack's exterior, which is not a search.  See Tr. at 69:25-70:10 (Gerson).  The United States likened the card scan to a situation in which the government arrests a person on suspicion of counterfeiting money, and then later holds the money under ultraviolet light, which it contends would not constitute a search.  See Tr. at 70:16-71:3 (Gerson).  The United States asserted:

> [T]he kind of examination that was done was to put the[] [cards] through a card reading device . . . , [which] the Court shouldn't consider to be any different from holding a magnifying [glass] up to some kind of a document or object and examining the exterior of the document . . . .  It's not a separate search for Fourth Amendment purposes.

Tr. at 71:21-72:6 (Gerson).

Oguntoyinbo responded by noting that it is always a search "when you get down to the level of searching the information that is contained electronically on some storage media."  Tr. at 76:24-77:2 (Kochersberger).  He asserted: "The issue is that the new search that's being done is examining the information that was intentionally place[d] . . . on the storage medium . . . [P]hyscial examinations even aided by technology is different than searching the information that's contained."  Tr. at 77:8-16 (Kochersberger).

-35-

In regard to the United States' position that, even if it was a search, it does not violate the Fourth Amendment, because it was a reasonable one, Oguntoyinbo argued that the United States' arguments do not have a sound basis in the law.  He asserted that, to the extent that the United States relies on <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), and its progeny, those cases are inapposite to the further search of the information stored on the cards.  <u>See</u> Tr. at 78:3-13 (Kochersberger).  He stated that the United States' argument that it would present a great burden to investigators of credit card crimes if they could not scan cards without probable cause also is irrelevant for Fourth Amendment reasonableness purposes.  <u>See</u> Tr. at 78:14-25 (Kochersberger).  He asserted:

> Essentially, they're claiming that they should be allowed to use credit card scanners at will because it's a limit[ed] intrusion, but our point is that searching electronically stored information that was purposefully placed on the media is never limited, it's always a serious intrusion, and the Government should treat it as a serious intrusion, and they can't say that because what we found is routine or ubiquitous sort of business information, it's okay.  That's not the point.
>
> The point is that when you place something electronically on the media you create an expectation of privacy in that and breaching that is serious.

Tr. at 78:18-79:3 (Kochersberger).  He contended that the proper approach to take is that the consensual search in which the law enforcement officers obtained the cards was one search, and the search of the data stored in those containers, the search of the cards' magnetic strips, "is a separate search from the search and seizure of the card itself."  Tr. at 79:6-14 (Kochersberger). He asserted that the United States' approach that the scan of the cards did not constitute a search after the cards were lawfully in their possession is analogous to concluding that, once law enforcement officers lawfully obtain a person's computer, they can then search through the computer without a warrant.  <u>See</u> Tr. at 79:15-20 (Kochersberger).  According to Oguntoyinbo, the government cannot search a computer in its possession without obtaining a warrant to do so.

See Tr. at 79:21-25 (Kochersberger).  He asserted that the same reasoning would extend to the medical cards to which the Court referred earlier: once in the government's possession, the government would need a warrant to search the information inside.  See Tr. at 80:25-81:5 (Kochersberger).

The Court asked what problem is presented by drawing the constitutional line at credit and debit cards, crafting a rule that says the police do not need a warrant to swipe such commercial cards and ensure that the information on the exterior of the card, in plain view once the card is otherwise lawfully obtained by law enforcement, is contained in the magnetic strip as it should be.  See Tr. at 81:6-12 (Court).  Oguntoyinbo responded that, although courts often draw bright-line rules, such a rule for credit and debit cards "seems to be a sort of artificial distinction . . . . dealing with the appearance of the container as opposed to the content and how it was placed there."  Tr. at 81:13-18 (Kochersberger).  He noted that crafting such a rule is the same thing as saying that a person can never have a reasonable expectation in the information stored on a magnetic strip on something that appears to be a credit card.  See Tr. at 81:18-21 (Kochersberger).   The Court asked whether that rule would be effectuating the purpose underlying the reasonable-expectation-of-privacy analysis; although somewhat circular, "if a court says there's no expectation of privacy the only people that are going to put information there are going to be people engaging [in] nefarious conduct.  If the[] [court says] there is a[] reasonable [expectation of privacy] you might put [War and Peace] on there."  Tr. at 81:22-82:2 (Court).  The Court asked: "[I]f you've got three billion cards out there and three billion people are using them for commercial purposes, should you be fashioning then some sort of rule for the small group of people that want to take a commercial instrument and recode it for privacy

-37-

purposes?" Tr. at 82:6-10 (Court).  Oguntoyinbo responded that he believes such line-drawing is a narrow view of the Fourth Amendment, and that the automobile exception has presented problems and people often find "strained somewhat in the way it's gone so far . . . ."  Tr. at 82:11-16 (Kochersberger).  He noted that he does not "think drawing a line at the label or the form of the electronically stored information device is what the Court should do."  Tr. at 84:13-20 (Kochersberger).

The United States retorted that drawing a line at commercial credit and debit cards is an appropriate line, as the way in which people so frequently use the cards, and the reality that the only people who change the information stored in the magnetic strips on the back of the cards are criminals, supports such constitutional line-drawing.  To craft such a narrow distinction stops at the beginning any sort of slippery-slope or parade-of-horribles arguments that may be made, as the rule stops where it begins: at credit and debit cards that necessarily have the same information stored electronically as is in plain view on the outside of the card.  See Tr. at 84:3-10 (Gerson).  The United States argued, similarly, the limited nature of the intrusion on a person's privacy, the mere checking to see if information in the magnetic strip is the same as that on the front of the card, shows that the search is reasonable -- which is the Fourth Amendment's touchstone.  See Tr. at 85:3-15 (Gerson).  The Court asked, even if, as the United States asserts, the search was reasonable, why the government did not get a warrant to search the cards along with the cellular telephones and laptops, as it had the cards in its possession and contends that it had probable cause without the information gleaned from the cards.  See Tr. at 86:17-87:6 (Court, Gerson).  The United States stated that it could have included the cards on the search warrant, but declined to do so, because "there [is] . . . no basis in law, or at least there hasn't

been until today, that says that we need to do that and because it is . . . inconsistent with the nationwide practice of secret service and of law enforcement . . . ."  Tr. at 87:8-19 (Gerson).

In response to the United States' argument about the reasonableness of the search, Alabi responded that he believes the Court should heed the danger of a narrow-minded decision that is based on the technology only as it exists presently, and in front of the court is an issue about the practices of the United States Secret Service generally in searching these cards without a warrant, and that issue "shouldn't be decided by the limitations on the technology."  Tr. at 90:9-22 (Samore).  Oguntoyinbo responded:

> First of all, I think the Government's argument is . . . essentially if it looks like a credit card we can search the electronic information, and since it looked like a credit card it's okay for us to search it.  If that's going to be [the] exception the Court . . . fashions or the rule that the court fashions then that's the way it goes but that's really essentially what they're saying.

Tr. at 91:5-11 (Kochersberger).  He noted his surprise with the general scarcity of case law analyzing similar issues, but asserted that care should be taken when analogizing electronically stored information to information found within physical objects, such as backpacks or cars, which may lawfully come into the government's possession, because the nature of electronically stored information is fundamentally different.

With respect to whether there was probable cause for the warrant to issue without the information gleaned from scanning the credit and debit cards, Oguntoyinbo noted that he is not willing to concede that there was probable cause without the information, but that he does not believe it was analyzed fully on either side of the briefing in this motion.  See Tr. at 92:23-93:3 (Kochersberger).  He noted that it is his preference to bifurcate the issues and, if the Court concludes that the information from the cards should be suppressed, then the parties would have

a better basis on which to analyze the sufficiency of the warrant.  See Tr. at 93:9-20
(Kochersberger).  The United States contended, however, that the issue whether the warrant is
sufficient without the information taken from the cards is properly before the Court, and pointed
to its brief at pages seventeen and eighteen, where it briefed the issue.  See Tr. at 94:24-95:7
(Gerson).  It contended that the items found in the car were more than sufficient for probable
cause, noting that the affidavit provided the Court with information about the other items found
in the vehicle, including hundreds of personal identifiers for persons other than the defendants,
which included their names, social security numbers, dates of birth, and bank account numbers,
and also included information about dozens of Wal-Mart gift cards found in the trunk.  See Tr. at
95:8-16 (Gerson).

        With regard to the officers' good-faith reliance on the search warrant, Oguntoyinbo
stated: "I don't think we dispute that they needed a warrant for the credit cards, but I don't think
that that makes it good faith."  Tr. at 96:10-14 (Kochersberger).  He asserted that neither the
good-faith exception nor the inevitable-discovery doctrine exception applies, because the
government did not ever ask for a warrant to issue on the information stored on the credit cards.
See Tr. at 96:10-22 (Kochersberger).  The Court noted that the parties appear to have
approximately six arguments, and, after further noting that the Supreme Court has recently
provided district courts some liberty in deciding in which order to tackle issues in a Fourth-
Amendment analysis, the Court asked the United States whether it had a preference for the order
of the Court's analysis.  See Tr. at 97:1-9 (Court).  The United States asked that the Court
analyze whether Oguntoyinbo has standing for Fourth Amendment purposes first, and then
whether the scan was a search, but then has no preference after those issues.  See Tr. at 97:10-14

(Gerson).   The United States argued that, even if the affidavit was insufficient to support probable cause for the warrant to search the laptop computers and cellular telephones, the government's agents had no reason to believe that the warrant was insufficient.  See Tr. at 100:23-101:11 (Gerson).  With regard to inevitable discovery, the United States argued that, if there was any basis in law to think that the credit cards should have been included in the search warrant, the government would have included them.  It argued that, to exclude the credit cards as not coming under the inevitable-discovery doctrine because the Court now, as a matter of first impression, concludes that a warrant is required to scan the backs of credit and debit cards flies in the face of the purposes behind the inevitable-discovery doctrine, and the Court should thus not so conclude.  See Tr. at 101:12-102:10 (Gerson, Court).  Alabi pointed out that, taken outside the limited context of credit cards, to allow inevitable discovery to cover the acts of a government agent that searches without a warrant an electronic storage medium in the sole possession of a person, not ever used to disclose the electronically stored information on the card, would create a dangerous precedent in the context of today's fast-expanding electronic world.  See Tr. at 103:8-104:10 (Sagone).  Oguntoyinbo asserted that the United States misstates the purposes underlying the inevitable-discovery doctrine, contending instead that its purpose is not to exclude evidence that the government has probable cause to obtain, and has begun to pursue a search warrant to obtain, because the government accidentally happened to stumble upon the evidence in good faith before the search warrant could issue.  See Tr. at 104:23-105:5 (Kochersberger).  The Court noted that it used to agree with Oguntoyinbo's characterization of the inevitable-discovery doctrine's purpose, but has recently seen case law in which higher

courts are seemingly more generous to the government in applying the doctrine, construing it almost as a proximate-cause analysis.  See Tr. at 105:6-15 (Court, Kochersberger).

The Court then asked, were the Court to articulate a rule that, if the medium is a card which appears to be a credit and debit card that a financial institution has issued, then there is no reasonable expectation of privacy, whether the United States still would argue that it was not a search, because such a rule would appear to implicitly recognize it is a search, as the government faced with a card labeled "medical information" would not then be able to scan the information from such a card without a warrant.  Tr. at 97:18-98:10 (Court, Gerson).  The United States responded:

> Yes, I guess that's right.  I guess that's what I'm saying.  I'm saying that if the card appears to be a bank credit or [debit] card and if all the guest is . . . doing is passing it through a card reader that is designed for no purpose other than account information and account bearer name, that that's not a Fourth Amendment search, but that if it was a card for carrying medical records or a piece of blank card stock and we didn't know what we were going to find on it because it was blank, that that would be a search.

Tr. at 98:11-20 (Gerson).

On February 27, 2013, Alabi filed his Unopposed Motion to Join in Defendant Oguntoyindo's [sic] Motion to Suppress, which the Court granted on March 4, 2013.  See Agreed order to Join in Defendant Oguntoyindo's [sic] Motion to Suppress at 1.  On March 8, 2013, Oguntoyinbo filed Defendant Kehinde Oguntoyinbo's Supplemental Brief in Support of Motion to Suppress.  See Doc. 112 ("MTS Supp.").  Oguntoyinbo argues that the inadmissible evidence that the United States obtained in scanning the backs of his credit and debit cards cannot be admitted under the inevitable-discovery doctrine, because "there is simply no evidence that an independent investigation, unrelated to the illegal search, would have led to the lawful

discovery of the evidence."  MTS Supp. at 1.  He asserts that "[t]he illegal search of Mr. Oguntoyinbo's credit cards tainted the only ongoing investigation of the Defendant; therefore the inevitable discovery exception cannot apply."  MTS Supp. at 3.  He contends that a prerequisite for the inevitable-discovery doctrine's application is the existence of an investigation independent of the investigation in which the evidence was seized unconstitutionally.  See MTS Supp. at 3-4.  He asserts that the credit and debit card information should thus be excluded as the only investigation ongoing at the time was the one that the arresting officers conducted, in which they obtained the cards, and their failure to get a search warrant for the cards irrevocably taints the evidence derived from the unlawful search of the electronically stored information in the cards.  See MTS Supp. at 5.

Oguntoyinbo points out that the Tenth Circuit has stated that it is "very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists."  MTS Supp. at 5-6 (quoting United States v. Souza, 223 F.3d 1197, 1206 (10th Cir. 2000)).  He asserts that the Tenth Circuit, in United States v. Souza, set forth the following four-factor test to guide courts in determining whether a warrant would have been issued that would have inevitably led to the discovery of the evidence in question:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

MTS Supp. at 6 (quoting United States v. Souza, 223 F.3d at 1204).  Oguntoyinbo argues that, under this analysis, the United State cannot meet its burden to demonstrate that it possessed the overwhelming or extremely strong probable cause that would have made obtaining a warrant a certainty.  See MTS Supp. at 8.  He asserts that the United States' "sole argument for the application of the inevitable discovery exception is[,] had it known a warrant was required, it would have got one.  The Government's logic is flawed."  MTS Supp. at 8.  He contends that the flaw in the argument is that the United States, even with the information obtained from the consensual search of the vehicle, had no basis on which to assert that probable cause existed to scan the credit and debit cards in Oguntoyinbo's or Alabi's names.  See MTS Supp. at 8.  According to Oguntoyinbo, because there is insufficient probable cause for a warrant to issue on these cards, all information obtained from the cards is inadmissible under the exclusionary rule, as the inevitable discovery doctrine cannot apply.  See MTS Supp. at 9-10.

On March 13, 2013, the United States filed the Government's Supplemental Memorandum in Opposition to Defendant Oguntoyinbo's Motion to Suppress.  See Doc. 114 ("Supp. Resp.").  The United States asserts that "[t]he Tenth Circuit has held that the independent, lawful police investigation does not have to be ongoing at the time of the unlawful search for the inevitable discovery doctrine to apply."  Supp. Resp. at 3 (citing United States v. Larsen, 127 F.3d 984, 987 (10th Cir. 1997).  It contends that "[t]he Tenth Circuit has held expressly that 'it is possible for an investigation that begins after the violation to be independent of the illegal investigation.'"  Supp. Resp. at 3 (quoting United States v. Larsen, 127 F.3d at 987).  The United States argues that three of the four factors in United States v. Souza to which Oguntoyinbo cites support the inevitable-discovery doctrine's application to this case.  See Supp.

Resp. at 4.  It asserts that the extent to which the warrant process had been completed at the time

is the only factor not weighing heavily in favor of the exception's application in the case,

although it should, because the only reason the agents read the magnetic strips before applying

for the warrant was that they did not believe they needed a warrant under the law, and because

the agents applied for the warrant the next day.  See Supp. Resp. at 5.  The United States also

contends that the strength of the probable cause at the time supports applying the inevitable-

discovery doctrine to the case, because the United States had probable cause without the

information gleaned from the cards, and would have included the cards on the warrant if it knew

the law so required.  See Supp. Resp. at 5-7.  The third factor that the United States contends

weighs in its favor on the inevitable discovery application is whether a warrant was ultimately

obtained, as a warrant was obtained here and, in light of the substantial evidence of identity theft

found in the vehicle independent of the information on the cards' magnetic strips, the warrant

would have issued without the cards' information.  See Supp. Resp. at 7-8.  According to the

United States, the factor analyzing whether police jumped the gun, because they lacked probable

cause, also weighs heavily in favor of applying the inevitable-discovery doctrine, as the United

States had sufficient probable cause for the warrant to issue independent of the evidence found in

the magnetic strips.  See Supp. Resp. at 8-9.  The United States thus asks the Court to conclude

that the inevitable-discovery doctrine applies to information found on the credit cards if the

Court finds that the original scan violated the Fourth Amendment.

### RELEVANT LAW REGARDING FOURTH-AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons,

houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. at 357 (footnotes omitted).

1. ***United States v. Jones*.**

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task

force obtained a warrant authorizing installation, within ten days, of a Global Positioning System device in Washington, D.C.  See 132 S. Ct. at 948.  On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland.  The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device.  See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice for the Supreme Court, writing for the majority, in which Chief Justice Roberts, and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'"  United States v. Jones, 132 S. Ct. at 949.  Justice Scalia reasoned that the government's conduct was a Fourth Amendment search, because the government trespassed on a constitutionally protected area.  See United States v. Jones, 132 S. Ct. at 949 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.'  It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment.")(citing United States v. Chadwick, 433 U.S. 1, 12 (1977)).  Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."  United States v. Jones, 132 S. Ct. at 949.  Justice Scalia  reconciled the Supreme Court's conclusion that attaching a GPS device to

track a jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S.

106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a

vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we

suggested that this [physical invasion] would make a difference, for we concluded that an

officer's momentary reaching into the interior of a vehicle did constitute a search."  United States

v. Jones, 132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property-law

based approach to determine whether there was a search, but did not shy away from the fact that,

in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .  Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

United States v. Jones, 132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v.

United States reasonable-expectation-of-privacy approach -- "no search occurred here, since

Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the

Government agents (its underbody) and in the locations of the jeep on the public roads, which

were visible to all."  United States v. Jones, 132 S. Ct. at 950.  Justice Scalia concluded,

however, that the Supreme Court "need not address the Government's contentions" in relation to

the Katz v. United States reasonable-expectation-of-privacy test analysis.   132 S. Ct. at 950.

Justice Scalia explained that the Supreme Court need not address those contentions, because the

trespass-based search approach, which existed at the time of the Fourth Amendment's adoption,

disposes of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation. At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Kyllo[ v. United States, 533 U.S. at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates. Katz did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded."   Alderman v. United States, 394 U.S. [at] 176 . . . .   "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ."  Id., at 180.

United States v. Jones, 132 S. Ct. at 950-51 (internal footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the

majority's opinion reflects an irreducible constitutional minimum: When the Government

physically invades personal property to gather information, a search occurs. The reaffirmation of

that principle suffices to decide this case."  United States v. Jones, 132 S. Ct. at 955 (Sotomayor,

J., concurring).  She continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . . Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society

recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740–741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

United States v. Jones, 132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But '[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis.'"

132 S. Ct. at 955 (Sotomayor, J., concurring)(quoting the majority opinion, 132 S. Ct. at 953).

The Honorable Samuel A. Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although they agree with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS) device to monitor a vehicle's movements for an extended period of time.  Ironically, the Court has chosen to decide this case based on 18th-century tort law. By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.  And for this reason, the Court concludes, the installation and use of the GPS device constituted a search.  Ante, at 948-949.

> This holding, in my judgment, is unwise.  It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

> I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

United States v. Jones, 132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first takes issue with the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."  132 S. Ct. at 958.  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search."  132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood comprehended any technical trespass that led to the gathering of evidence," but noted his disagreement, stating: "[W]e know this is incorrect."  132 S. Ct at 958.  Justice Alito pointed out that the open-fields doctrine grew out the distinction between a physical intrusion of property:  "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  United States v. Jones, 132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority uses was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with cases involving wiretapping and eavesdropping surveillance cases.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespassed-based" decision that the trespass committed when the government trespassed on the defendant's effects by attaching the GPS devise to the jeep constituted a Fourth Amendment search.  132 S. Ct. at 960-61.

Justice Alito pointed to multiple problems which he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the government's conduct that he contends society would find offensive the GPS-monitoring, rather than the attachment of the device.  If the government could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and by deciding whether there was a trespass, the Fourth Amendment coverage "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

2.      *Florida v. Jardines*.

In Florida v. Jardines, Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate surroundings" is a search for Fourth Amendment purposes.  133 S. Ct. at 1417-18.  Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in Florida v. Jardines.  Justice Kagan filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy'

twice over," but noting: "I join the Court's opinion in full."   133 S. Ct. at 1420 (Kagan, J., concurring).   Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In <u>Florida v. Jardines</u>, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.   Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a canine trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.   As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point." 133 S. Ct. at 1413.   The dog's handler then immediately left the porch, and told the other agents and officers at the scene that the dog had alerted to drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.   Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.   <u>See</u> 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

Florida v. Jardines, 133 S. Ct. at 1414.  The Supreme Court noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text."  133 S. Ct. at 1414.

The Supreme Court held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15.  The Supreme Court then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S.[ 207,] 213 [(1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas.  In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner." Id. Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886), states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

Florida v. Jardines, 133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave,"

he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that." 133 S. Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.   Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the Katz test] when the government gains evidence by physically intruding on constitutionally protected areas."  133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 951-52).  Because the

-55-

Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider the conduct amounts to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

Florida v. Jardines, 133 S. Ct. at 1417.

The Honorable Elena Kagan, Associate Justice for the Supreme Court, wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests." Florida v. Jardines, 133 S. Ct. at 1418 (Kagan, J., concurring). Justice Kagan analogized the government's conduct in using a drug-sniffing door on Jardines' porch to a stranger coming to your front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one." 133 S. Ct. at 1418 (Kagan, J., concurring). This conduct, she posited, is a trespass which exceeds any implied license, is also an invasion of reasonable expectations of privacy, and "is this case [Florida v. Jardines] in every way that matters. Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted. The equipment they used was animal, not mineral [which is of no significance]." 133 S. Ct. at 1418 (Kagan, J., concurring). According to Justice Kagan, had she written the majority opinion based on the Katz v. United States

reasonable-expectations-of-privacy search test:

> A decision along those lines would have looked . . . well, much like this one. It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Ante, at 1414 (quoting Silverman v. United States, 365 U.S. 505, 511 . . . (1961)). It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity." Ante, at 1414. It would have explained that "'privacy expectations are most heightened'" in the home and the surrounding area. Ante, at 1414-15 (quoting California v. Ciraolo, 476 U.S. [at] 213 . . . ). And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there. See ante, at 1415-16, and n. 2-3.

Florida v. Jardines, 133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito, joined in his opinion by Chief Justice Roberts, and Justices Kennedy and Breyer, dissented. He submitted that "[t]he Court's decision in this important Fourth Amendment case is based on a putative rule of trespass law that is nowhere to be found in the annals of Anglo-American jurisprudence." Florida v. Jardines, 133 S. Ct. at 1420 (Alito, J., dissenting). Justice Alito noted that general trespass law permits a license to public members to use a walkway to approach a house's door, including strangers such as mailmen and solicitors, and the majority's conclusion that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law. 133 S. Ct. at 1420-21 (Alito, J., dissenting). Justice Alito also asserted that decision is inconsistent with the Katz v. United States' reasonable-expectations-of-privacy test:

> A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human.

Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass, . . . is unfounded." 133 S. Ct. at 1421 (Alito, J., dissenting). Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. See 133 S. Ct. at 1421-22 (Alito, J., dissenting). He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor. 133 S. Ct. at 1423 (Alito, J., dissenting). Justice Alito pointed out that the implied license also applies to law enforcement, and cites to Kentucky v. King, 131 S. Ct. 1849 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "knock and talk" is not a Fourth Amendment search. Florida v. Jardines, 133 S. Ct. at 1423 (Alito J., concurring). Given that "Detective Bartelt did not exceed the scope of the license to approach respondent's front door," Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the 'objectiv[e] . . . purpose to conduct a search.'" 133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original). According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash. On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.

The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog."  But where is the support in the law of trespass for this proposition? Dogs' keen sense of smell has been used in law enforcement for centuries. The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors." If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years. But the Court has found none.

Florida v. Jardines, 133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).   Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today. While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit."  133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see Illinois v. Caballes, . . . and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

Florida v. Jardines, 133 S. Ct. at 1424 (Alito, J., dissenting).   Justice Kagan asserted that Detective Bartelt's use of Franky the drug-sniffing dog was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.   Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device. The very argument now advanced by the concurrence appears

in Justice Souter's <u>Caballes</u> dissent.  But the Court was not persuaded." <u>Florida v. Jardines</u>, 133

S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing <u>Illinois v. Caballes</u>, 543

U.S. at 409-410 and 413 n.3).  Justice Alito contended that "<u>Kyllo</u> is best understood as a

decision about the use of new technology. . . . A dog, however, is not a new form of 'technology'

or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back

many centuries." 133 S. Ct. at 1425 (Alito, J., dissenting).  Justice Alito therefore concluded that

the government's conduct in <u>Florida v. Jardines</u> "did not constitute a trespass and did not violate

respondent's reasonable expectations of privacy. I would hold that this conduct was not a search,

and I therefore respectfully dissent." 133 S. Ct. at 1426.

    3.    **Standing.**

    The Tenth Circuit refers to the test whether a particular search implicates a defendant's

Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy

expectation -- as one of "standing." <u>E.g.</u> <u>United States v. Creighton</u>, 639 F.3d 1281, 1286 (10th

Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a

subjective expectation of privacy in the [item searched] that society is prepared to recognize as

reasonable."); <u>United States v. Poe</u>, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising

a Fourth Amendment challenge must first demonstrate that he has standing to object to the

search.")(citing <u>United States v. Rubio-Rivera</u>, 917 F.2d 1271, 1274 (10th Cir. 1990)); <u>United</u>

<u>States v. Shareef</u>, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge

a search only if he or she ha[d] a reasonable expectation of privacy in the area being searched.").

Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one

of standing.  <u>See, e.g.</u>, <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("Standing requires the

defendant to show 'that he had a subjective expectation of privacy in the premises searched and

that society is prepared to recognize that expectation as reasonable.'")(quoting United States v.

Poe, 556 F.3d at 1121).  The Supreme Court's decisions in United States v. Jones and Florida v.

Jardines, however, suggest that this test has now expressly been designated a substantive Fourth

Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a

distinct analysis under the rubric entitled standing.

    In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the

inquiry whether a search implicates a defendant's personal Fourth Amendment interests as

standing, "rather than simply recognizing it as one involving the substantive question of whether

or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed

by the search and seizure which he seeks to challenge."  439 U.S. at 425.  Dispensing with this

label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those
> whose own Fourth Amendment rights were violated by a challenged search and
> seizure to suppress evidence obtained in the course of such police activity, it
> would be appropriate to retain Jones' use of standing in Fourth Amendment
> analysis.   Under petitioners' target theory, a court could determine that a
> defendant had standing to invoke the exclusionary rule without having to inquire
> into the substantive question of whether the challenged search or seizure violated
> the Fourth Amendment rights of that particular defendant.   However, having
> rejected petitioners' target theory and reaffirmed the principle that the "rights
> assured by the Fourth Amendment are personal rights, [which] . . . may be
> enforced by exclusion of evidence only at the instance of one whose own
> protection was infringed by the search and seizure," Simmons v. United States,
> 390 U.S. at 389 . . . , the question necessarily arises whether it serves any useful
> analytical purpose to consider this principle a matter of standing, distinct from the
> merits of a defendant's Fourth Amendment claim.   We can think of no decided
> cases of this Court that would have come out differently had we concluded, as we
> do now, that the type of standing requirement discussed in Jones and reaffirmed
> today is more properly subsumed under substantive Fourth Amendment doctrine.
> Rigorous application of the principle that the rights secured by this Amendment

are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

Rakas v. Illinois, 439 U.S. at 138-39. The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40. In Minnesota v. Carter, the Supreme Court recognized that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140, 99 421.

Minnesota v. Carter, 525 U.S. at 87-88. As the Supreme Court notes that "[t]he inquiry under either [the substantive application of the principle that the rights secured by this Amendment are personal, in place of a separate notion of "standing,"] is the same," Rakas v. Illinois, 439 U.S. at 139, that the Katz v. United States reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test, is in line with

the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine." Rakas v. Illinois, 439 U.S. at 139.

### 4.    Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information. See United States v. Jones, 132 S. Ct. at 947 ("[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (emphasis omitted))(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

### a.    Trespass-Based Analysis.

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones,

132 S. Ct. at 951 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . . But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 133 S. Ct. at 1414 (2013).

### b.   The *Katz v. United States* Reasonable-Expectations-of-Privacy Search Test Remains Good Law.

With Justice Scalia penning both the majority opinion in Florida v. Jardines and United States v. Jones, the question arises whether the Katz v. United States reasonable-expectation-of-privacy test is still good law. Justice Scalia has consistently been critical of this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the Katz test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in Katz . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'"

bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable.  When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment.  That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'"  Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[10]  In both of these recent decisions, however, Justice Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis.  Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  See <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment" (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  It is also uncertain whether the Supreme Court majority would go as far as to replace the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis with the trespass-based approach.  See <u>United States v. Jones</u>, 132 S. Ct. at 953 ("Situations involving merely the transmission of electronic signals without trespass would <u>remain</u> subject to <u>Katz</u> analysis.").

In <u>Jones v. United States</u>, Justice Alito, concurring in the judgment, joined by Justices

---

[10] The Honorable Clarence Thomas, Associate Justice for the Supreme Court, was the only other Justice to join Justice Scalia in his <u>Minnesota v. Carter</u> concurrence.

Ginsberg, Breyer, and Kagan, disagreed with the majority's revival of the trespass-based approach to determine whether there was a Fourth Amendment search, writing that he "would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove."  132 S. Ct. at 958 (Alito, J., concurring).  Although Justice Sotomayor in Jones v. United States disagreed with Justice Alito's opinion that the trespass-based approach has been repudiated, noting that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum," she supports continued application of the Katz v. United States reasonable-expectation-of-privacy approach as an appropriate analysis: "In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance."  132 S. Ct. at 955 (Sotomayor, J., concurring).

In Florida v. Jardines, Justice Kagan, in her concurring opinion, in which Justices Ginsburg and Sotomayor joined, agreed that the use of the drug sniffing dog at the doorstep was a Fourth Amendment search, but wrote separately to note that she "could just as happily have decided it by looking to Jardines' privacy interests."  Florida v. Jardines,133 S. Ct. at 1418 (Kagan, J., concurring).  Justice Alito, in his dissent in which Chief Justice Roberts, and Justices Kennedy and Breyer joined, did not take a position in relation to whether one approach or the other, or both, is correct, concluding that the officer's conduct is constitutional under both analyses: "The conduct of the police officer in this case did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct was not a search, and I therefore respectfully dissent."  133 S. Ct. at 1426 (Alito, J., dissenting).  It thus

appears that, as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the Katz v. United States reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach, to determine whether the conduct amounts to a Fourth Amendment search.

c.    <strong><em>Katz v. United States</em> Reasonable-Expectations-of-Privacy Analysis.</strong>

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).   "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."   United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966).[11]   The Tenth Circuit has thus noted that "[a]n illegal search or seizure only harms those

---

[11] The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).   In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.   The petitioner has strenuously argued that

with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests depends on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable."  Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012).

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United

---

the booth was a "constitutionally protected area."  The Government has maintained with equal vigor that it was not.  But this effort to decide whether or not a given 'area,' viewed in the abstract, is 'constitutionally protected' deflects attention from the problem presented by this case.  For the Fourth Amendment protects people, not places.  What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.  See Lewis v. United States, 385 U.S. 206, 210; United States v. Lee, 274 U.S. 559, 563 . . . (1927).  But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.  See Rios v. United States, 364 U.S. 253 . . . ; Ex parte Jackson, 96 U.S. 727, 733 . . . .

Katz v. United States, 389 U.S. at 351-52.  The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches.  In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'"  133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).  See United States v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . . Katz did not narrow the Fourth Amendment's scope.'").  The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area," Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than

determining whether law enforcement conduct was a search, it sometimes proves easier to

"assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse
> the principle first enunciated in Katz v. United States.  Katz involved
> eavesdropping by means of an electronic listening device placed on the outside of
> a telephone booth -- a location not within the catalog ("persons, houses, papers,
> and effects") that the Fourth Amendment protects against unreasonable searches.
> We held that the Fourth Amendment nonetheless protected Katz from the
> warrantless eavesdropping because he "justifiably relied" upon the privacy of the
> telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a
> Fourth Amendment search occurs when the government violates a subjective
> expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v.

United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately

stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A

Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "a Fourth

Amendment search does not occur . . . unless 'the individual manifested a subjective expectation

of privacy in the object of the challenged search,' and 'society [is] willing to recognize that

expectation as reasonable.'"  Kyllo v. United States, 533 U.S. at 33 (emphasis in

original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source

outside of the Fourth Amendment, either by reference to concepts of real or personal property

law or to understandings that are recognized and permitted by society.'"  United States v. Jones,

132 S. Ct. at 951.  See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a

reasonable expectation of privacy exists, courts consider concepts of real or personal property

law . . . .").  In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."  Rakas v. Illinois, 439 U.S. at 143 & n.12.  While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."  United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

#### i.    Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to

protect.  In <u>Smith v. Maryland</u>, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which <u>Katz</u>' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in <u>Jones v. United States</u>, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.[12]  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and

---

[12] URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource."   <u>Uniform Resource Locator</u>,   Wikipedia.org,   http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

perhaps not. I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).

### ii.    Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d at 838 (United States v. Allen, 235 F.3d at 489). The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects. See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83). This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the

majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, supra, §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand

grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable

expectation of privacy in the contents of his or her luggage, the Supreme Court held that the

dog's sniff test was not a Fourth Amendment search, and emphasized the unique nature of the

investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of
> personal luggage that is protected by the Fourth Amendment.  A "canine sniff" by
> a well-trained narcotics detection dog, however, does not require opening the
> luggage.  It does not expose noncontraband items that otherwise would remain
> hidden from public view, as does, for example, an officer's rummaging through
> the contents of the luggage.  Thus, the manner in which information is obtained
> through this investigative technique is much less intrusive than a typical search.
> Moreover, the sniff discloses only the presence or absence of narcotics, a
> contraband item.  Thus, despite the fact that the sniff tells the authorities
> something about the contents of the luggage, the information obtained is limited.
> This limited disclosure also ensures that the owner of the property is not subjected
> to the embarrassment and inconvenience entailed in less discriminate and more
> intrusive investigative methods.
>
> In these respects, the canine sniff is *sui generis*.  We are aware of no other
> investigative procedure that is so limited both in the manner in which the
> information is obtained and in the content of the information revealed by the
> procedure. Therefore, we conclude that the particular course of investigation that
> the agents intended to pursue here - exposure of respondent's luggage, which was
> located in a public place, to a trained canine - did not constitute a "search" within
> the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical

field test of a white powdery substance to reveal that the substance was cocaine.  See 466 U.S. at

122-24.  A Federal Express employee and supervisor had opened a damaged package, and

exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466

U.S. at 111.  They then called the DEA and repacked the contents in the original packaging

before they provided the package to the DEA officers.  See 466 U.S. at 111.  When the agents

arrived, the agents removed the exposed plastic bags from the broken package, opened each of

the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466

U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and

the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether

the additional intrusion occasioned by the field test, which had not been conducted by the

Federal Express agents and therefore exceeded the scope of the private search, was an unlawful

'search' or 'seizure' within the meaning of the Fourth Amendment." United States v. Jacobsen,

466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional

digital scan of the white substance was not a Fourth Amendment search, because the test

discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a

result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

. . . .

Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[13]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the line of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"   543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable,'"   543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).  The

---

[13] The Honorable John Paul Stevens, former Associate Justice for the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

Supreme Court in <u>Illinois v. Caballes</u> noted that its decision was consistent with <u>Kyllo v. United States</u>, as the thermal imaging device in <u>Kyllo v. United States</u> could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. <u>Kyllo v. United States</u>, 533 U.S. 27 . . . .   Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." <u>Id.</u>, at 38 . . . .   The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

<u>Illinois v. Caballes</u>, 543 U.S. at 409-10.

   **5.    <u>Reasonable Government Searches</u>.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable.  <u>Kentucky v. King</u>, 131 S. Ct. at 1856 (quoting <u>Brigham City v. Stuart</u>, 547 U.S. 398, 403 (2006)).   <u>See</u> <u>Samson v. California</u>, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting <u>United States v. Knights</u>, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable."  <u>United States v. Knights</u>, 534 U.S. at 121 (citing, as

an e.g. cite, Terry v. Ohio, 392 U.S. 1 (1968)).  This balancing test has been justified by the

Supreme Court's recognition that "[t]he Fourth Amendment does not protect all subjective

expectations of privacy, but only those that society recognizes as 'legitimate.'"  Vernonia Sch.

Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338

(1985)).

    "Whether a search is reasonable 'is determined by assessing, on the one hand, the degree

to which it intrudes upon an individual's privacy and, on the other, the degree to which it is

needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S.

at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d

1178, 1184 (10th Cir. 2007)("[T]he totality-of-the-circumstances test [i]s one where 'the

reasonableness of a search is determined by assessing, on the one hand, the degree to which it

intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the

promotion of legitimate governmental interests.").

> As the text of the Fourth Amendment indicates, the ultimate measure of the
> constitutionality of a governmental search is "reasonableness."  At least in a case .
> . . where there was no clear practice, either approving or disapproving the type of
> search at issue, at the time the constitutional provision was enacted, whether a
> particular search meets the reasonableness standard "'is judged by balancing its
> intrusion on the individual's Fourth Amendment interests against its promotion of
> legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor

Executives' Ass'n, 489 U.S. 602, 617 (1989)).  The Supreme Court has held that the test of

reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of
> precise definition or mechanical application.  In each case [determining
> reasonableness] requires a balancing of the need for the particular search against

the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.  See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure. This is so in light of an inmate's diminished privacy rights . . . .").

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."   Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J.,

concurring)(quoting <u>Georgia v. Randolph</u>, 547 U.S. 103, 111 (2006)).  Similarly, in <u>Vernonia Sch. Dist. 47J v. Acton</u>, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

6.      **Consensual Searches**.

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  <u>See</u> <u>Schneckloth v. Bustamonte</u>, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  <u>United States v. Peña</u>, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 219).  The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  <u>United States v. Sanchez</u>, 608 F.3d 685, 690 (10th Cir. 2010)(quoting <u>United States v. Taverna</u>, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  <u>See</u> <u>United States v. Peña</u>, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

(i) the threatening presence of several officers; (ii) the use of aggressive language

or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active

brandishing of the weapon." United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

### 7.    Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.

Probable Cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant "is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S.213, 238 (1983)).  See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein).  In making his or her determination, the

magistrate judge "may draw reasonable inferences from the material provided in the warrant application."  United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause."  United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed."  Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the Fourth Amendment's strong preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

The deference accorded a magistrate judge's probable cause determination, however, is not boundless.  See United States v. Leon, 468 U.S. 897, 914 (1984).  The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause.  See United States v. Danhauer, 229 F.3d at 1006.  Specifically, the court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances."  United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at

239).

8.      **The Particularity Requirement for Search Warrants.**

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible."  Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971).  The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized."  Cassady v. Goering, 567 F.3d 628, 635 (10th Cir. 2009)(quoting United States v. Leary, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  See Voss v. Bergsgaard, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); United States v. Janus Indus., 48 F.3d 1548, 1553 (10th Cir. 1995)("As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.")(quoting Stanford v. Texas, 379 U.S. 476, 485 (1965)).   "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized." United States v. Janus Indus., 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In Cassady v. Goering, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the

search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting Voss v. Bergsgaard, 774 F.2d at 405).

The Tenth Circuit has previously applied a blanket suppression where officers conducted a general search for evidence of crimes not specifically listed in the warrant.  See Cassady v. Goering, 567 F.3d at 643; United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996); United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988).

## RELEVANT LAW REGARDING THE EXLUSIONARY RULE

When evidence is obtained in violation of a person's Fourth or Fifth Amendment rights, the government will generally be prohibited from using that evidence in a criminal prosecution of that person.   See Sanchez-Llamas v. Oregon, 548 U.S. 331, 332-33 (2006)("[T]he exclusionary rule has been used primarily to deter certain Fourth and Fifth Amendment violations, including, e.g., unconstitutional searches and seizures, and confessions exacted in violation of the right against compelled self-incrimination or due process.")(internal citations omitted); United States v. Calandra, 414 U.S. 338, 347 (1974) ("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  The exclusionary rule will apply if the defendant can show, by a preponderance of the evidence, a constitutional violation under the Fourth Amendment, and a causal nexus between the violation and the evidence sought to be excluded.

See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the government to prove that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.  There are a number of exceptions to the exclusionary rule.

### 1.      The Inevitable-Discovery Doctrine.

If illegally obtained evidence is somehow purged of the taint of the unconstitutional conduct, it can be admitted.  "The Government can establish that a particular item of evidence has been purged of the primary taint by demonstrating that the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." United States v. Olvares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006).  See United States v. Torres-Castro, 470 F.3d at 999 ("[T]he government may avoid suppression by demonstrating that the evidence would have been inevitably discovered, that it was discovered by independent means, or that it was so attenuated from the illegality as to dissipate any taint from the Fourth Amendment violation.").

"The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted 'if an independent, lawful police investigation inevitably would have discovered it.'"  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005)(internal citations omitted)(quoting United States v. Owens, 782 F.2d 146, 152 (10th Cir. 1986)).  See United States v. Torres-Castro, 470 F.3d at 999. "Inevitable discovery analysis thus requires the court to examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered

-86-

legally and to assess the probability of the contingencies having occurred."  United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005).  The inevitable-discovery doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct"; "it is possible for an investigation that begins after the violation to be independent of the illegal investigation."  United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997).  See United States v. Cunningham, 413 F.3d at 1204 n.1 (stating that there is no conflict between the rules set forth in United States v. Larsen and United States v. Cunningham).  "[A]s long as it can be shown by demonstrated historical facts that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible."  United States v. Griffin, 48 F.3d at 1151 (internal citations and quotations omitted).  The Tenth Circuit adopted a four-part test in United States v. Cunningham to aid district courts in determining whether the evidence would inevitably have been discovered:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

United States v. Cunningham, 413 F.3d at 1203-04.

The Tenth Circuit in United States v. Souza referred to "steps taken to obtain a warrant prior to the unlawful search" as a "prerequisite to a consideration of the inevitable discovery exception."  223 F.3d at 1205.  The Tenth Circuit later, however, recognized that the statement is incompatible with its holding in United States v. Larson -- that the doctrine "applies whenever an

independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct," United States v. Larsen, 127 F.3d at 986-87 -- and noted that this statement in United States v. Souza was dicta:

> [W]e have, in a case post-dating Larsen, referred to "steps taken to obtain a warrant prior to the unlawful search" as "prerequisite" to application of the inevitable discovery doctrine. Souza, 223 F.3d at 1205. The 'prerequisite' description, however, constitutes dicta -- and probably inadvertent dicta at that -- in an opinion that, in another part, explicitly acknowledges, without challenging, the holding of Larsen. See id. at 1203 n.7 ("Larsen focused solely on whether the inevitable discovery rule requires proof of a separate investigation ongoing at the time of the constitutional violation.").

United States v. Sanders, 43 F. App'x 249, 254 n.2 (10th Cir. 2002)(unpublished).  Accordingly, the Court concludes that officers having already taken steps to acquire a warrant for the particular evidence sought to be admitted under the inevitable-discovery doctrine is not a prerequisite for the evidence's admission.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway."  782 F.2d at 152-53.  The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine.  Rejecting the government's position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit found:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine.  First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers.  In fact, such an intrusion would have been a

significant invasion of his privacy.  Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it.  Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

United States v. Owens, 782 F.2d at 153.  "United States v. Owens suggests that courts should be realistic, if not skeptical, when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation." United States v. Martinez, 686 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning, J.), aff'd, 643 F.3d 1292 (10th Cir. 2011).

        2.      **The Independent-Source Doctrine.**

        If the information found during an "unconstitutional search[] . . . [is] used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to [the] warrant would be inadmissible as fruit of the poisonous tree."  United States v. Hatfield, 333 F.3d 1189, 1194 (10th Cir. 2003)(citing Murray v. United States, 487 U.S. 533, 542-44 (1988)). When determining whether evidence is fruit of the poisonous tree, a court is to consider whether the evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Segura v. United States, 468 U.S. 796, 804-05 (1984)(internal quotations omitted)(alteration in original).  Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree.  See Segura v. United States, 468 U.S. at 799 (citing

-89-

Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)).  Evidence therefore need not be excluded under the fruits-of-the-poisonous-tree doctrine if there is an independent source for discovery of the challenged evidence.   See Segura v. United States, 468 U.S.at 805.   Two Supreme Court cases have considered the operation of the independent-source doctrine in situations where a search warrant is obtained subsequent to an unlawful search.

In Segura v. United States, police unlawfully entered an apartment and spotted drug-trafficking paraphernalia in plain view.  See 468 U.S. at 801.  A warrant was later obtained, based upon information that the police had known before the entry and executed at the apartment.  In the meantime, police stayed in the apartment to preserve the scene.  Pursuant to the warrant, they later seized the paraphernalia, as well as cocaine, cash, ammunition, and records of drug transactions, none of which had been observed during the unlawful search. See Segura v. United States, 468 U.S. at 801. Before the Supreme Court was the question whether the evidence that was not in plain view during the unlawful entry should be suppressed. See 468 U.S. at 802 n. 4.

The Supreme Court held that, because the warrant was based on information obtained before the search, the evidence seized was from an independent source and was not fruit of the poisonous tree.   See 468 U.S. at 813-14.   Thus, whether the entry and occupation of the apartment was unlawful was "irrelevant to the admissibility of the challenged evidence," because of the independent source.  Segura v. United States, 468 U.S. at 813.  Finding any connection between the unlawful entry and the seizure under the warrant to be sufficiently attenuated, the Supreme Court rejected the argument that the police occupation led to the seizure, because the evidence might otherwise have been destroyed.  See 468 U.S. at 815-16.

Segura v. United States was limited to situations where the challenged evidence was not

in plain view during an unlawful search.   Murray v. United States, 487 U.S. 533 (1988) addressed this question that Segura v. United States left open: whether the independent-source doctrine was available for evidence observed in plain view during an unlawful search.   The Supreme Court held that the doctrine also applied to evidence in plain view.   See 487 U.S. at 540-41.

Murray v. United States dealt with a situation in which federal law enforcement obtained a warrant for a warehouse after illegally forcing entry to that warehouse.   Based upon tips from informants, federal agents began surveillance of several defendants.   See 487 U.S. at 535. Agents observed two of the defendants entering and then leaving a warehouse, one driving a camper and the other driving a truck.   See 487 U.S. at 535.   When the defendants left the warehouse, the agents saw two individuals and a tractor-trailer rig with a long container inside. See 487 U.S. at 535.   Several other drivers drove the camper and the truck, and ultimately the vehicles were lawfully stopped and found to contain marijuana.   See 487 U.S. at 535.   After hearing of the marijuana in the vehicles, agents entered the warehouse and saw numerous burlap-wrapped bales in plain view.   See 487 U.S. at 535.   The agents left and did not reenter the warehouse until later.   They obtained a warrant, without mentioning the entry or relying upon any observations from that entry, and seized the bales, which contained marijuana.   See 487 U.S. at 535.

The Supreme Court stated that "reseizure of tangible evidence already seized" could be allowed in the right circumstances.   United States v. Murray, 487 U.S. at 542.   "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply."   487 U.S. at 542.   A source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted

by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant."  487 U.S. at 542 (footnote omitted).  Although the district court had made factual findings that the unlawful entry was not revealed to the magistrate and that the agents did not rely on any observations from the entry in applying for a warrant, the record contained no findings on whether the agents would have sought a warrant absent the entry and so the Supreme Court ultimately remanded for a determination in the district court regarding the independent-source doctrine's applicability. See 487 U.S. at 543-44.

"A source is genuinely independent if the government can show that the evidence was obtained by means sufficiently distinguishable to be purged of the primary taint."  United States v. Forbes, 528 F.3d 1273, 1278 (10th Cir. 2008)(internal quotations omitted).  "By contrast, a source is not independent if, granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality."  528 F.3d at 1278 (internal quotations omitted, change in original).  To be an independent source, the source does not need to be temporally distinct from an unlawful search.  "It [i]s of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events.  Rather, it [i]s enough that a genuinely independent source of the evidence" justify a search.  528 F.3d at 1279.

In support of this principle, the Tenth Circuit approvingly discussed United States v. Moore, 329 F.3d 399 (5th Cir. 2003).  In that case, police allegedly unlawfully arrested a motorist and then conducted a canine search of the vehicle's exterior, leading to the discovery of drugs in the trunk.  See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05).  Despite the closeness of the events, the United States Court of

Appeals for the Fifth Circuit held that the canine search, which was legal in the circumstances regardless of the legality of the arrest, was an independent source and thus the drugs found in the trunk were not subject to suppression.  See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05).  Following United States v. Moore, the Tenth Circuit held that, although officers may have unlawfully searched the trailer of a tractor-trailer rig, a near-simultaneous lawful canine search that revealed drugs in the cab of the rig was an independent source.  See United States v. Forbes, 528 F.3d at 1280.

 3.    **The Good-Faith Exception.**

Another exception to the exclusionary rule is the investigating officer's "good-faith."  In United States v. Leon, the Supreme Court faced the question whether to create an exception to the exclusionary rule when a police officer obtained evidence through the use of a warrant that he mistakenly thought probable cause supported.  See 468 U.S. at 905.  The Supreme Court noted that excluding evidence which was obtained pursuant to a warrant that the officer reasonably thought to be valid would not deter police misconduct, because the affected officer had taken all the necessary steps to comply with the Fourth Amendment.  See 468 U.S. at 918-19.  It further noted that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge, and that such exclusion would not have a significantly deterrent effect on judicial conduct.  See 468 U.S. at 916-17.  The Supreme Court thus concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant.  See 468 U.S. at 922-23.

The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression of

the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant.  See United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v.

Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000).

> [T]he suppression of evidence obtained pursuant to a warrant should be ordered
> only in those unusual cases in which exclusion will further the purposes of the
> exclusionary rule[.]  Where an officer acting with objective good faith obtains a
> search warrant from a detached and neutral magistrate and the executing officers
> act within its scope, there is nothing to deter.

United States v. Tuter, 240 F.3d at 1298-99.  Furthermore, there is a presumption that, "when an

officer relies upon a warrant, the officer is acting in good faith."  United States v. McKneely, 6

F.3d 1447, 1454 (10th Cir. 1993).

### a.    Warrants based on illegally obtained information.

When a search is conducted pursuant to a warrant that is based on illegally obtained

information, a court is not to blindly apply the good-faith exception.  Instead, the court is to

consider the warrant with the illegally obtained information excluded and determine, based on

the remaining information, whether probable cause nevertheless existed.  If the remaining

content of the warrant affidavit establishes probable cause, the search pursuant to that warrant

was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we
> nonetheless uphold the warrant if there was probable cause absent that
> information.  An affidavit containing erroneous or unconstitutionally obtained
> information invalidates a warrant if that information was critical to establishing
> probable cause.  If, however, the affidavit contained sufficient accurate or
> untainted evidence, the warrant is nevertheless valid.

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005).  See United States v. Cusumano, 83

F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in

the affidavit and ask whether sufficient facts remain to establish probable cause."); United States

v. Snow, 919 F.2d 1458, 1460 (10th Cir. 1990)("An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause.  If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid.").  The apparent rationale for this rule is that one officer cannot execute a warrant "in good faith" if it contains information that he or a fellow officer obtained illegally.  United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006) ("Leon's good-faith exception applies only narrowly, and ordinarily only where an officer relies, in an objectively reasonable manner, on a mistake made by someone other than the officer.").

**b.      Herring v. United States.**

In Herring v. United States, 555 U.S. 135 (2009), officers arrested Herring pursuant to an arrest warrant listed in the Dale County, Alabama warrant database.  See 555 U.S. at 137.  In the search incident to that arrest, officers found drugs and a gun on Herring's person.  See 555 U.S. at 137.  Herring was then indicted on federal gun and drug-possession charges.  See 555 U.S. at 138.  It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall.  See 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it.  See 555 U.S. at 138.  The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed.  See 555 U.S. at 138.

The Supreme Court affirmed the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule.  The Supreme Court agreed with the Eleventh Circuit that, although the failure of the police to update the warrant database to reflect the fact that Herring's warrant was withdrawn was negligent, it was not reckless or

deliberate.  See 555 U.S. at 140.  The Supreme Court reiterated its holding in United States v. Leon: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant."  Herring v. United States, 555 U.S. at 142 (citing United States v. Leon, 468 U.S. at 922).  Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system."  Herring v. United States, 555 U.S. at 144.

The Supreme Court in Herring v. United States then held that, as long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled.  555 U.S. at 146.  Thus, it appears that, if the police make a negligent administrative error which results in a warrant not being withdrawn when it should have been, and evidence is obtained incident to an arrest made in reasonable reliance on that warrant, the good-faith exception to the exclusionary rule will apply.

The Tenth Circuit, in United States v. McCane, 573 F.3d 1037 (10th Cir. 2009), indicated how it believes that Harring v. United States has modified the standard for finding the good-faith exception applies.  The Tenth Circuit described Herring v. United States as extending the exception to "good faith reliance upon the negligent mistake of a fellow law enforcement employee."  United States v. McCane, 573 F.3d at 1043.  "In Herring, the Court applied the good-faith exception where, in making an arrest, police relied upon a record-keeping error in the

police computer database indicating there was an active warrant for the arrestee."  United States v. McCane, 573 F.3d at 1043.   "[T]he good-faith inquiry 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances."  573 F.3d at 1044 (quoting Herring v. United States, 555 U.S. at 145).  As the Supreme Court stated: "[E]vidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."  United States v. Herring, 555 U.S. at 143.  See United States v. McCane, 573 F.3d at 1044 ; United States v. Harrison, 566 F.3d 1254, 1256 (10th Cir. 2009)("An officer who knows or should have known that a search warrant was invalid may not rely upon the good faith exception to immunize his subsequent seizure of evidence."); United States v. Otero, 563 F.3d 1127, 1133 (10th Cir. 2009).

## ANALYSIS

The Secret Service's scan of the Defendants' credit and debit cards' magnetic strips to read the electronically stored information contained in the strips, when law enforcement already physically and legally possessed the cards, did not violate the Defendants' Fourth Amendment rights.  Regardless whether the scan violated the Fourth Amendment, however, the evidence found when the cards were scanned and read is admissible under the inevitable-discovery doctrine.  Moreover, the Court will not exclude the evidence law enforcement found in execution of the search warrant for the cellular telephones and laptop computers found during the consensual search of the Defendants' car, because there was probable cause without information gleaned from the credit and debit cards' scan, and because the officers' objectively reasonable reliance on the search warrant brings it under the good-faith exception to the exclusionary rule. The Court will therefore deny the Defendants' Motion to Suppress.

I.   **THE COURT WILL NOT ANALYZE WHETHER THE DEFENDANTS HAVE STANDING FOR FOURTH AMENDMENT PURPOSES TO CHALLENGE THE SECRET SERVICE'S SCAN OF THE CREDIT AND DEBIT CARDS' MAGNETIC STRIPS SEPARATE FROM THE ANALYSIS WHETHER THE SECRET SERVICE'S SCAN VIOLATED THEIR FOURTH AMENDMENT RIGHTS.**

At the hearing on the Defendants' Motion to Suppress, the United States, in response to the Court's inquiry in what order the parties would like the Court to analyze the issues, stated that it preferred the Court to analyze standing for Fourth Amendment purposes first, then to analyze whether the scan was a search, and noted that after those issues it has no preference.  See Tr. at 97:10-14 (Gerson).   The Supreme Court in Rakas v. Illinois, however, held that the separate standing test "is more properly subsumed under the substantive Fourth Amendment doctrine," noting: "[W]e think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing." 439 U.S. at 139.  Moreover, in Minnesota v. Carter, the Supreme Court recognized that analyzing whether a defendant had a reasonable expectation of privacy, "under the rubric of 'standing' doctrine, . . . [is] an analysis that this Court expressly rejected 20 years ago in Rakas." 525 U.S. at 87.

A defendant has Fourth Amendment standing to object to a search when, under the Tenth Circuit's construction of the test, the defendant has "a subjective expectation of privacy in the [area searched] that society is prepared to recognize as reasonable."  United States v. Creighton, 639 F.3d at 1286.  The Katz v. United States reasonable-expectation-of-privacy approach for a Fourth Amendment search analyzes whether "'the government violates a subjective expectation of privacy that society recognizes as reasonable.'"  United States v. Jones, 132 S. Ct. at 954-55 (Sotomayor, J., concurring)(quoting Kyllo v. United States 533 U.S. at 33)(citing Katz v. United

States, 389 U.S. at 361 (Harlan, J., concurring)).  Whereas the Supreme Court in Rakas v. Illinois noted that "[r]igorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of 'standing,' will produce no additional situations in which evidence must be excluded," 439 U.S. at 139, whether a district court first analyzes whether the person asserting the right has a legitimate privacy expectation, and then moves on to analyze whether the government's conduct violated that right, or, if alternatively a court analyzes whether government conduct violated any reasonable privacy expectation of the person asserting the right, "[t]he inquiry under either approach is the same," 439 U.S. at 139.

The Supreme Court's recent Fourth Amendment search jurisprudence follows the approach in Rakas v. Illinois and Minnesota v. Carter, construing the Katz v. United States reasonable-expectation-of-privacy analysis as a substantive Fourth Amendment analysis, rather than as an approach to determine Fourth Amendment standing.   In Florida v. Jardines, for example, the majority notes that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment," Florida v. Jardines, 133 S. Ct. at 1417 (emphasis in original)(quoting United States v. Jones, 132 S. Ct. at 951-52), and also notes that "Katz may add to the baseline," by recognizing that "property rights 'are not the sole measure of Fourth Amendment violations,'" Florida v. Jardines, 133 S. Ct. at 1414.   In light of the Supreme Court's characterization of Katz v. United States' reasonable-expectation-of-privacy approach as part of the Fourth Amendment substantive analysis whether "government officers violate a person's 'reasonable expectation of privacy,'" United States v. Jones, 132 S. Ct. at 950 (quoting Katz v. United States, 389 U.S. at 360 (Harlan, J., concurring)), in these two most recent Fourth Amendment search decisions -- United States v. Jones and Florida v. Jardines -- the Court concludes that, rather than analyzing Fourth Amendment

standing separate from the substantive test whether a Fourth Amendment search occurred, the proper procedure is to analyze whether the government officer, the Secret Service agent, violated the Defendants' Fourth Amendment rights by scanning the thirty-one credit and debit cards' magnetic strips.

## II.   THERE WAS NO NEED FOR A WARRANT TO SEARCH THE ELECTRONICALLY STORED DATA ON THE CREDIT AND DEBIT CARDS, BECAUSE SCANNING THE ELECTRONICALLY STORED DATA IS NOT A FOURTH AMENDMENT SEARCH.

The United States contends that scanning the magnetic strips on the backs of the thirty-one credit and debit cards was not a Fourth Amendment search, because, "[w]hen physical objects come lawfully into the hands of law enforcement, no warrant is necessary before the police may subject them to examination." MTS Response at 6. The Defendants assert that the United States' position, "taken to its logical end, would mean that a warrant would never be required to retrieve digitally stored information from private cell phones, pagers, hard drives, or any other storage device, a proposition which is simply untrue." MTS Reply at 4. The Court concludes that scanning the credit and debit cards' magnetic strips was not a search for Fourth Amendment purposes, because the search does not violate the Supreme Court's trespass-based search approach, and because scanning credit and debit cards' magnetic strips is "[o]fficial conduct that does not 'compromise any legitimate interest in privacy.'" Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123).

### A.   THE SECRET SERVICE'S SCAN OF THE DEFENDANTS' CREDIT AND DEBIT CARDS' MAGNETIC STRIPS WAS NOT A FOURTH AMENDMENT SEARCH UNDER THE TRESPASS-BASED ANALYSIS, BECAUSE THERE WAS NO PHYSICAL INTRUSION INTO A CONSTITUTIONALLY PROTECTED AREA.

A Fourth Amendment search occurs where the government, to obtain information,

trespasses on a person's property to obtain information.  A Fourth Amendment search may also occur where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information.  See Florida v. Jardines, 133 S. Ct. at 1417 ("The Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment . . . ." (emphasis omitted))(quoting United States v. Jones, 132 S. Ct. at 947).  Given Justice Scalia's recent guidance in the Florida v. Jardines majority opinion that "a person's 'Fourth Amendment rights do not rise or fall with the Katz formulation,'" Florida v. Jardines, 133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 950), and that the trespass-based search analysis is a "baseline" to determine whether law enforcement investigatory conduct constitutes a Fourth Amendment search, id. at 1414, the Court will start its Fourth Amendment inquiry with this trespass-based approach.[14] The trespass-based search analysis posits: "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment has occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

---

[14] Neither party raises the issue whether the United States' scan of the cards here was a search under the trespass-based rule for a Fourth Amendment search.  Some thought the trespass-based search rule, before the Supreme Court decided United States v. Jones and Florida v. Jardines, to have outlived its usefulness.  See, e.g., United States v. Jones, 132 S. Ct. at 959 (Alito, J., concurring in the judgment)("This trespass-based rule was repeatedly criticized . . . . Katz v. United States, . . . finally did away with the old approach, holding that a trespass was not required for a Fourth Amendment violation."); United States v. Jones, 132 S. Ct. at 959 (Alito, J., concurring in the judgment)(collecting cases stating that trespass was neither necessary nor sufficient for a Fourth Amendment search).  Although the Supreme Court has not repudiated the Katz v. United States analysis -- remaining as another approach, for now -- the Supreme Court appears to favor the trespass-based approach, at least for "easy cases."  Florida v. Jardines, 133 S. Ct. at 1417 ("One virtue of the Fourth Amendment's property rights baseline is that it keeps easy cases easy.").

    1.    **Because Scanning the Credit And Debit Cards to Read the Account Information Stored on the Cards does not Involve a Physical Intrusion, the Scan was not a Fourth Amendment Search Under the Trespass-Based Search Analysis.**

The Supreme Court has not explicitly defined "physically intruding" as requiring an entity to invade a space in the physical -- as opposed to virtual -- world, but United States v. Jones and Florida v. Jardines hint that such a physical-world invasion is required.  In United States v. Jones, the Supreme Court reconciled its conclusion that attaching a GPS device to track a jeep in plain view was a Fourth Amendment search with its recognition in New York v. Class, 475 U.S. 106 (1986), that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."  United States v. Jones, 132 S. Ct. at 952.  Similarly, in Florida v. Jardines, the Supreme Court classified the case as "straightforward" in light of the Fourth Amendment "baseline" that, "when the Government does engage in physical intrusion of a constitutionally protected area," there is a search, because "the[] [officers] gathered . . . information by physically entering and occupying the [curtilage of the Sardine's home] to engage in conduct not explicitly or implicitly permitted by the homeowner."  133 S. Ct. at 1414 (further emphasis added).

The Secret Service's digital scan of the electronic information contained in the Defendants' credit and debit cards' magnetic strips was not a physical invasion as the trespass-based analysis requires for a Fourth Amendment search.  The Defendants are not contesting -- in this motion -- that they consented to the search in which the law enforcement officer found the thirty-one credit and debit cards.  The Defendants pointed out at the suppression hearing that

-102-

their contention is that the Fourth Amendment search which they contend violated their right to be free from unreasonable searches was the further examination of the magnetic strips' contents to gather the information contained therein.  The Secret Service, in gathering the information on the cards' magnetic strips, did not gather the information on the magnetic strips by any physical invasion or trespass in the physical -- as opposed to virtual -- world.  Rather, the Secret Service gathered the information that was electronically stored on the cards using the "Model 5607 Card Reader," which "reads and displays the data encoded on all three tracks of the magnetic strips on credit cards, ATM cards, [and] driver's licenses."   Model 5607 Magnetic Stripe Card Reader/Verifier Instruction Manual at 1 (emphasis added).  The Supreme Court in United States v. Jones distinguished attaching, physically, a GPS device to a vehicle in plain view from the observation of a vehicle in New York v. Class without ever reaching into the vehicle.  Here, reading and displaying virtual data encoded on a track does not involve any physical invasion or penetration of space.  Thus, whereas both United States v. Jones and Florida v. Jardines involved situations in which "the Government obtains information by physically intruding" into an area, Florida v. Jardines, 133 S. Ct. at 1414 (emphasis added)(internal quotations omitted)(quoting United States v. Jones, 132 S. Ct. at 950 n.3), sliding a card through a scanner to read virtual data does not involve physically invading a person's vehicle to attach a physical device or physical invasion into the curtilage of a person's home with a dog to detect the smell of drugs.  Thus, because the Secret Service properly possessed the thirty-one credit and debit cards, and because, by scanning the cards to read the virtual data contained on the strips, the Secret Service's conduct did not involve a physical penetration of space, the Court concludes there was no physical invasion here.  The Court therefore concludes that there was no Fourth Amendment search here under the trespass-based search analysis.

2.    **Because the Defendants' Credit and Debit Cards' Magnetic Strips are not a Constitutionally Protected Area, Scanning the Magnetic Strips was not a Virtual Intrusion into a Constitutionally Protected Area, and was Therefore not a Fourth Amendment Search Under the Trespass-Based Search Analysis.**

The Supreme Court has not suggested that it intends to extend the trespass-based search analysis to cover virtual -- as opposed to physical -- invasions.  Moreover, it may be implicit in Justice Scalia's repeated insistence that United States v. Katz added to the trespass baseline, rather than substituted for the trespass-based approach and that the trespass analysis applies "when the government <u>does</u> engage in a physical intrusion," and when the government <u>does not</u> "engage in a physical intrusion," but rather engages in a virtual intrusion, the United States v. Katz reasonable-expectation-of-privacy analysis applies to the alleged virtual intrusion.  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 951).  On the other hand, Justice Scalia never suggested that the trespass-based approach cannot or does not cover the possibility of a virtual intrusion into a constitutionally protected area.  Further, his use of "may" when he wrote that, "though Katz may add to the [trespass-based] baseline, it does not subtract anything from the Amendment's protections," may intentionally suggest that United States v. Katz does not actually add anything to the trespass-based approach.  Florida v. Jardines, 133 S. Ct. at 1414 (emphasis added).  Given that "[t]he text of the Fourth Amendment reflects its close connection to property," United States v. Jones, 132 S. Ct at 949, it is thus possible that Justice Scalia views the trespass-based approach, which provided the "preservation of that degree of privacy against the government that existed when the Fourth Amendment was adopted," 132 S. Ct at 950, as being the sole Fourth Amendment search test, which covers both trespasses in virtual reality as well as in physical reality.

To accept this intellectual leap from physical to both physical and virtual trespasses, the

Supreme Court will have to explain some distinctions that have arisen in its Fourth Amendment jurisprudence since the United States v. Katz test's adoption.  This task, however, is not insurmountable.  One of the glaring areas in which the Court sees a problem in making the trespass-based analysis the sole approach to whether conduct constitutes a Fourth Amendment search is the area of eavesdropping and wire-tapping.  The Supreme Court, it seems, would have to explain how it could adopt the trespass-based analysis and still account for the original distinction, between Olmstead v. United States, 277 U.S. 438 (1928), in which the Supreme Court held, under the trespass-based test that wiretaps on a public street to record the conversation exiting the defendant's home did not violate the Fourth Amendment, and United States v. Katz, in which, while noting that "the underpinnings of Olmstead and Goldman[ v. United States, 316 U.S. 129 (1942)] have been so eroded by our subsequent decisions that the 'trespass' doctrine there enunciated can no longer be regarded as controlling," the Supreme Court held that a wiretap on the outside of a public telephone booth violated the defendant's Fourth Amendment rights, because "[t]he Government's activities in electronically listening to and recording the petitioner's words violated the privacy upon which he justifiably relied while using the telephone booth."  389 U.S. at 353.  Justice Scalia might conclude that Katz v. United States is wrong, and that wiretapping the public telephone booth does not implicate the Fourth Amendment, as it is not a home, person, place, or effect.  The Court does not think, however, that, Justice Scalia would believe Olmstead v. United States was correct in holding that wiretapping the home telephone did not constitute a Fourth Amendment search.  Applying the trespass-based approach to virtual invasions as well as physical invasions would yield the correct result in Olmstead v. United States -- that tapping a home telephone line from outside the house is nevertheless a Fourth Amendment search -- because the wiretap allowing the government to

listen in to conversations can be classified as a virtual intrusion in the area. Thus, under the trespass-based approach which includes virtual trespasses, home telephone lines from public streets may be viewed as "the Government obtain[ing] information by [virtually] intruding on . . . houses." Florida v. Jardines, 133 S. Ct. at 1414. Similarly, broadening the trespass-based search analysis to encompass both virtual and physical trespasses to collect information resolves the tension between Goldman v. United States, in which the Supreme Court held that there was no Fourth Amendment violation by the government's conduct in listening to a conversation in a lawyer's officer through the wall using a "detectaphone," 316 U.S. at 135, but then holding in Silverman v. United States, 365 U.S. 505 (1961), that eavesdropping on a conversation by "inserting . . . [a microphone with a foot-long spike] under the baseboard in a second-floor room . . . until the spike hit something solid 'that acted as a very good sounding board,'" was a search, because it was "accomplished by means of an unauthorized physical penetration into the premises occupied." 365 U.S. at 506, 509. Under the broadened trespass-based approach, because both of these listening methods put the government in a position in which they could hear conversations taking place inside an enclosed area, and obtain information which, without technology's assistance, they could not otherwise hear without physically intruding into the constitutionally protected area, the conduct in both situations would be considered government's intrusion into a constitutionally protected area to obtain information, and a Fourth Amendment search.

Nevertheless, Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, asserted in United States v. Jones that Justice Scalia's approach "strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law," that "it is highly artificial" and that he would "analyze the question presented in this case by asking whether

respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." 132 S. Ct. at 958 (Alito, J., concurring in the judgment). Justice Sotomayor in her concurring opinion in United States v. Jones noted that, although she agreed the trespass-based approach was "an irreducible constitutional minimum," she also believes that "[i]n cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion of property, the majority opinion's trespassory test may provide little guidance." 132 S. Ct. at 955 (Sotomayor, J., concurring).   Considering that Justice Breyer was among those who joined in Alito's Florida v. Jardines dissent, in which he noted that "[t]he Court's decision is also inconsistent with the reasonable-expectations-of-privacy test,"  133 S. Ct. at 1421 (Alito, J., dissenting), and also considering that Justices Ginsburg and Sotomayor joined Justice Kagan in her Florida v. Jardines concurring opinion, in which she wrote "separately to note that I could just as happily have decided [the case] by looking to Jardines' privacy interests," 133 S. Ct. at 1418 (Kagan, J., concurring), and "suggest[s] that a focus on Jardines' privacy interests would make an 'easy case easy' twice over," 133 S. Ct. at 1420 (Kagan, J., concurring), it is likely that a Supreme Court majority -- at the least Justices Ginsburg, Breyer, Alito, Sotomayor, and Kagan -- are not in favor of repudiating the Katz v. United States reasonable-expectation-of-privacy test.

Even if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search.  The trespass-based search analysis does not implicate all information-gathering government intrusions -- for example, the "open fields" doctrine, Florida v. Jardines, 133 S. Ct. at 1414, is not a Fourth Amendment search -- but rather protects persons only where the government's information-

gathering invades "'a constitutionally protected area.'"  Florida v. Jardines, 133 S. Ct. at 1414 ("[T]hough Katz may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government does engage in [a] physical intrusion of a constitutionally protected area.'")(quoting United States v. Knotts, 460 U.S. at 286 (Brennan, J., concurring in the judgment)).  In the Florida v. Jardines majority opinion, Justice Scalia explains that "[t]he Fourth Amendment does not . . . prevent all investigations on private property," but rather "'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." Oliver v. United States, 466 U.S. at 176).  Based on this language, and the language immediately following this explanation -- "when it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's 'very core' . . ." Florida v. Jardines, 133 S. Ct. at 1414 -- it is reasonable to infer that, with the Supreme Court's revival of the trespass-based approach to the Fourth Amendment search analysis as the "baseline" analysis, the Supreme Court will shift focus back to the requirement that the trespass must intrude upon "a constitutionally protected area." 133 S. Ct. at 1414  ("[P]roperty rights 'are not the sole measure of Fourth Amendment violations,' -- but though Katz may add to the baseline, it does not subtract anything from the Amendment's protections 'when the Government does engage in [a] physical intrusion of a constitutionally protected area.'" (emphasis added)(internal citations omitted))(quoting United States v. Knotts, 460 U.S. at 286 (Brennan, J., concurring)).  See United States v. Jones, 132 S. Ct. at 951 ("As Justice Brennan explained in his concurrence in Knotts, Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment.'" (emphasis in original))( quoting United States v. Knotts, 460 U.S. at 286 (Brennan, J., concurring)).  As Justice Scalia noted: "Thus, our theory

is not that the Fourth Amendment is concerned with 'any technical trespass that led to the gathering of evidence.'  The Fourth Amendment protects against trespassory searches only with respect to those items ('persons, houses, papers, and effects') that it enumerates."  Jones v. United States, 132 S. Ct. at 953 n.8 (emphasis in original)(quoting Jones v. United States, 132 S. Ct. at 958 (Alito, J., concurring)).  See Florida v. Jardines, 133 S. Ct. at 1414 ("When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'")(quoting Jones v. United States, 132 S. Ct. at 950 n.3).

The Defendants contend that the Secret Service's scan of the cards to read the account information stored on the magnetic strips was a search.  Whereas an officer's entry into a home, an area in which the officer cannot see and does not know what lies inside, may be considered an invasion into a constitutionally protected, as would an officer's invasion into a parcel of luggage -- a person's effect -- to gather information about what lies inside the luggage that the officer cannot otherwise see, an invasion into a constitutionally protected area which an officer cannot otherwise see from looking at the outside of the area may thus underlie a Fourth Amendment trespass-based search.  Taking this reasoning one step further, the Defendants contend that the Card Reader's scan of the magnetic strips to read the account information stored on the credit and debit cards by the issuing institution, because this information cannot be seen by looking at the outside of the card, is similarly an invasion into an area which an officer cannot otherwise see from looking at the outside of the area, and thus a Fourth Amendment search.  The question in this hypothetical virtual intrusion, however, becomes whether the magnetic strip on the backs of credit and debit cards may be considered a constitutionally protected area.

The Fourth Amendment's language suggests that a magnetic strip on the back of a credit

or debit card, as opposed to the credit or debit card separately, is not a constitutionally protected area. First, the Fourth Amendment protects people from unreasonable searches and seizures of "their" property, and the only time in which scanning credit and debit cards' magnetic strips would violate someone's expectation to be "secure" in the information stored in the magnetic strips is when the information therein is not "their" property. U.S. Const. amend IV ("The right of the people <u>to be secure</u> in <u>their</u> persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." (emphasis added)). <u>See</u> <u>Anderson v. United States</u>, 399 F.2d 753, 755 (10th Cir. 1968)("The courts have very specifically categorized the Fourth Amendment prohibition against unreasonable search and seizure as a personal right."). As Justice Scalia stated in his concurrence in <u>Minnesota v. Carter</u>, in which Justice Thomas joined: "The obvious meaning of the provision is that <u>each</u> person has the right to be secure against unreasonable searches and seizures in <u>his own</u> person, house, papers, and effects." 525 U.S. at 92 (Scalia, J., concurring)(emphasis in original). He additionally submitted that, to read "their" as giving an individual a right to preventing unreasonable searches of others' person, papers, and effects, "which would give me a constitutional right not to have your person unreasonably searched . . . . [,] is so absurd that it has to my knowledge never been contemplated." 525 U.S. at 92 (Scalia, J., concurring). Along these lines, the Supreme Court has recognized that, early on in its jurisprudence -- before it invoked the <u>Katz v. United States</u> reasonable-expectation-of-privacy approach -- "a defendant who wished to assert a Fourth Amendment objection was required to show that he was the owner or possessor of the seized property or that he had a possessory interest in the searched premises." <u>Simmons v. United States</u>, 390 U.S. 377, 390 (1968)(citing, as an <u>e.g.</u> cite, <u>Jones v. United States</u>, 362 U.S. 257, 262 (1960)). The Fourth Amendment thus protects the Defendants from unreasonable searches and

seizures of their effects and their papers, and the Fourth Amendment protects the Defendants against law enforcement's search of their person, their wallet, or their vehicle to take possession of the thirty-one debit and credit cards at issue.  The Supreme Court has held that, to invoke protection of a person's home, person, papers or effect, the person must "show that he was the owner or possessor  . . . or had a possessory interest," in the property searched, <u>Simmons v. United States</u>, 390 U.S. at 390; scanning credit or debit cards would reveal only information which a person would wish to keep "secure," U.S. Const. amend IV, if the person did not own the information.  The "obvious meaning of the provision is that each person has the right to be secure against unreasonable searches and seizures in <u>his own</u> person, house, papers, and effects," <u>Minnesota v. Carter</u>, 525 U.S. at 92 (Scalia J., concurring)(emphasis in original), and "a 'search within the original meaning of the Fourth Amendment' . . . 'undoubtedly occur[s]'" when "'the Government <u>obtains information</u> by . . . intruding' on persons, houses, papers, or effects," <u>Florida v. Jardines</u>, 133 S. Ct. at 1414 (emphasis added)(quoting <u>United States v. Jones</u>, 132 S. Ct. at 950-51, n.3).  The scan of a credit or debit card's magnetic strip would not allow the government to obtain any information which the government does not already have when in possession of the credit or debit card itself, unless the information contained on the magnetic strip was unlawfully obtained for further unlawful use in credit card fraud and is not the person's own.

Second, a scan limited to credit and debit cards' magnetic strips when the cards are physically in the possession of the person scanning the cards is not an invasion into a constitutionally protected area. All of the enumerated constitutionally protected areas -- homes, persons, papers and effects -- are areas in which a person may keep information that he or she wishes to keep private, which a person should expect to be secure from arbitrary government

intrusion, and thus areas in which the Framers required probable cause to subject them to law enforcement disclosure.  Credit and debit cards' magnetic strips are not areas in which an average person would store information that he or she wishes to keep private.  Credit cards and debit cards, unlike a person's personal effects such as luggage or a wallet, are not meant to contain things or information which a person may wish to keep secure, but rather contain the information that the financial institution which issued the card to the cardholder placed there -- the account information embossed on the front of the card.  A person may wish to keep the contents of his or her luggage secure from arbitrary police interference, because, while the outside of the bag may not seem private, a person may store any number of private things within. A person may also have an interest in keeping the contents of a wallet secure, because the person may not wish to disclose information contained within, such as a social security card, family photographs, or even account information found on the outside of his or her credit and debit cards.  In contrast, a credit or debit card's magnetic strip cannot contain anything except a limited number of alphanumeric characters.  Moreover, rather than expecting this information and these characters to remain secure from disclosure, credit and debit cards are issued solely for the purpose of disclosing the information when using the card, so that the person using the card may purchase the goods.  In contrast to such private, personal effects which are constitutionally protected areas, the evidence in the case shows that, with regard to the alphanumeric characters on credit and debit cards' magnetic strips, in all but criminal circumstances, once law enforcement have lawful possession of a person's credit or debit card, the information in the cards' magnetic strips has already been disclosed to the officers.  The Court thus concludes that, because credit and debit cards' magnetic strips contain nothing that any non-criminal may wish to keep "secure" from government searches or seizures once the card is already physically in

government's possession, credit and debit cards' magnetic strips are not constitutionally protected areas.

Third, the Court concludes that any eighteenth century analog for the information-gathering investigation technique that the Secret Service used here would not have been considered a Fourth Amendment search.  Justice Scalia in United States v. Jones looked to eighteenth-century law -- Entick v. Carrington, 95 Eng. Rep. 807 (C.P. 1765) -- for support that the Fourth Amendment is tied to property law, and then reasoned that tracking the jeep with the attached GPS device would be analogous to an eighteenth-century constable surreptitiously entering a horse-drawn carriage to follow along the ride for many days.  See 132 S. Ct. at 949 & 950 n.3.  Similarly, in Florida v. Jardines, Justice Scalia reasoned that the detective's use of the drug-sniffing dog was a Fourth Amendment search, because, in the eighteenth century, although there existed an implied license to invade another's property and approach someone's front door, the detective's information-gathering purposes would have exceeded the scope of such a license. As Justice Sotomayor points out in her concurring opinion in United States v. Jones, the trespass-based approach presents a difficulty in interpreting application of the Founders' intent in the Fourth Amendment when presented with the use of technology. 132 S. Ct. at 955 ("In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance.")

The Court has thought of two situations which may be sufficiently analogous to the Secret Service's scan of the Defendants' debit and credit cards magnetic strips to read the account information contained on those cards to provide insight about such an information-gathering technique at the Founders' time: use of a search dog and counterfeit money.  As Justice Alito points out in his Florida v. Jardines dissent, law enforcement officers, since at least the

fourteenth century, used tracking dogs in their "'pursui[t] [of] thieves or seiz[ure] [of] malefactors.'"  133 S. Ct. at 1424 (Alito, J., dissenting)(citation omitted).  The Supreme Court has also held that use of a drug-sniffing dog is not a search, given that "the manner in which information is obtained through this investigative techniques is much less intrusive than a typical search . . . . , [as] the sniff discloses only presence or absence of narcotics . . . . [and thus] the information obtained is limited."  United States v. Place, 462 U.S. at 707.  Similar to a drug sniff alerting the handler only to the presence of narcotics -- information about illegal activity -- scanning credit and debit cards to read the information contained on the magnetic strips, when law enforcement already has physical possession of the cards, will disclose "only the presence or absence of" illegal information: either the information disclosed is the same information on the outside of the credit and debit cards, or is information about a different account, used to commit credit card fraud.  Where law enforcement scans a person's credit and debit cards already in its possession, just like a drug-sniffing dogs alert to narcotics in a bag, "the information obtained is limited" to criminal activity.  United States v. Place, 462 U.S. at 707.  That police have used tracking dogs since the fourteenth century, does not end the inquiry, because, based in light of the Supreme Court majority's conclusion in Florida v. Jardines, it is reasonable to assume that law enforcement officers were not exempt from trespass laws when using tracking dogs; tracking in constitutionally protected areas would thus likely violate the Fourth Amendment.  Once law enforcement tracked the suspect to a house using a tracking dog, the officers probably could not go into the home to arrest the man without that being an intrusion, which, today, would require a warrant.  Using a scanner that could read the electronically stored information on credit and debit cards if they are in a person's wallet, through that person's purse or pants, may be analogous to such an invasion, that invasion is not at issue here, because the Secret Service already possessed

the Defendants' cards and could view, in public view, the account information on the cards' outsides.  Rather, the limited scan of the cards to disclose only whether the account information on the outside, exposed to public view, is contained on the magnetic strip -- given that where it is not, the contents evidence unlawful activity -- is analogous to law enforcement's eighteenth-century investigative technique using a tracking dog, where the tracking dog alerts that it has found the person it is pursuing in the public square, also in public view.  The tracking dog's alert of the criminal in public view would not reasonably have been intended by the Framers to violate "the right" of that criminal in the public square "to be secure in [the criminal's] person[], house[], papers, and effects . . . ."  U. S. Const. amend. IV.

The Secret Service's scan of the Defendants' credit and debit cards' magnetic strips, to read the account information on the magnetic strips, is also analogous to an eighteenth-century police officer's investigation whether certain coinage or money is counterfeit.  It has been noted that "[c]ounterfeiting money is . . . as old as minting money."  Nocolas Christin, Alessandro Acquisti, Bryan Parno, Adrian Perrig, Monetary Forgery in the Digital Age: Will Physical-Digital Cash be a Solution? 7 I/S: J. L. & Pol'y for Info. Soc'y 171, 172 (Winter, 2012). Counterfeit coins have been discovered dating back to the Fourth Century B.C.E.  See N. Christin et al., supra, at 172.  At the Founders' time, in a trial at Old Bailey in 1690, Thomas and Anne Rogers were tried and found guilty of high treason for "Clipping 40 pieces of Silver," evidence of which was discovered when the law enforcement officer found "clipt Mony" in the bottom of a chest.[15]  Resolutions of the Judges upon the Case of the Rogers (Oct. 15, 1690),

---

[15] Old Bailey was London, England's central criminal court from 1674 to 1913.  See The Proceedings of Old Bailey, http://www.oldbaileyonline.org/index.jsp (last visited Apr. 19, 2013). "[C]lipt Mony" refers to an early practice at the time when money was coined rather than paper, known as "clipping," which meant "to shave the edges of a coin."  Counterfeit Money,

available at http://www.oldbaileyonline.org/browse.jsp?div=t16901015-36 (last visited Apr. 19, 2013)("Rogers' Case").   Under the contemporary plain view doctrine, while the officer's investigation into the chest in the Rogers' Case may be a Fourth Amendment search, see Walter v. United States, 447 U.S. at 654 ("[A]n officer's authority to possess a package is distinct from his authority to examine its contents."),[16] assuming there was probable cause to enter the chest, the officer's observation that the money was clipped, indicating that the Rogers counterfeit coins, would not be a further search, as the coin was in plain view.   In Rogers' Case, the officer's investigation of the coin, in plain view once rightfully in the officer's possession, to see if it was clipped, and thus evidence of criminal activity only, would not violate the Founders' belief in "the right" of the person possessing the coin "to be secure in [the criminal's] person[], house[], papers, and effects."   U. S. Const. amend. IV.   The Secret Service's scan of the Defendants' credit and debit cards' magnetic strips when the Secret Service already possessed the cards disclosed only evidence that the account information was not that of the Defendants, and thus evidence of criminal activity only.   Such a limited investigatory technique to quickly and obviously provide information whether the payment form is being used criminally, analogous to a visual scan of chipped coins in Rogers' Case, does not violate the Defendants' right to be secure in their person, house, papers, or effects.   The Court, therefore, concludes that the Framers would not view the limited scan of the Defendants' credit and debit cards magnetic strips when the Secret Service already possessed the cards -- to quickly determine whether this form of

---

Wikipedia.org, http://en.wikipedia.org/wiki/Counterfeit_money (last visited Apr. 19, 2013).   The precious metals' shavings were then collected and made into new coinage.   See id.

[16] The plain view doctrine provides that "[a]gents or officers may seize evidence without a warrant if it is in plain view."   United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139 (citing Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971)).

payment is being used unlawfully -- violates the Defendants' right to be secure in their effects, and is thus not a Fourth Amendment search.

In conclusion, on the evidence established at the suppression hearing, once the officers lawfully possessed the Defendants' thirty-one credit and debit cards, the virtual invasion of the alleged protected area would not have disclosed anything additional beyond that which the officers already knew and saw -- the cardholders' names and account information embossed on the credit and debit cards' exteriors -- but would only quickly allow law enforcement to find that the payment form is being used unlawfully.  When a law enforcement officer sees only the exterior of the other "constitutionally protected areas" that the Fourth Amendment enumerates -- persons, houses, papers, and effects -- there may still be information, which a law enforcement officer does not already know or see, and which the person asserting his or her Fourth Amendment right owns or has a right to possess and to feel secure will be free from unreasonable searches.  When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes.  In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip.  Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in <u>their</u> persons, houses, papers, and effects . .

. .”  U.S. Const. amend IV. Because “[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects,” Florida v. Jardines, 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 178), and because the search of a credit or debit card's magnetic strip does not implicate the interests in requiring separate probable cause to search these areas -- additionally and beyond the search to gain lawful possession of the card itself -- the Court concludes that credit and debit cards' magnetic strips are not a constitutionally protected area.  Additionally, in light of law enforcement investigatory techniques around the Framers' time, because the scan disclosed information, beyond that in plain view, of only unlawful activity, the Court concludes that the Founders would not have considered this information-gathering technique a Fourth Amendment search.   The Court therefore concludes that, while the law enforcement officers' scan of the Defendants' thirty-one credit and debit cards to reveal the information contained in the cards' magnetic strips may have been a virtual intrusion into property to gather information, it was not an “intrusion of a constitutionally protected area” and thus not a Fourth Amendment search.  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Knotts, 460 U.S. at 286 (Brennan, J., concurring)).

> **B.    THE SECRET SERVICE'S SCAN OF THE MAGNETIC STRIPS ON THE DEFENDANTS' CREDIT AND DEBIT CARDS WAS NOT A FOURTH AMENDMENT SEARCH, BECAUSE SCANNING CREDIT AND DEBIT CARDS' MAGNETIC STRIPS DOES NOT COMPROMISE ANY LEGITIMATE INTEREST IN PRIVACY.**

The Secret Service's scan of the Defendants' thirty-one credit and debit cards was not a Fourth Amendment search under the trespass-based analysis.  Scanning the cards to read their account information was not a physical trespass.  The majority of the Supreme Court in United States v. Jones, however, opined that “we do not make trespass the exclusive test” and that “[s]ituations involving the transmission of electronic signals without trespass would remain

subject to the Katz analysis." 132 S. Ct. at 953 (emphasis in original).  The Court will therefore analyze whether the scan constituted a Fourth Amendment search under the Katz v. United States reasonable-expectation-of-privacy analysis.  The Defendants contend that they had a clear expectation of privacy in the personal information electronically stored on each of the credit/debit cards magnetic strips.  See Motion to Suppress at 1.  The United States asserts that the Defendants cannot demonstrate that they had either a subjective expectation of privacy in the information stored on the magnetic strips or that such a subjective expectation is one that society would recognize as reasonable.  The Court agrees with the United States.

1.  **The Defendants had a Subjective Expectation of Privacy in the Information Contained in their Credit and Debit Cards' Magnetic Strips.**

The first step that a district court takes in analyzing whether a defendant has an expectation of privacy requires analyzing "whether the defendant manifested a subjective expectation of privacy in the area searched."  United States v. Ruiz, 664 F.3d 833, 838 (10th Cir. 2012)(quoting United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000)).  "The first part of the Katz test requires only . . . [a person's] conduct [to] have demonstrated an intention to keep activities and . . . [property] private, and that he did not knowingly dispose it to the open view of the public."  LaFave, supra, § 2.1(d), at 439 (quoting Note, supra, at 754).  Although courts often give little attention to this subjective component of the two-part Katz v. United States test, see LaFave, supra, § 2.1(d), at 438, courts have invoked this part to hold that a person's disclosure of something in which the person asserts he or she has a reasonable expectation of privacy precludes finding the manifestation of such a subjective belief.  Thus, in United States v. Miller, for example, the Supreme Court recognized:

This Court has held repeatedly that the Fourth Amendment does not prohibit the

obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Defendants submit that they had a reasonable expectation of privacy in the credit and debit cards that the Secret Service scanned, and that they exhibited their subjective expectation of privacy by not ever having used the cards. In United States v. Medina, No. 09-20717-CR, 2009 WL 3669636 (S.D. Fla. Oct. 24, 2009), the only case that the parties or the Court found analyzing this same issue, the Honorable Edwin G. Torres, United States Magistrate Judge, noted that, because the defendant attempted to use the counterfeit credit card, he "thus knowingly disclosed the information on the magnetic strip of his credit card to a third party and [could not] claim a reasonable expectation to privacy in it." 2009 WL 36669636, at *11. As in United States v. Miller, the use of the credit cards at issue, even if intended only for the limited use of conveying the information contained in the magnetic strip to the bank to facilitate the purchase of goods, would likely preclude the Defendants from maintaining a subjective expectation of privacy. The Defendants conceded as much at the suppression hearing:

> If the defendant had used one of the cards in question and the Government had evidence of the fact that they had given that information to a third party, be it a merchant or . . . whatever the case may be, I don't know that I would be arguing that we should have that exception.

Tr. at 37:13-18 (Kochersberger). The Court is reluctant to accept the Defendants' assertion that they possessed thirty-one credit cards, many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants, but they nonetheless subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards. Nevertheless, the United States has not demonstrated that the Defendants

had other than "an intention to keep [their] activities and . . . [the information] private," and the United States has not shown that the Defendants "knowingly dispose[d] [the thirty-one cards] to the open view of the public," LaFave, supra, § 2.1(d), at 43, aside from consenting to the officer's search in which the cards were discovered.   The Court therefore concludes that the Defendants have met their burden with respect to the subjective component of the two-part Katz v. United States reasonable-expectation-of-privacy search analysis, and that, at the time of the search, they had maintained a subjective expectation of privacy in the electronic information on the thirty-one cards' magnetic strips.

**2.     A Subjective Privacy Interest in the Account Information Contained on Credit and Debit Cards' Magnetic Strips is not a Privacy Interest that Society is Prepared to Recognize as Reasonable.**

Under the second step of Katz v. United States' reasonable-expectation-of-privacy analysis, the Court must determine whether the subjective privacy interest is "legitimate," by analyzing whether it is "an interest in 'privacy that society is prepared to consider reasonable.'" Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 122).   See United States v. Ruiz, 664 F.3d at 838 ("In determining whether [the defendant] had a legitimate expectation of privacy . . . we consider . . . 'whether society is prepared to recognize that expectation as objectively reasonable.'")(quoting United States v. Allen, 235 F.3d at 489); Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 ("The proper inquiry is whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable.").   The United States asserts that "[a]n expectation in the account information encoded on the backs of credit and debit cards would not be reasonable," because the "encoded information . . . is precisely the same information as that embossed on the front of the card."   MTS Response at 12.   The Defendants assert that the great lengths to which society

has gone to regulate credit card information and keep such information secure evinces that society is prepared to recognize as reasonable the Defendants' expectation of privacy in the information stored on their credit and debit cards' magnetic strips.  See MTS Reply at 3.  The Court concludes that society would not recognize as reasonable an expectation of privacy in the information stored on a credit card's or debit card's magnetic strip beyond and in addition to the account information on the outside of the card.

The Supreme Court has stated that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).  Justice Harlan, the Katz v. United States reasonable-expectation-of-privacy approach architect, stated that the question whether society would recognize a subjective expectation of privacy as reasonable "must . . . be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement."  United States v. White, 401 U.S. 745, 787 (1971)(Harlan, J., dissenting).

Society is not prepared to recognize as legitimate an asserted privacy interest in information in plain view that any member of the public may see.  In California v. Ciraolo, the Supreme Court held that the "respondent's expectation that his garden was protected from [officers'] observation," which "took place within public navigable airspace . . . in a physically

-122-

nonintrusive manner," is unreasonable "and is not an expectation that society is prepared to honor."  476 U.S. at 213-14.  The Supreme Court reasoned that there were factors weighing in favor of finding the respondent's expectation of privacy reasonable, including that he "took . . . precautions to maintain his privacy," that "the 10-foot fence was placed to conceal the marijuana crop from at least street-level views," and that the garden was within the curtilage of the home, where "[t]he protection afforded . . . is essentially a protection of families and personal privacy in an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened."  476 U.S. at 211-13.  The Supreme Court reasoned, however:

> That the area is within the curtilage does not itself bar all police observation. The Fourth Amendment protection of the home has never been extended to require law enforcement officers to shield their eyes when passing by a home on public thoroughfares. Nor does the mere fact that an individual has taken measures to restrict some views of his activities preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible.  "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection."

California v. Ciraolo, 476 U.S. at 213 (quoting Katz v. United States 389 U.S. at 351).  The Supreme Court ultimately concluded that, because "[a]ny member of the public flying in this airspace who glanced down could have seen everything that these officers observed."  476 U.S. at 213-14.

When the information within an area or item has not been exposed to public view, and when investigating the contents may reveal information other than information about criminal activity only, the investigation of the area or item is a Fourth Amendment search.  Compare Walter v. United States, 447 U.S. 649, 654-55 (1980)("[I]t has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents.") with United States v. Jacobsen, 466 U.S. at 120 (noting that "the removal of plastic bags from the tube

and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search," and holding that the inspection of the contents "infringed no legitimate expectation of privacy and hence was not a 'search' within the Fourth Amendment.").   In Walter v. United States, the defendants were charged with interstate shipment of five illegal obscene films, based on the following "bizarre facts":

> 12 large, securely sealed packages containing 871 boxes of 8-millimeter film depicting homosexual activities were shipped by private carrier from St. Petersburg, Fla., to Atlanta, Ga. The shipment was addressed to "Leggs, Inc.," but was mistakenly delivered to a substation in the suburbs of Atlanta, where "L'eggs Products, Inc.," regularly received deliveries.  Employees of the latter company opened each of the packages, finding the individual boxes of film.  They examined the boxes, on one side of which were suggestive drawings, and on the other were explicit descriptions of the contents.  One employee opened one or two of the boxes, and attempted without success to view portions of the film by holding it up to the light.  Shortly thereafter, they called a Federal Bureau of Investigation agent who picked up the packages . . . .
>
>      Thereafter, without making any effort to obtain a warrant or to communicate with the consignor or the consignee of the shipment, FBI agents viewed the films with a projector.

447 U.S. at 651-52.  The Supreme Court held that the FBI agents' "unauthorized exhibition" of multiple obscene films given to them by a third party "constituted an unreasonable invasion of the owner's constitutionally protected interest in privacy," notwithstanding that "the nature of the contents of these films was indicated by descriptive material on their individual containers."  447 U.S. at 654. The Supreme Court noted: "The fact that FBI agents were lawfully in possession of the boxes of film did not give them authority to search their contents . . . . [as] it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents."   447 U.S. at 654-55 (quoting United States v. Chadwick, 433 U.S. at 10).   The Supreme Court reasoned that the third party's prior opening of the boxes did not "excuse the [FBI's] failure to obtain a search warrant," because in screening the videos, which the employees

"attempted without success," the FBI's investigation went beyond "examination of their contents to the extent that they had already been examined by third parties."  447 U.S. at 656.   The Supreme Court stated:

> Since that examination had uncovered the labels, and since the labels established probable cause to believe the films were obscene, the Government argues that the limited private search justified an unlimited official search.  That argument must fail, whether we view the official search as an expansion of the private search or as an independent search supported by its own probable cause.

Walter v. United States, 447 U.S. at 656.

In United States v. Jacobsen, the Supreme Court, when faced with facts similar to those in Walter v. United States, held that the government's field test of a small amount of a white powdery substance was not a search,  because "governmental conduct that can reveal whether a substance is cocaine, an no other arguably 'private' fact, compromises no legitimate privacy interest."  466 U.S. at 123.  A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder.  See 466 U.S. at 111.  They then called the DEA and repacked the contents in the original packaging before they provided the package to the DEA officers.  See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field tested the white powder, identifying the powder as cocaine.  See 466 U.S. at 111-12.  The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine, and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.   This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .
>
> Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

The Court has previously found that "[a]n individual has an expectation of privacy in an electronic repository for personal data, including cell telephones and pager data memories." United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139 (citing United States v. Chan, 830 S.

Supp. 531, 534-35 (N.D. Cal. 1993)).  The Court concluded that "agents properly seized the pager and the cell phone under the doctrine of plain view," but the Court "assume[d] without deciding that the manipulation [of the pager required to read the allegedly incriminating message and of the cellular telephone to retrieve the incoming call list] exceeded the scope of the plain view doctrine."  376 F. Supp. 2d at 1141-42.  The conclusion that there was a reasonable expectation of privacy in a pager's contents in United States v. Chan -- the decision on which the Court relied for the proposition that an individual maintains a legitimate expectation of privacy in electronic repositories -- was based on the proposition that "[a] warrant may be required to search the contents of a container when its owner's expectation of privacy relates to the contents of that container, rather than to the container itself."  830 F. Supp. at 534 (citing United States v. Chadwick, 433 U.S. 1, 10-11 (1977); Walter v. United States, 447 U.S. at 649).

The only purpose in storing electronic information on credit and debit cards' magnetic strips is to facilitate a financial transaction by enabling third-party disclosure of the account information on the outside of the cards to be disclosed to the receiving financial institution, which is not physically present.  Importantly, the issue in this case is not whether the officers' possession of the thirty-one credit cards was the fruit of an unlawful search.  Rather, the Defendants contest the further search of the account information stored on the cards' magnetic strips.  See Motion to Suppress at 1 (moving the Court to suppress "all evidence discovered as a result of the April 7, 2011 warrantless search of electronic information stored on the magnetic strips of thirty-one (31) credit/debit cards seized from the Defendant's vehicle").  Issuing financial institutions store on their credit and debit cards' magnetic strips, when they issue a credit or debit card to a cardholder, the same information on every card that they issue: one character and then the account information identical to the account information embossed on the

front of the front of the card.  <u>See</u> MTS Response at 3 (noting that a "name, account number and name of issuing financial institution [i]s embossed on the front of the card."); Tr. at 19:1-4 (Kochersberger, Vela)(Q: "The magnetic strips that you were demonstrating on the machine those are contained on credit cards as you demonstrated right?" A: "Yes, sir."); Wikipedia entry for Magnetic Stripe Card at 3-4.  There is a specific and straight-forward reason that financial institutions store this identical information on the magnetic strip of every credit and debit card that they issue: the information allows the consumer to use the card.  The purpose of a credit card is to allow a money transfer in a consumer transaction.  That transaction takes place in electronic commerce largely the same way that it takes place in a cash exchange: the provider of goods or services exchanges the goods or services for equal monetary value.  In a cash transaction, a consumer hands to the supplier the equal value in cash, and, upon receiving the cash, the supplier hands to the consumer the goods.  Credit cards allow for purchase of goods, without exchanging cash, by transferring cash value electronically from one account to another.  Yet, because the supplier is not able to physically touch and count the money when transferred electronically, the only way in which to ensure that the supplier is receiving equal cash value when providing the goods or services to the consumer is to almost instantaneously ensure that the consumer has sufficient moneys in the account for transfer.  The account information electronically stored on the backs of credit and debit cards facilitates this process: cash registers at stores use a card reader which scans the information off of the back of the magnetic strip each time a card is swiped through the reader to facilitate the financial transaction by sending that information to the card-issuer so that the issuer can charge the cardholder's account.  <u>See</u> Tr. at 47:1-13 (Gerson)(noting that "the clerk at Albertson's" grocery store uses a card scanner to scan information, and "when we use credit cards in everyday life to conduct a financial transaction . . .

we . . . slide it through some kind of a reading device," which "read[s] one or another of the lines that are on the back of that card . . . and then send[s] information to the financial institution that is the supposed issuer of that card in order to find out if there's money in the account . . . ."). Thus, each time a credit or debit card is used, the electronic information is provided to a third party -- the financial institution that issued the card.

A privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable.  In <u>California v. Ciraolo</u>, the respondent went to substantial lengths to protect as private the curtilage of his home, an area where privacy interests are at their greatest.  The Supreme Court nevertheless held that this expectation of privacy was not objectively reasonable, because the marijuana farm in the curtilage of his home was viewable from public vantage point -- the airspace overhead -- and there is no requirement that law enforcement shield their eyes from things viewable from public vantage point.  Here, as the Defendants point out, financial institutions go to great lengths in their attempt to ensure that the electronic account information is kept secure during its electronic transfer.  To use a credit or debit card in a store, a person must swipe a credit or debit card, or have the store clerk do the same, necessarily exposing the card and the account information embossed on the card to public vantage point.  Moreover, that using the card discloses the information to the store clerk, even if the user swipes the card rather than the clerk, is evident when the store clerk often asks for the last four digits of the user's account number -- a question to ensure the information on the card's magnetic strip matches the account information on the front.  "The mere fact that an individual has taken measures to restrict some views of his activities [does not] preclude an officer's observations from a public vantage point where he has a right to be and which renders the activities clearly visible," <u>California v. Ciraolo</u>,

476 U.S. at 213, and "[w]hat a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection," Katz v. United States, 389 U.S. at 351. The Supreme Court held in California v. Ciraolo that exposing the curtilage to the limited view of the public passing in an airplane overhead precluded finding as reasonable the expectation of privacy in the marijuana garden; here, given that credit and debit cards' account information is exposed to public view, where an officer may rightfully be, each time they are used as intended, society is not prepared to recognize as reasonable an expectation of privacy in the account information on the front of the person's credit and debit cards.

Although the Secret Service's scan of credit and debit cards to read the account information stored on the cards' magnetic strips is an investigation into the contents of an item or area, it is not a Fourth Amendment search, as it reveals only the same information revealed in a private search when the card is used as intended. The Supreme Court held in United States v. Jacobsen that officers' opening of a package and the zip-lock baggies contained within the package to obtain the white powdery substance contained within those packages "infringed no legitimate expectation of privacy and hence was not a [Fourth Amendment] 'search,'" because the investigation "enabled the agent to learn nothing that had not previously been learned during the private search." 466 U.S. at 120. Here, each time a credit or debit card is used as intended, and scanned by a store clerk or entered into a website at checkout so that the cardholder can purchase an item, the account information stored on the card's magnetic strip is revealed, whether to the store clerk, the website, the issuing financial institution, or any combination, or all three. That the Supreme Court held in Walter v. United States that viewing the contents inside of movie reels, even though the labels on the outside gave the FBI probable cause to believe that there was evidence of criminal activity on the reels, was a Fourth Amendment search is thus

distinguishable.  The Supreme Court in <u>Walter v. United States</u> pointed out that the FBI's search went beyond that of the private employees' search, as the employees "attempted without success to view portions of the film" and thus revealed information unknown by means of the private search.  447 U.S. at 652.  Here, on the other hand, each time a credit and debit card is used, the full contents of the account information stored on the magnetic strip is successfully viewed by the private party; otherwise, the transaction fails, and the card is returned to the cardholder.  Thus, because the Secret Service's scan of credit and debit cards in their possession, every time after the credit and debit cards have been used as intended -- to purchase goods -- "enable[s] the agent to learn nothing that had not previously been learned during a private search" of the magnetic strip's account information when the card was used, the Secret Service's scan "infringe[s] no legitimate expectation of privacy and hence [i]s not a 'search' within the meaning of the Fourth Amendment."  <u>United States v. Jacobsen</u>, 466 U.S. at 120.

Even in situations in which credit and debit cards have not been used, because the Secret Service's scan of credit and debit cards' magnetic strips to read the account information stored on the strips discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully, the scan is "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' [and] is not a search subject to the Fourth Amendment."  <u>Illinois v. Caballes</u>, 543 U.S. at 408 (quoting <u>United States v. Jacobsen</u>, 466 U.S. at 123.  In <u>Illinois v. Caballes</u>, the Supreme Court held that use of a drug-sniffing dog to sniff the outside of a person's vehicle during a lawful traffic stop is not a Fourth Amendment search, because it "'does not expose noncontraband items that otherwise would remain hidden from public view,' [and thus] . . . does not implicate legitimate privacy interests."  543 U.S. at 409 (quoting <u>United States v. Place</u>, 462 U.S. at 707).  Although in <u>United States v. Place</u> the

-131-

Supreme Court noted that it believed a drug-sniffing dog's sniff to be "*sui generis*," United States v. Place, 462 U.S. at 707, the Supreme Court in United States v. Jacobsen extended the principle that such a limited investigatory technique is not a Fourth Amendment search to "[a] chemical test that merely discloses whether or not a particular substance is cocaine," reasoning that "governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no privacy interest." 466 U.S. at 123. Here, once the Secret Service physically possessed the Defendants' thirty-one credit and debit cards, scanning the magnetic strips revealed only the account information on the insides of the magnetic strips. While, on the one hand, one may reasonably contend that the limited alphanumeric information revealed from the scan is beyond that revealed from a drug-sniffing dog's alert, functionally, it is the same amount of information, because it is either the account information already known by viewing the exterior of the cards, or else "contraband." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Place, 462 U.S. at 707). See Black's Law Dictionary at 365 (9th ed. 2009)(defining "contraband" as "goods that are unlawful to import, export, produce, or possess" (emphasis added)); 18 U.S.C. § 1028(a)(1) (defining aggravated identity theft)("Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years" (emphasis added)). Moreover, the Supreme Court in United States v. Jacobsen noted: "Congress has decided -- and there is no question about its power to do so -- to treat the interest in 'privately possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably 'private' fact, compromises no legitimate privacy interest." 466 U.S. at 123. Congress has decided that credit card fraud and identity theft

is illegitimate; because the Secret Service's scan of the Defendants' credit and debit cards, like the "chemical test that discloses whether or not a particular substance is cocaine," discloses only evidence of criminal activity -- or contraband -- this information-gathering investigation technique "does not compromise any interest in privacy" and is therefore not a Fourth Amendment search.  466 U.S. at 123.  Because the electronic information contained on the magnetic strips, which the issuing financial institution stores there, is the same account information on the front of the card, the Court thus concludes that society is not prepared to recognize as reasonable an expectation of privacy in the electronic information contained on credit and debit cards' magnetic strips, and any such subjective expectation of privacy is thus illegitimate.

The Court's conclusion that there is no legitimate privacy expectation in the information stored on credit and debit cards' magnetic strips is, in the Defendants' view, both short-sighted and incorrect.  They argue that, rather than seeing the information contained in the magnetic strips the same as the account number, the Court should recognize that credit and debit cards' magnetic strips are "electronic storage devices capable of storing a variety of personal data . . . ." MTS Reply at 3.  The Court recognizes that credit and debit cards' magnetic strips can be "reencoded" to contain alphanumeric data, subject to certain inherent character limitations, and thus the magnetic strips "are capable," once reencoded, "of storing a variety of personal data, including an individual's name, address, birthdate, and social security number[,] [which] information is arguably among the most inherently private information an individual possesses." MTS Reply at 3.  See Tr. at 21:17-25 (Kochersberger, Vela)(Q: "[I]f you have the appropriate device you can actually erase that information from the credit [card and] put other information on it, right?"  A: "To my knowledge you could do that, you could it's called reencoding."  Q:

-133-

"[T]hat's the issue in this case is that some of the cards you believe were reencoded with information different than how it came from the issuer right?"  A: "That is correct.").  According to the Defendants, because the credit and debit cards' magnetic strips are capable of being reencoded to contain this information, society would recognize an expectation of privacy in such an "electronic repository for personal data" as objectively reasonable.  United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139 ("An individual has an expectation of privacy in an electronic repository for personal data, including cell telephones and pager data memories.")(citing United States v. Chan, 830 S. Supp. at 534-35).  The Supreme Court has recognized in Walter v. United States that a third party's opening of the packages to expose the 8-mm video tapes within and the labels indicating that the tapes contained unlawful material did not destroy the objective expectation of privacy in the information contained on the film reels.  The Defendants would like for the Court to apply this reasoning to the circumstances here, and conclude that the Defendants' consent to provide to the officers the thirty-one credit and debit cards in the Defendants' possession did not destroy their objective expectation of privacy in the content within the cards: the electronically stored information contained in the cards' magnetic strips.

The ability to reencode cards' magnetic strips equates, formally, to the fact that the cards' magnetic strips are electronic storage media and possibly an electronic repository for personal data.  The second step in the Katz v. United States reasonable-expectation-of-privacy analysis does not, however, look formally at the location or item in which there is allegedly an objectively reasonable privacy expectation, but rather looks, functionally, at "the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion," Oliver v. United States, 466 U.S. at 177-78, and ultimately "must . . . be answered by assessing the nature of a particular practice and the

likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement," United States v. White, 401 U.S. at 787 (Harlan, J., dissenting).   Courts have found that there is an objectively reasonable privacy expectation in information stored in electronic storage media such as CD-ROMs, DVDs, USB drives, cellular telephones, pagers, and laptop computers, because individuals have put those locations to use for storing information.   Among the information stored on these media may include personal information such as names, addresses, birthdates, and social security numbers.   These items are bought and sold almost exclusively for the individual's ability to "manipulat[e]" the information and data within them, United States v. Morales-Ortiz, 376 F. Supp. 2d at 1141, so that users can store and manipulate the information stored within them.   Thus, given that the Supreme Court has recognized that "it has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents," Walter v. United States, 447 U.S. at 654-55 (quoting United States v. Chadwick, 433 U.S. at 10), there is little difficulty in courts' extension of this rule to require specific authority to examine the contents of 8mm film reels, CD-ROMs, DVDs, USB drives, cellular telephones, pagers, or laptop computers.

These electronic storage devices and electronic repositories for personal data are useful, because of individuals' ability to store and manipulate electronic information in them, and the ability of to exclude others from viewing the contents of these media even if the public is able to view the exterior of the media.   Moreover, the general public looking at the outside of a USB drive, a laptop computer, or a cellular telephone does not know the contents of these items. Credit and debit cards, however, are not useful because of the individuals' ability to store and manipulate information.   Individuals and society put credit and debit cards to use by disclosing their contents.   In other words, while individuals use electronic storage media primarily to

-135-

manipulate information electronic for storage, and while individuals may see these media as useful for their ability to keep information from the others' view, individuals use credit and debit cards primarily to disclose information that the issuing financial institution stored electronically, and the limited information stored on credit cards' magnetic strips is useless if not disclosed. Rather than using credit and debit cards to manipulate and store the data contained in the cards' magnetic strips, individuals and society put to use the magnetic strips by using the data that the issuer encoded on them -- the account information embossed on the front -- to facilitate a financial transaction and purchase goods and services.  Additionally, because CD-ROMs, DVDs, USB drives, cellular telephones, pagers, or laptop computers are designed to be used by individuals for the explicit purpose of manipulating and storing information, individuals can do so readily and easily, and all individuals using this media do so as a matter of course.  With regard to credit and debit cards, because they are designed to be used by disclosing only the electronic information stored there by the financial institution originally, individuals cannot reencode the information on these cards readily or easily, but must have the proper equipment to do so. See Tr. at 21:17-25 (Kochersberger, Vela)(Q: "[I]f you have the appropriate device you can actually erase that information from the credit [card and] put other information on it, right?" A: "To my knowledge you could do that, you could it's called reencoding."  Q: "[T]hat's the issue in this case is that some of the cards you believe were reencoded with information different than how it came from the issuer right?"  A: "That is correct.").  And individuals, at least most individuals, and likely law-abiding individuals, do not do so as a matter of course.  Probably the only individuals in society who put credit and debit cards to use as electronic storage media -- by manipulating the information electronically stored on the backs of credit and debit cards -- are criminals who, rather than storing names, birthdates, addresses, e-mail passwords, and other

personal information on the cards, store credit and debit card account information "skimmed" from other credit and debit cards so that the criminals can use the credit cards for electronic financial transactions, but effectively hand the supplier someone else's cash.  See Tr. at 23:20-23 (Kochersberger, Vela).  Justice Harlan noted that this second part of the Katz v. United States objective reasonableness determination ultimately "must . . . be answered by assessing the nature of a particular practice and the likely extent of its impact on the individual's sense of security balanced against the utility of the conduct as a technique of law enforcement," United States v. White, 401 U.S. at 787 (Harlan, J., dissenting), and, in California v. Ciraolo, the Supreme Court similarly held that legitimacy of a privacy expectation depends on "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment," California v. Ciraolo, 476 U.S. at 212 (quoting Oliver v. United States, 466 U.S. at 181-83).  The additional disclosure of the electronic information on the magnetic strip beyond the disclosure of the account information on the front of the card, for all persons who use their credit or debit cards lawfully, does not infringe on any person's right to be "secure" in his or her person or effects, and does intrude upon the personal and societal values protected by the Fourth Amendment.  Accordingly, the balance weighs heavily in favor of the utility of law enforcement. The Court therefore concludes that the Defendants' subjective expectation of privacy in the electronic information stored on their credit and debit cards' magnetic strips, separate from and additional to the credit and debit cards themselves, is not a privacy expectation that society is prepared to recognize as legitimate, and is thus objectively unreasonable.

The Court is sensitive to the concerns that the Defendants point out about limiting avenues for future technology growth, and is also sensitive to peoples' privacy expectations in their credit and debit card account information generally.  The Court believes that its limited

conclusion here -- that society is not prepared to recognize as legitimate a privacy interest in the information stored on credit and debit cards' magnetic strips separate from and in addition to a privacy interest in the credit and debit card and account information itself -- does not cut contrary to either of these concerns.   First, the Court is not concluding that there is no reasonable expectation of privacy in magnetic strips on cards generally, but only as to credit and debit cards specifically.   If, for instance, a person or society decides that a convenient and safe means of storing personal information, such as personal medical records or passwords, is to store this information on magnetic strips on the back of a card similar to a credit card, thereby allowing a person to carry that card around in his or her wallet, so long as that card does not reasonably appear to be a credit or debit card, the Court's holding does not affect anyone's ability to do so. The Court does not conclude that a person does not have an objectively reasonable expectation in the electronically stored information on a card's magnetic strip where the front of that card says "medical information," or perhaps says nothing at all, because, as the Defendants point out, any card other than a credit or debit card may in the future come to be used as an electronic repository for personal data.  Thus, if law enforcement officers obtain such a card during a lawful search, such as a consensual search, they are not able to the perform the additional search of the electronic information stored on such a card without probable cause.   See United States v. Morales-Ortiz, 376 F. Supp. 2d at 1139 ("An individual has an expectation of privacy in an electronic repository for personal data . . . .")  Where, however, the front of the card appears to be a credit or debit card, such as a card with a "Visa," "MasterCard," "American Express" symbol on the front, and account information embossed on the front of the card, the Court concludes that there is no objectively reasonable privacy expectation to the information stored on the card's magnetic strip.

Second, the Court's conclusion does not cut against society's and Congress' recognition of the importance of keeping credit and debit card account information secure and private.  The Court does not conclude that a person's privacy expectation in his or her account number and credit card information, generally, is not objectively reasonable, but rather the additional privacy in a credit or debit card's magnetic strip, particularly.  Thus, a law enforcement officer cannot walk up to a person and demand to see their credit and debit cards -- assuming that the person has his or her credit cards inside a pocket, wallet, purse, or otherwise not directly viewable from a public vantage point.  See Walter v. United States, 447 U.S. at 654-55 ("[I]t has been settled that an officer's authority to possess a package is distinct from his authority to examine its contents.")(quoting United States v. Chadwick, 433 U.S. at 10).  Similarly, the limited information stored on the backs of credit and debit cards does not implicate the sort of invasion of privacy behind society's and Congress' concern in keeping credit card information secure. The information disclosed in scanning credit and debit cards' magnetic strips is limited to the same information that the exterior of the card discloses.  Thus, at the time that the store clerk sees the card as it is taken out of a wallet or purse, or law enforcement possesses the card, the store clerk or law enforcement has already seen the entirety of the information which will be disclosed by scanning the card in a card reader.  The information gleaned from scanning the credit or debit card is not only identical to information on the outside of the card, but is also limited to a certain number of alphanumeric characters.  Just as the store clerk, when he or she scans a credit and debit card, is not able to see or pull up the cardholder's account history, view the cardholder's most recent credit card bill, or see the outstanding credit limit, law enforcement's scan of the credit or debit card provides them only the same alphanumeric information, and does not allow law enforcement to view the account history or remaining credit

limit.  Law enforcement uses the same technology as the store, and the information gleaned from the scan is subject to the inherent alphanumeric limitations that magnetic strips provide.  Just as society accepts that a store clerk, when given a credit or debit card, is able to see the account number and name on a card when the card is scanned, and then often asks the cardholder for the last four digits on the front to make sure they match the last four digits displayed after scanning the magnetic strip, society recognizes as reasonable that law enforcement, when lawfully in possession of a credit or debit card, is able to see the account and name on a card when the card is scanned, and checking whether the information on the magnetic strip is the same as on the card -- as it will be unless changed for nefarious purposes -- is not an invasion of an objectively reasonable expectation of privacy.

Finally, the Supreme Court has, in the past, suggested that whether a subjective expectation is legitimate -- i.e., whether society would recognize that expectation as reasonable -- depends at least in part on whether the expectation of privacy stems from illegal activities.  In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court noted that whether a person has lawful possession of property or their activity is lawful is part of the calculus in determining whether a privacy expectation is "legitimate":

> Obviously, however, a "legitimate" expectation of privacy by definition means more than a subjective expectation of not being discovered.  A burglar plying his trade in a summer cabin during the off season may have a thoroughly justified subjective expectation of privacy, but it is not one which the law recognizes as "legitimate." His presence, in the words of Jones, 362 U.S., at 267 . . . , is "wrongful"; his expectation is not "one that society is prepared to recognize as 'reasonable.'"  Katz v. United States, 389 U.S., at 361,  . . . (Harlan, J., concurring).  And it would, of course, be merely tautological to fall back on the notion that those expectations of privacy which are legitimate depend primarily on cases deciding exclusionary-rule issues in criminal cases.  Legitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.  One of the main

rights attaching to property is the right to exclude others, see W. Blackstone, Commentaries, Book 2, Ch. 1, and one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of this right to exclude.  Expectations of privacy protected by the Fourth Amendment, of course, need not be based on a common-law interest in real or personal property, or on the invasion of such an interest.  These ideas were rejected both in Jones, supra, and Katz, supra.  But by focusing on legitimate expectations of privacy in Fourth Amendment jurisprudence, the Court has not altogether abandoned use of property concepts in determining the presence or absence of the privacy interests protected by that Amendment.  No better demonstration of this proposition exists than the decision in Alderman v. United States, . . . where the Court held that an individual's property interest in his own home was so great as to allow him to object to electronic surveillance of conversations emanating from his home, even though he himself was not a party to the conversations.  On the other hand, even a property interest in premises may not be sufficient to establish a legitimate expectation of privacy with respect to particular items located on the premises or activity conducted thereon.

Rakas v. Illinois, 439 U.S. at 144-45 n.12.  The Supreme Court in Rakas v. Illinois reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason.  Accordingly, the Court cannot soundly conclude that society is prepared to recognize as reasonable the Defendants' subjective expectation of privacy in the information stored on their credit and debit cards' magnetic strips -- which the evidence shows would only be different from the information embossed on the outside of the card if the intent is to engage in a crime.  The Court does not believe that society would recognize as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals.

## III.   THERE WAS NO NEED FOR A WARRANT TO SEARCH THE ELECTRONICALLY STORED DATA ON THE CREDIT AND DEBIT CARDS, BECAUSE A WARRANTLESS SEARCH OF THE ELECTRONICALLY STORED DATA IS NOT PER SE UNREASONABLE.

The Defendants assert that, because there was no warrant to scan the electronically stored information in the thirty-one credit and debit cards' magnetic strips, the "warrantless search is

presumed invalid and 'per se' unreasonable . . . ."  Motion to Suppress at 3 (citing Katz v. United States, 389 U.S. at 356).  The United States contends:

> If this Court determines that reading the magnetic strips on the credit and debit cards was a search for Fourth Amendment purposes, and further determines that [the Defendants] had a reasonable expectation of privacy in the magnetic strips, the Court should nonetheless deny the Motion to Suppress because reading the magnetic strips without a warrant was reasonable.

MTS Response at 14-15.  Although the Court concludes that the scan of the Defendants' credit and debit cards was not a Fourth Amendment search, the Court further determines that, even if the Secret Service's scan of the Defendants' thirty-one credit and debit cards was a Fourth Amendment search, the warrantless scan of the magnetic strips when the credit cards were lawfully in the government's possession was reasonable.

Not every Fourth Amendment intrusion requires a warrant or probable cause, "because 'the ultimate touchstone of the Fourth Amendment is reasonableness.'"  Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. at 403).  The Fourth Amendment prohibits only "unreasonable searches and seizures."  New Jersey v. T.L.O., 469 U.S. at 334 (quoting Elkins v. United States, 364 U.S. 206, 213 (1960)).  Whether a particular search is reasonable depends on the totality of the circumstances.  See Samson v. California, 547 U.S. at 848 ("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. at 118).  "[T]he totality-of-the-circumstances test [i]s one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests."  Banks v. United States, 490 F.3d at 1184 (quoting Samson v. California, 547 U.S. at 848).

-142-

The Supreme Court in New Jersey v. T.L.O. held that the Katz v. United States reasonable-expectation-of-privacy analysis parallels the totality-of-the-circumstances reasonableness test in one important way for purposes of this case: an individual's privacy expectation, which is alleged to have made the search unreasonable, must be legitimate. See New Jersey v. T.L.O., 469 U.S. at 338 ("Of course, the Fourth Amendment does not protect subjective expectations of privacy that are unreasonable or otherwise 'illegitimate.' To receive the protection of the Fourth Amendment, an expectation of privacy must be one that 'society is prepared to recognize as legitimate.'")(quoting Hudson v. Palmer, 468 U.S. 517, 526 (1984)). Thus, in Hudson v. Palmer, the Supreme Court held that prison inmates have no legitimate expectation of privacy in their prison cells, and, therefore, that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." 468 U.S. at 525-26. The Supreme Court reasoned: "Notwithstanding our caution in approaching claims that the Fourth Amendment is inapplicable in a given context, . . . . [t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." 468 U.S. at 525-26.

The Secret Service's warrantless scan of the credit and debit cards' magnetic strips was reasonable, because, given that any privacy interest in the account information stored on credit and debit cards' magnetic strips is illegitimate, the Fourth Amendment is inapplicable to the scan of the Defendants' cards' magnetic strips. The Supreme Court in Hudson v. Palmer held that, because inmates have no legitimate expectation of privacy in their prison cells, the Fourth Amendment therefore does not apply to searches of that area. Similarly, the Defendants' subjective privacy expectation in their credit and debit cards' magnetic strips is not legitimate. The Supreme Court based its reasoning in Hudson v. Palmer on its recognition that privacy rights

of prisoners is inconsistent with the concept of incarceration and the needs of penal institution. Similarly, the Court here reasons that an expectation of privacy in the information stored in magnetic strips cannot be reconciled with the requirement that society recognizes the privacy expectation as legitimate, because the only society members who would benefit from society's recognition of this expectation in credit and debit cards' electronically stored information as legitimate are persons intending to use the credit and debit cards as tools of a criminal trade.  The Court therefore concludes that the lack of a legitimate privacy expectation in a person's credit and debit cards' magnetic strips beyond the privacy expectation in the credit or debit cards themselves precludes him or her from "invok[ing] the protections of the Fourth Amendment" when law enforcement officers scan a credit and debit card which is already lawfully in the officers' possession, and the scan is thus a reasonable search for Fourth Amendment purposes. Hudson v. Palmer, 468 U.S. at 530.

Nevertheless, the most troubling aspect of the Court's conclusion that the Secret Service's scan of the defendant's thirty-one credit and debit cards was not a Fourth Amendment search, or if it was, that it was reasonable, is that it would have been so easy for the Secret Service to get a warrant.  The evidence was not going anywhere, and the Secret Service still had to get a warrant to look at the electronically stored information in the computers and telephones. It would have been so easy to have tossed in to the search warrant application the request to scan the magnetic strips.  The law apparently does not take into consideration the ease or difficulty of obtaining a warrant in determining whether there was a Fourth Amendment search in the first place, or in determining whether the search was reasonable.  While this fact may be a factor in creating exceptions to the warrant requirement or to the exclusionary rule, that the police could have easily obtained a search warrant does not mean a search warrant was required at all.

-144-

IV.   **THE COURT WILL NOT SUPPRESS THE INFORMATION FOUND IN THE SCAN OF THE DEFENDANTS' CREDIT AND DEBIT CARDS, AND WILL NOT SUPPRESS ANY EVIDENCE FOUND DURING THE EXECUTION OF THE LATER SEARCH WARRANT, BECAUSE EXCEPTIONS TO THE EXCLUSIONARY RULE APPLY TO ALL OF THE EVIDENCE THE DEFENDANTS SEEK TO EXCLUDE.**

The exclusionary rule precludes the government's ability to use evidence in a criminal prosecution that was obtained by law enforcement in violation of the defendant's Fourth or Fifth Amendment rights.  Thus, "[i]f the police acquire evidence in the process of violating one's constitutional rights, they are forbidden from using that evidence in a criminal prosecution against the individual, unless an exception to the exclusionary rule applies."  United States v. Martinez, 686 F. Supp. 2d at 1185 (citing United States v. Calandra, 414 U.S. 338, 347 (1974)).  When an exception applies to the evidence's acquisition, the evidence is purged of the unconstitutional conduct's taint, and the Court can admit the evidence.  See United States v. Martinez, 686 F. Supp. 2d at 1185 ("The rule also demands exclusion of evidence that was obtained as a but-for result of the illegal search, unless the evidence is so far removed from the constitutional violation that the 'taint' of the violation no longer clings to it.").

Because the Court finds that the Secret Service's scan of the Defendants' credit and debit cards did not violate their Fourth Amendment rights, the information gleaned from the scan is admissible. Accordingly, the Court need not find that the information found in the cards' scan would have inevitably been discovered and need not address whether, because the United States used the information in the search warrant application, it should exclude all information found in the search warrant's execution.  Nevertheless, the Court concludes that, if the information found in the scan of the thirty-one credit and debit cards was discovered in violation of the Defendants' Fourth Amendment rights, it is admissible under the inevitable discovery doctrine, and the

-145-

evidence found in execution of the search warrant is admissible, because the search warrant application was sufficient without the information, and because the officers relied on the search warrant in good faith.

### A. INFORMATION FOUND ON THE THIRTY-ONE CREDIT AND DEBIT CARDS' MAGNETIC STRIPS WOULD HAVE INEVITABLY BEEN DISCOVERED.

One exception to the exclusionary rule is the inevitable-discovery doctrine, which allows courts to admit unconstitutionally obtained evidence "if an independent, lawful police investigation inevitably would have discovered it." United States v. Cunningham, 413 F.3d at 1203 (quoting United States v. Owens, 782 F.2d at 152). The Tenth Circuit has adopted the following four-part test, often referred to as the United States v. Souza factors, to aid district courts in determining whether the evidence would inevitably have been discovered:

> 1) the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) evidence that law enforcement agents "jumped the gun" because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.

United States v. Cunningham, 413 F.3d at 1203-04 (quoting United States v. Souza, 223 F.3d 1197, 1204 (10th Cir. 2000)).

At first blush, it appears that the first United States v. Souza factor -- "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search," United States v. Cunningham, 413 F.3d at 1203-04 -- cuts against admitting the information on the cards' magnetic strips, because the United States had not begun the warrant process for the information on the cards' magnetic strips and did not intend to do so. Given that the reason law enforcement did not take steps to seek a warrant was that there is no precedent

-146-

indicating that scanning credit and debit cards' magnetic strips requires a warrant, however, and in light of the amount of other evidence that the officers found during the consensual search of the Defendants' car indicating that they probably committed or intended to commit credit card fraud and identity theft, the Court concludes that the policies behind the inevitable-discovery rule suggest the information should be admissible under the doctrine.  "[T]he exclusionary rule serves to deter deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systematic negligence," but is not intended to apply "when police mistakes are the result of negligence."  United States v. Martinez, 686 F. Supp. 2d at 1185 (quoting Herring v. United States, 555 U.S. at 702, 704).  The inevitable-discovery doctrine is intended to allow admission of evidence unconstitutionally obtained through police mistake, which, but-for the unintended mistake, would have been obtained under a search warrant.  The Tenth Circuit has furthered this policy in holding that the doctrine "applies whenever an independent investigation inevitably would have led to discovery of the evidence, whether or not the investigation was ongoing at the time of the illegal police conduct," United States v. Larsen, 127 F.3d 984, 986-87 (10th Cir. 1997), and in cautioning "that courts should be realistic, if not skeptical when assessing the probability that law-enforcement officers would inevitably have uncovered the challenged evidence through an independent investigation," United States v. Martinez, 686 F. Supp. 2d at 1244 (citing United States v. Owens, 782 F.2d at 153).  Here, if the law had required a warrant to scan and read the information contained in the Defendants' credit and debit cards' magnetic strips, the only reason that a search warrant was not first obtained was police mistake: the officers' mistaken belief that the law did not require a warrant.  Notably, however, this mistaken belief was not a mistake at the time, but will only become a mistake in hindsight, after a court decides as a matter of first impression that scanning a credit or debit card's magnetic strip

-147-

requires probable cause beyond that necessary to obtain the card itself.  The only case on point found by the parties or by the Court is United States v. Medina, in which Judge Torres concluded "that reading the information on the magnetic strip of the credit cards taken from Defendant's wallet does not implicate the Fourth Amendment where, as we have found, Defendant voluntarily consented to a[n] unrestricted search of his wallet."  2009 WL 3669636, at *11. Thus, although not controlling precedent, the only case in which this issue was decided concluded, as the Court does here, that there is no need for a warrant to read the information from credit and debit cards' magnetic strips.  Excluding the evidence obtained from the Secret Service's scan of the Defendants' credit and debit cards, when requiring a warrant for such a scan is unprecedented, is thus inconsistent with the police behind the inevitable-discovery doctrine. The Court therefore concludes that, under the circumstances here, where law enforcement was without any precedential guidance from which officers may anticipate a warrant requirement for what they otherwise believe is not a search or seizure implicating the Fourth Amendment, the first factor weighs in favor of finding that the inevitable-discovery doctrine applies.

The United States v. Souza's second through fourth factors weigh in favor of admitting the information that Secret Service obtained by the cards' scan.  First, given the substantial amount of information found in the Defendants' car during the consensual search suggesting that the Defendants were committing or intending to commit credit card fraud and/or identity theft, the showing of probable cause at the time the search occurred is strong.  During the consensual search, the state trooper found the following items in the Defendants' trunk: approximately 67 Wal-Mart cash cards valued at approximately $1650.00; approximately $5673.00 in cash; two laptop computers; and a bundle of paperwork which contained a list of approximately 500 names

with birth dates, Social Security numbers, addresses, and telephone numbers.  See Warrant Application at 9.  Moreover, the warrant application noted that the officer found the thirty-one credit and debit cards, five of which "had names . . . seem[ing] to have no connection to Oguntoyinbo or Alabi."  Warrant Application at 9.  With this evidence, there is a sufficient showing of probable cause to search the cards' magnetic strips for information contained therein evidencing a crime.  See United States v. Danhauer, 229 F.3d at 1006 (noting that probable cause requires "facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity"); United States v. Corral-Corral, 899 F.2d at 937 ("Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched.").

Second, that a search warrant was ultimately obtained in the case -- although not directed to the scan of the credit and debit cards' magnetic strips -- weighs in favor of finding the evidence gleaned from the cards' scan admissible.  That there is no precedent suggesting a search warrant for the magnetic strips was necessary, and the amount of information otherwise providing probable cause for a search warrant of the computers and cellular telephones found in the Defendants' vehicle, play into the Court's conclusion that this third factor weighs in favor of admitting the evidence.  The officers in this case did not intentionally bypass a search warrant altogether and search through the cellular telephones and computers alongside the magnetic strip scan, but rather, where they knew a warrant was required for a search, went through the process and waited until the warrant issued to then search the cellular telephones and computers.  The Court believes that, if the law suggested that the officers were required to obtain a warrant for the information on the cards, the warrant that issued would have covered that information also.

Finally, the evidence in this case does not suggest that law enforcement agents "jumped

the gun" because they lacked confidence in their probable cause showing "and wanted to force the issue by creating a fait accompli," but, rather, suggests the opposite: that law enforcement had probable cause and that the officers' conduct throughout adhered to the Fourth Amendment's strictures.  United States v. Cunningham, 413 F.3d at 1203-04 ("4) evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli.").  The officer asked for and received consent to search the Defendants' car in the first place; and he recorded the consent. See Warrant Application at 9.  Upon finding the trove of evidence in the Defendants' trunk, rather than search further into the electronically stored data in the computers and cellular telephones at the scene, or two days later when Secret Service scanned the thirty-one cards, the officers waited until a warrant issued to search these devices, as they knew the law required.  The Court thus concludes that the fourth United States v. Souza factor weighs in favor of admitting the evidence, as there is no evidence showing that law enforcement's scan of the cards' magnetic strips was motivated by a "lack[] [of] confidence in their showing of probable cause" or that they "wanted to force the issue by creating a fait accompli."  United States v. Cunningham, 413 F.3d at 1204.  Thus, because the Court concludes that all four of United States v. Souza's factors weigh in favor of finding the inevitable-discovery doctrine applicable to the evidence found in the Secret Service's scan of the thirty-one credit and debit cards, the Court will deny the Defendants' request to exclude the evidence under the exclusionary rule.

**B.    THE SEARCH WARRANT APPLICATION WAS SUFFICIENT WITHOUT THE INFORMATION GLEANED FROM THE SCAN OF THE DEFENDANTS' CREDIT AND DEBIT CARDS.**

The law enforcement officers used the information found in scanning the Defendants' thirty-one credit and debit cards in the search warrant application for the search warrant it later

executed to search the cellular telephones and laptops that the state trooper found in the Defendants' car.  Thus, if the scan violated the Defendants' Fourth Amendment right to be free from unreasonable searches, and the exclusionary rule prevents the United States' subsequent use of the information found during the cards' scans, it is possible that the search warrant, and all the evidence found because of the search warrant, including the information in the search of the computers and cellular telephones, is excluded as "fruit of the poisonous tree."  United States v. Martinez, 696 F. Supp. 1216, 1239, aff'd, 643 F.3d 1292 (10th Cir. 2011)("[A] defendant may . . . suppress any . . . evidence deemed to be 'fruit of the poisonous tree,' (i.e., evidence discovered as a direct result of the unlawful activity), by showing the requisite factual nexus between the illegality and the challenged evidence.")(quoting United States v. Olivares-Rangel, 458 F.3d 1104, 1109 (10th Cir. 2006)).  If the search warrant application was sufficient without the information obtained from the officers' scan of the Defendants' credit and debit cards, however, then the search of the items listed in the search warrant was not unconstitutional, as the probable cause came from an independent source, and the information found is therefore not the fruit of the poisonous tree.  See United States v. Rey, 663 F. Supp. 2d 1086, 1104 (D.N.M. 2009)(Browning, J.)("[E]vidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree."); Segura v. United States, 468 U.S. at 814-15 (holding that, although the search warrant at issue was based upon illegally obtained evidence, because "information possessed by the agents before" the illegal seizure provided sufficient probable cause for the warrant to issue, their knowledge "constituted an independent source for the discovery or seizure of the evidence," and the evidence was not fruit of the poisonous tree).

Supreme Court precedent suggests that, as long as the unlawful search or seizure was not the motivating factor in seeking the search warrant, a search warrant based on evidence known to

officers before apart from an unlawful search or seizure fits under the independent-source doctrine. In Segura v. United States, the Supreme Court's holding that the independent-source doctrine precluded exclusion of the evidence seized pursuant to the search warrant turned on the fact that the warrant was based on information obtained before the unlawful search. See 468 U.S. at 814 ("None of the information on which the warrant was secured was derived from or related in any way to the initial entry into petitioners' apartment; the information came from sources wholly unconnected with the entry and was known to the agents well before the initial entry"). The Supreme Court has also stated that a source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." Murray v. United States, 487 U.S. at 542 (footnote omitted). In the same vein, the Tenth Circuit has held: "It [i]s of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events. Rather, it [i]s enough that a genuinely independent source of the evidence" justify a search. United States v. Forbes, 528 F.3d at 1279.

The Court's inquiry here is directed at determining whether the physical evidence discovered in the Defendants' car provided law enforcement probable cause to apply for the search warrant that issued in the case. The Supreme Court held in Segura v. United States that law enforcement's knowledge apart from the unlawful search is an independent source sufficient to preclude the exclusionary rule's application. Because the Secret Service's scan of the credit and debit cards' magnetic strips happened after law enforcement officers found all of the physical evidence in the Defendants' trunk, but before the United States submitted the search warrant application, law enforcement's knowledge derived only from the physical evidence in

the trunk is an independent source here.  Thus, if the physical evidence found in the car provides probable cause for the search warrant for the computers and cellular telephones, it provides an independent source for the search warrant.

The Tenth Circuit has stated that probable cause requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d at 99.  The consensual search of the Defendants' trunk produced the following physical evidence: (i) approximately sixty-seven Wal-Mart cash cards valued at approximately $1650.00; (ii) approximately $5673.00 in cash; (iii) two laptop computers; (iv) a bundle of paperwork which contained a list of approximately 500 names with birth dates, Social Security numbers, addresses, telephone numbers; and (v) thirty-one credit and debit cards, five of which had names other than the Defendants'.  See Warrant Application at 9.  The list of approximately 500 names with birth dates, Social Security numbers, addresses, and telephone numbers, in conjunction with thirty-one credit cards with four different names on the fronts of the cards would provide an officer with "more than mere suspicion" that the Defendants had committed or intended to commit, or at least aid and abet, aggravated identity theft.  See 18 U.S.C. § 1028(a)(1) (defining aggravated identity theft)("Whoever, during and in relation to any felony violation enumerated in subsection (c), knowingly transfers, possesses, or uses, without lawful authority, a means of identification of another person shall, in addition to the punishment provided for such felony, be sentenced to a term of imprisonment of 2 years."); 18 U.S.C. § 1029(a) (defining fraud activity in connection with access devices)("Whoever . . . (3) knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices," or conspires to do the same).  The totality of the physical evidence found in the trunk, given the multiple credit and debit cards, the numerous Wal-Mart cash cards, the cash on hand in the trunk,

two laptop computers, and the list is "sufficient . . . to warrant" a reasonable person to believe that the "offense [of identity theft and/or credit card fraud] has been or is being committed." Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *43 (D.N.M. Jan. 14, 2013)(Browning, J.)("Probable cause . . . exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'")(quoting United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)).  A reasonable person would also believe that, in light of the computers being found alongside the other evidence in the Defendants car, a nexus exists between the information contained in the computers, and the defendants' cellular telephones and the defendants' commission of identity theft and/or credit card fraud.  See United States v. Corral-Corral, 899 F.2d at 937 ("Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched.").  Because the search warrant affidavit here contained facts about the items found in the Defendants' trunk, which would lead a prudent person to believe that a search of the computers and cellular telephones sought to be searched would uncover evidence of criminal activity, the Court concludes that there was a source of probable cause for the search warrant to issue independent of the information gleaned from Secret Service's scan of the Defendants' credit and debit cards.  The independent-source doctrine thus applies to the United States' search of the six cellular telephones and two laptop computers in execution of the search warrant issued in the case, and the Court will therefore not exclude the information found in the telephones and computers as fruit of the poisonous tree.

-154-

**C.     LAW ENFORCEMENT RELIED IN GOOD FAITH ON THE SEARCH WARRANT.**

Even if the scan of the Defendants' credit and debit cards was a Fourth Amendment search, and the search warrant was thus invalid because it lacked probable cause without the information discovered in the cards' scan, the exclusionary rule does not exclude the information found searching the computers and cellular telephones in execution of the search warrant, because the good-faith exception applies.  "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." Herring v. United States, 555 U.S. at 142 (citing United States v. Leon, 468 U.S. at 922).  See United States v. McCane, 573 F.3d at 1044 ("[T]he good-faith inquiry 'is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal in light of all of the circumstances.")(quoting Herring v. United States, 555 U.S. at 145).

`          The Supreme Court in Herring v. United States concluded that negligent bookkeeping was no reason to exclude evidence found when an officer executed, in good-faith, an arrest warrant that had been recalled, but for which the database had not been updated to reflect the recall.  See 555 U.S. at 137-38.  As the Court has noted, the Supreme Court was guided in reaching its decision by the punitive policy behind the exclusionary rule and was thus "focused on whether exclusion under the circumstances of that case would have a substantial deterrent effect on the complained-of unconstitutional conduct."  United States v. Martinez, 686 F. Supp. 2d at 1205 (citing Herring v. United States, 555 U.S. at 144-46).  Concluding that penalizing negligent bookkeeping would not further the deterrent purpose behind the exclusionary rule, the Supreme Court held that, in light of the negligent mistake of the law enforcement employee, the

officers' good-faith reliance on the warrant excepted the evidence from exclusion under the exclusionary rule.  See Herring v. United States, 555 U.S. at 146.  The Supreme Court in Herring v. United States held that objectively reasonable reliance on a warrant that is later invalidated excepts the evidence discovered from exclusion.   Here, given that there is no precedent suggesting that a search warrant is necessary to read the information on credit and debit cards' magnetic strips lawfully in law enforcement possession, reliance on the search warrant -- even if the warrant had been based only information from the scan -- was objectively reasonable. Because to penalize the law enforcement officers here for relying on the warrant would not further the exclusionary rule's deterrence policy, where the officers were without notice that their conduct was in any way unlawful or unreasonable, as in Herring v. United States, the Court declines to do so.  The Court thus concludes that, regardless whether the Secret Service's scan of the Defendants' credit and debit cards' magnetic strip was constitutional, the good-faith exception applies to the officers execution of the search warrant and search of the cellular telephones and laptop computers.  The Court will therefore not exclude the evidence found in the search of the telephones or computers under the exclusionary rule.

In conclusion, the Court determines that the Secret Service's scan of the Defendants' credit and debit cards' magnetic strips when the credit and debit cards' were lawfully in law enforcement possession was not a Fourth Amendment search under either the trespass-based approach or the alternative Katz v. United States reasonable-expectation-of-privacy approach. Even if the scan was a search, however, the search did not violate the Defendants' Fourth Amendment rights, because it was reasonable under the circumstances.  Regardless whether the scan violated the Fourth Amendment, the evidence found in the scan of the cards is admissible under the inevitable-discovery doctrine.  Moreover, the Court will not exclude the evidence that

law enforcement discovered in the execution of the search warrant for the cellular telephones and laptop computers, which the state police seized during the consensual search of the Defendants' car.  That there was sufficient probable cause without information gleaned from the credit and debit cards' scan, and the officers' objectively reasonable reliance on the search warrant, brings the search pursuant to the warrant under the good-faith exception to the exclusionary rule.

**IT IS ORDERED** that Defendant Kehinde Oguntoyinbo's Motion to Suppress, filed January 23, 2013 (Doc. 95), in which Defendant Oladipo Alabi, pursuant to the Agreed Order to Join in Defendant Oguntoyindo's [sic] Motion to Suppress, filed March 4, 2013 (Doc. 109), joined, is denied.  The Court will not exclude the information found from scanning the credit and debit cards, and will not exclude any information found in execution of the search warrant for the telephones and computers.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
   United States Attorney
Jonathon M. Gerson
   Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

  *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

  *Attorney for Defendant Oladipo Alabi*

Donald Kochersberger
Streubel, Kochersberger & Mortimer LLC
Albuquerque, New Mexico

  *Attorneys for Defendant Kehinde Oguntoyinbo*

-157-