## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                 No. CR 11-2292 JB

OLADIPO ALABI and
KEHINDE OGUNTOYINBO,

      Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on Mr. Alabi's Motion to Suppress, filed July 3, 2012 (Doc. 36)("Motion to Suppress"). The Court held a suppression hearing on April 11, 2013. The primary issues are whether the Court should suppress all evidence seized during the search of Defendants Oladipo Alabi's and Kehinde Oguntoyinbo's Toyota Camry, because: (i) the stop was racially selective law enforcement in violation of the Equal Protection Clause of the United States Constitution; (ii) the search of the Camry violated Alabi's Fourth Amendment Right to be free from unreasonable searches; or (iii) the traffic stop violated Alabi's Fourth Amendment right to be free from unreasonable seizures. The Court will deny the Motion to Suppress. The Court concludes that, because Alabi was a passenger in the Camry, and because any possessory interest Alabi had in the Camry was insufficient to give him a legitimate expectation of privacy in the Camry, New Mexico State Police ("NMSP") Officer Chester Bobbitt's search of the Camry did not implicate Alabi's Fourth Amendment interests. Alabi, therefore, cannot be heard to object to Bobbitt's search of the Camry on Fourth Amendment grounds. Regardless whether the search implicated Alabi's Fourth Amendment interests, however, Oguntoyinbo's consent to search the Camry, the trunk, and the baggage in the Camry

was valid, and Bobbitt's subsequent search did not, therefore, implicate the Fourth Amendment. The traffic stop was not an unlawful seizure of Alabi, because Bobbitt had probable cause to believe that the Defendants violated New Mexico state law by driving on an interstate highway with expired license plate tags.  Finally, Alabi failed to proffer sufficient statistical or direct evidence to show that Bobbitt's traffic stop or vehicle search violated the Fifth Amendment, because it was racially selective law enforcement.  The Court thus concludes that Bobbitt's traffic stop and search of the Defendants' Camry did not violate Alabi's constitutional rights, and will not exclude the evidence derived from the search.

## **FACTUAL BACKGROUND**

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues.  See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a [pretrial] motion, the court must state its essential findings on the record.").  This Memorandum Opinion and Order's findings of fact shall serve as the Court's essential findings for rule 12(d) purposes.  The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure, and the voluntariness of an individual's confession or consent to search.  See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982)("[U]nder Rule[] 104(a) . . . , the district court 'is not bound by the Rules of Evidence except those with respect to privilege.'")(quoting United States v. Matlock, 415 U.S. 164, 174 (1974)).  In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court.  See Fed. R. Evid. 104(a)("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible.  In so deciding, the

court is not bound by evidence rules, except those on privilege."). Thus, the Court may consider

hearsay in ruling on a motion to suppress. See United States v. Merritt, 695 F.2d at 1269 ("The

purpose of the suppression hearing was, of course, to determine preliminarily the admissibility of

certain evidence allegedly obtained in violation of defendant's rights under the Fourth and Fifth

Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the

hearsay rule."); United States v. Garcia, 324 F. App'x 705, 708 (10th Cir. 2009)(unpublished)

("We need not resolve whether Crawford's[1] protection of an accused's Sixth Amendment

confrontation right applies to suppression hearings, because even if we were to assume this

protection does apply, we would conclude that the district court's error cannot be adjudged

'plain.'");[2] United States v. Ramirez, 388 F. App'x 807, 810 (10th Cir. 2010)(unpublished)("It is

beyond reasonable debate that Ramirez's counsel were not ineffective in failing to make a

Confrontation Clause challenge to the use of the confidential informant. The Supreme Court has

not yet indicated whether the Confrontation Clause applies to hearsay statements made in

suppression hearings."). Cf. United States v. Hernandez, 778 F. Supp. 2d 1211, 1226 (D.N.M.

2011)(Browning, J.)(concluding "that Crawford v. Washington does not apply to detention

---

[1] Crawford v. Washington, 541 U.S. 36 (2004), stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at trial unless the witness is unable to testify and the defendant had a previous opportunity to cross-examine the witness. See 541 U.S. at 53-54.

[2] United States v. Garcia is an unpublished opinion, but the Court may rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored . . . . However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision." United States v. Austin, 426 F.3d 1266 (10th Cir. 2005). The Court finds that United States v. Garcia, United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004), and Blackwell v. Strain, 496 F. App'x 836 (10th Cir. 2012), have persuasive value with respect to material issues in the case, and will assist the Court in its disposition in this Memorandum Opinion and Order.

hearings").[3]

1.      On April 6, 2011, at 8:20 a.m., Bobbitt was patrolling Interstate Highway 40 ("I-40") near Tucumcari, Quay County, New Mexico, and was parked alongside two other officers in separate police cruisers before 8:13 a.m.  See Transcript of Suppression Hearing at 17:5-15 (taken Apr. 11, 2013)(Gerson, Bobbitt)("Tr.")(Q: "[O]n the 6th of April, 2011, what assignment did you have for the day?"  A: "I was patrolling I-40 . . . . I would have left my residence around 7:00 and would have travelled to the interstate to begin to patrol the interstate.");[4] Tr. at 64:13-22 (Samore, Bobbitt)(Q: "[Y]ou recall being pulled off on the side of the road . . . shortly before th[e] [traffic camera] video begins at 8:13 in the morning . . . ?"  A: "Yes." Q: "Do you remember [with] whom you were meeting?"  A: "Sergeant Chavarria and there was someone else

---

[3] The Defendants do not raise any arguments under <u>Crawford v. Washington</u> against any evidence in this case, likely because all the declarants were available at the hearing for cross-examination.  The Court, therefore, need not decide whether <u>Crawford v. Washington</u> applies to suppression hearings.  The Court notes, however, that no court has held <u>Crawford v. Washington</u> applies to suppression hearings, and the courts that have decided the issue have found that <u>Crawford v. Washington</u> does not apply to suppression hearings.  <u>See</u> <u>Ebert v. Gaetz</u>, 610 F.3d 404, 414 (7th Cir. 2010)(right of confrontation does not apply at a suppression hearing); <u>United States v. Garcia</u>, 324 F. App'x. 705, 708 (10th Cir. 2009)(unpublished)("There is no binding precedent from the Supreme Court or this court concerning whether <u>Crawford</u> applies to pretrial suppression hearings.  To the extent that we can divine clues from our case law concerning the resolution of this issue, they do not benefit Mr. Garcia.").  <u>Cf.</u> <u>United States v. Morgan</u>, 505 F.3d 332, 339 (5th Cir. 2007)("[W]e hold that <u>Crawford v. Washington</u> does not apply to the foundational evidence authenticating business records in preliminary determinations of the admissibility of evidence."); <u>United States v. Saneaux</u>, 365 F. Supp. 2d 493, 498 n.5 (S.D.N.Y. 2005)(concluding that <u>Crawford v. Washington</u> does not apply to determining whether a statement is admissible under the coconspirators hearsay exception, "because the Court is not bound by the Rules of Evidence in the disposition of preliminary matters such as this one, I may properly consider such evidence even if it cannot be introduced at trial").

[4] The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcripts may contain slightly different page and/or line numbers.

I believe."  Q: "So there were two separate cars plus your car?"  A: "The best I can recall.").[5]

2.      Bobbitt, while parked on the side of I-40 eastbound with the two other police officers in separate cars, heard and saw the Defendants' Camry pass by him, heard that it was speeding, and gave chase to the vehicle.  See Tr. at 66:18-67:14 (Samore, Bobbitt)(Q: "Do you recall what caused you to pull back on the road that day?" A: "Yes. I noticed them speeding by. . . .  I saw the vehicle as it passed by . . . ."  Q: "You made eye contact with my client.  Do you remember that, as he passed you?"  A: "No, I don't' recall making eye contact with your client." Q: "Why did you notice [their] car as [it] went past . . . ?"  A: "I heard a noise, I noticed it was speeding.").

3.      When Bobbitt gave chase to the Camry, he pursued the vehicle at approximately 112.5 miles per hour.  See Tr. at 74:22-24 (Samore, Bobbitt)(Q: "Would you agree that from what that video shows you were going over 112 miles an[] hour?" A: "Okay"); Tr. at 75:13-14 (Gerson)(stipulating to the calculation of Bobbitt's speed based on the video); Alabi et al. NM

_____

[5] Some NMSP officers patrolling I-40 on April 6, 2011, were engaged in special criminal interdiction training, including Officer Adrian Salas and Sergeant Rigoberto Chavarria, who assisted Bobbitt on and off with the Defendants' investigation and arrest.  Bobbitt states, however, that he does not recall being a part of the interdiction. See Adrian Salas Department of Public Safety Daily Activity Log, dated April 6, 2011 (Defendant's Hearing Exhibit K at 3)(noting that from hours 08:00 to 13:30 he had drug interdiction training with Sergeant Chavarria); Tr. at 112:18-19 (Court admitting Exhibit K into evidence); Tr. at 120:4-7 (Samore, Bobbitt)("I don't' recall being a part of [the drug interdiction training exercises] if they were doing that.  I don't know.  That's what his daily says.  I don't recall being a part of that."); Tr. at 64:23-65:5 (Samore, Bobbitt)(Bobbitt deferring to the two other officers' daily reports, which state that "April 6 and 7 were some special [drug] interdiction training days"); Tr. at 79:22-24 (Samore, Bobbitt)(Q: "[Do you] recall that the two officers that assisted you in this case . . . were officer Chavarria and officer [Salas]?"  A: "Yes.").  Bobbitt's daily report from April 6, 2011, does not report that he was involved in drug interdiction training on that day.  See Chester Bobbitt Department of Public Safety Daily Activity Log, dated April 6, 2011 (United States' Hearing Exhibit 1)(logging traffic stop of "Oguntoyinbo, Kehinde," for "Expired Tags"); Tr. at 17:2-3 (Court)(admitting Exhibit 1 into evidence).  The Court therefore concludes that, while some officers engaged in criminal interdiction training on April 6, 2011, a preponderance of the evidence does not show that Bobbitt was among those officers.

State Police Traffic Stop Video at 8:14:06-14:47 (United States' Hearing Exhibit 2)("Traffic Stop Video");[6] Tr. at 20:15-18 (Court)(admitting into evidence United States' Hearing Exhibit 2).

4.    The speed limit on the I-40 section that Bobbitt was patrolling was 75 miles per hour.  See Tr. at 66:15-17 (Samore, Bobbitt)(Q: "[W]hat was the speed limit in the area you were pulled over?"  A: "Should have been 75.").

5.    Bobbitt's police cruiser is equipped with a video camera that allows him to record events in front of the vehicle.  See Tr. at 17:23-18:4 (Gerson, Bobbitt)(Q: "Was the vehicle you were driving that day [equipped] with a video camera . . . ?"  A: "Yes it was. . . .  [I]t basically is a camera installed in the vehicle to record different [events] throughout your day.").

6.    Bobbitt recorded the traffic stop of the Defendants' vehicle on April 6, 2011, with his police cruiser's video camera.   See Traffic Stop Video; Tr. at 18:19-19:1 (Gerson,

---

[6] The Traffic Stop Video's recording also includes sound recordings.  The sound recording, however, was inconsistent, cutting in and out, and sometimes catching only the sound of the wind outside, and the sound recording did not begin at the same time as the video feed, but began later.  Bobbitt explained that the mechanism to turn on the audio recording is separate from the mechanism to begin video recording, and admitted that, while NMSP officers are supposed to turn on the sound recording at the beginning of the stop, he "may have" pressed the button on his belt to begin audio recording after turning on the video and at the time the sound began.  Tr.  at 115:11-19 (Samore, Bobbitt)(Q: "[M]ight you have just turned on the audio on your belt right when . . . it's picked up on this recording."  A: "I may have, I don't know. . . .  I believe I turned it on probably as soon as I made the stop.").

Although Alabi suggested throughout his briefing and at the evidentiary that Bobbitt had purposely turned off the audio recording or somehow intentionally left portions out of the recording, the Court, in its review of the Traffic Stop Video, did not reach this conclusion.  The audio cuts in and out at times throughout the video; but the timing does not suggest any intentional loss, such as if Bobbitt turned on and off the recording.  Rather, the audio portions that came through on the video were some of the most damaging -- capturing both sides of Oguntoyinbo's consent to search vehicle and the trunk and all of Bobbitt's side of the conversation when he secured Alabi's consent to search the vehicle's inside and Alabi's bags -- and then much of the traffic stop that is largely irrelevant -- Bobbitt's conversations with the assisting officers.  Thus, while most of the audio recording in the Traffic Stop Video is non-existent, or, if it is, not clear, the Court finds that it is not through any intentional act and does not find fault with the United States or the NMSP.

Bobbitt)(Bobbitt noting that he "would have . . . turned on [the camera] when I made the traffic stop with the [Defendants] . . . ."); Tr. at 19:2-8 (Gerson, Bobbitt)(Q: "Was there a video taken of the stop of the car?"  A: "Yes there was.").

7.      When Bobbitt pulled up behind the Camry in the left-hand lane of traffic, Bobbitt observed that the Toyota Camry's California license plate tag was expired.  See Tr. at 21:14-23 (Gerson, Bobbitt)(Bobbitt explaining that the video shows him travelling behind a vehicle, and that, as he came up behind the vehicle, he noticed that "[t]he tags are expired."); Traffic Stop Video at 8:14:06-14:47.

8.      Bobbitt engaged his vehicle's siren and lights, and pulled the vehicle over to the right side of the road perform a traffic stop.  See Tr. at 22:15-20 (Gerson, Bobbitt)(Q: "[J]ust before I stopped the video from playing there was a new sound that came across the [audio system in] the Courtroom. What was that sound?"  A: "That would be me turning on my microphone, a[nd] siren . . . [t]o effect a traffic stop on the vehicle."); Tr. at 23:9-13 (Gerson, Bobbitt)("The vehicle has pulled over and stopped alongside the [Interstate] with me right behind it."); Traffic Stop Video at 8:14:06-15:14.

9.      The basis of Bobbitt's traffic stop of the Camry was that the Camry had expired license plate tags.  See Tr. at 22:21-22 (Gerson, Bobbitt)(Q: "And what was the basis for the traffic stop?"  A: "Expired tags.").

10.     When Bobbitt approached the driver-side window, he noticed that the driver and passenger were of African-American descent.  See Tr. at 24:12-25:1 (Gerson, Bobbitt)(Bobbitt explaining that it was when he approached the vehicle he observed the race or ethnicity of the Camry's driver and the passenger -- the Defendants);[7] id. at 22:23-23:6 (Gerson, Bobbitt)(Q: "At

_____

[7] Bobbitt's explanation about learning of the Defendants' race or ethnicity proceeded as

-7-

the point that you engaged your siren to have a stop take place, did you know who was inside this vehicle?" A: "No I didn't."  Q: Did you know the national origin o[f] any persons who might be inside this vehicle?"  A: "No.").

11.    Bobbitt did not know the driver's and passenger's race until he approached the driver-side window.

12.    Bobbitt asked the driver, Oguntoyinbo, for his license, proof of insurance, and registration; Bobbitt then asked Oguntoyinbo to step out of the vehicle while Bobbitt analyzed his paperwork.  See Tr. at 24:2-11 (Gerson, Bobbitt)(Q: "[Did we just] observ[e] . . . you engaging in some discussion with the driver of the vehicle and the driver getting out?"  A: "Yes."

_____

follows:

   Q.    Now, did you observe at some point after you approached the vehicle and engaged the driver in conversation, what race or ethnicity the driver was?

   A.  Sure.

   Q.  When was it that you observed that?

   A.  When I approached the vehicle.

   Q.   And did you observe anybody else inside the vehicle when you approached the vehicle?

   A.  Yes.  There was another gentleman inside the vehicle.

   Q.  And did you observe the race or[] [ethnicity] of that person?

   A.  Yes.

   Q.   And at the point that you approached the vehicle on foot to ask the driver for a license and [registration]or insurance information, was that the point at which you . . . discovered the race or ethnicity of the people in this car?

   A.  [Yes].

Tr. at 24:12-25:1 (Gerson, Bobbitt).

Q: "[W]hat did you say to the driver or what did the driver say to you?"  A: "I asked for his

driver's license, insurance, registration, and then I would have asked him to exit the vehicle with

-- and stand outside with me."); Traffic Stop Video 8:15:14-16:42.

13.     Bobbitt asked Oguntoyinbo to get out of the car for purposes of Bobbitt's safety.

See Tr. at 25:3-11 (Gerson, Bobbitt)(Q: "Why did you ask him to get out of the car?"  A: "It was

really an officer-safety issue.  When they park so close to the white line like that I'd rather not

stand on the white line to issue a citation or conduct any kind of business . . . .  I've almost been

run over several times doing that.").

14.     When Oguntoyinbo exited the Camry, Bobbitt took him to the rear of the vehicle

to show him that the license plate was expired.  See Tr. at 25:14-21 (Gerson, Bobbitt)(Q: "The

video appeared to show you . . . gesturing in some fashion as you were walking between your

vehicle and the defendants' vehicle. What were you doing there?"  A: "We were discussing his

expired license plate . . . .  Basically, I was showing him, hey, you know, your plates are

expired."); Traffic Stop Video 8:16:42-17:24.

15.     Bobbitt also told Oguntoyinbo: "And you were going too fast, too."  Traffic Stop

Video at 8:17:48-17:50.

16.     Oguntoyinbo followed Bobbitt to the front of Bobbitt's police cruiser, and

provided to Bobbitt his identification and the rental contract for the Camry.  See Tr. at 26:21-

27:8 (Gerson, Bobbitt)(Q: "[T]he point . . . after the driver [has] exited from his car[] and he's

standing there at the side of the road with you [did you know his identity]?"  A: "Only by his

identification he provided."   Q: "And had at this point had he shown you any registration

information for the car?"  A: "[A] rental contract."); Traffic Stop Video 8:16:42-17:24; Hertz

Rental Agreement (United States' Hearing Exhibit 3); Tr. at 28:18-19 (Court)(admitting Exhibit

3 into evidence).

17.     Oguntoyinbo told Bobbitt that he was not at fault for the Camry's expired tags, because, given that he was renting it, "it wasn't his car."  Tr. at 29:17-24 (Gerson, Bobbitt).  See Traffic Stop Video at 8:17:24-18:26.

18.     The Hertz Rental Agreement that Oguntoyinbo presented to Bobbitt had Oguntoyinbo's first name misspelled as "Ninende," where the driver's license that Oguntoyinbo presented to Bobbitt had Oguntoyinbo's correct first name, Kehinde.  Hertz Rental Agreement at 1.  See Tr. at 27:14-28:7 (Gerson, Bobbitt)(Bobbitt testifying that the name of the driver as he identified himself to Bobbitt that morning was "Ogunoyinbo, Kehinde"); Chester Bobbitt Department of Public Safety Daily Activity Log at 1.

19.     Bobbitt pointed out to Oguntoyinbo that his name was spelled differently on the Hertz Rental Agreement than it was spelled on his legal alien driver's license, and asked Oguntoyinbo which was the correct spelling, so that he could properly issue the traffic citation for the expired license plate tags.  See Tr. at 30:2-14 (Gerson, Bobbitt)("I was comparing his identification . . . and the rental contract that he also provided to me.  The name -- the name on the contract is spelled differently than what was on his ID."); Tr. at 30:19-22 (Q: "And why, if at all did you need to know the spelling of his name as you were standing there on the side of the roadway?"  A: "To[] properly issue the traffic citation for the expired tags."); Traffic Stop Video at 8:18:26-18:56.

20.     After discussing the discrepancy about the misspelling of Oguntoyinbo's first names, Bobbitt issued the traffic citation to "Kehinde Oguntoyinbo."  Tr. at 30:23-31:9 (Gerson, Bobbitt)(Q: "[T]o whom did you issue [the traffic citation]?"  A: "Kehinde Oguntoyinbo.").  See State of New Mexico Uniform Traffic Citation, dated April 6, 2011 (United States' Exhibit

4)("Traffic Citation"); Tr. at 31:16-17 (Court)(admitting Exhibit 4 into evidence).

21.     While writing out the traffic citation, Bobbitt asked Oguntoyinbo about his travels, including where he lived, where he was heading, and why he was heading there. Oguntoyinbo responded that he had flown over from Nigeria, that he was headed to Texas to "buy wrecked cars," and that he did not have a place of residence in the United States.  Tr. at 32:4-11 (Gerson, Bobbitt)(A: "We were talking about his travels, what he did for a living, and why [and] where he was headed"   Q: "And what if anything did he tell you about a place of residence in the United States?"   A: "He told me he didn't have one."); Traffic Stop Video at 8:20:04-24:05.

22.     Bobbitt did not issue Oguntoyinbo a traffic citation, but rather issued him a written warning only.  See Traffic Citation at 1.

23.     When Bobbitt finished writing out the traffic warning, he asked Oguntoyinbo to sign and initial the warning.  When Oguntoyinbo followed Bobbitt's directions, Bobbitt gave Oguntoyinbo the citation and returned the information Oguntoyinbo had provided Bobbitt.   See Tr. at 33:5-15 (Gerson, Bobbitt)(Q: "[W]hat, if anything, did Mr. Oguntoyinbo do after you said to him, 'sign here, initial here,' with respect to th[e] citation?"   A: "He initialed and signed the citation and I gave him his information and the citation."); Traffic Stop Video at 8:24:05-27:11; Traffic Citation at 1.

24.     Bobbitt then told Oguntoyinbo that "[h]e was free to leave."  Tr. at 33:18-20 (Gerson, Bobbitt)(Q: "I'm stopping the video at 8:27 and 26 seconds.  Officer Bobbitt, what did you just tell Mr. Oguntoyinbo at this point?"   A: "He was free to leave.").  See Traffic Stop Video at 8:27:11-27:26.

25.     After Bobbitt had returned to Oguntoyinbo all of his information and told

Oguntoyinbo that he was free to leave, as Oguntoyinbo turned around and was headed back to the Camry, Bobbitt asked Oguntoyinbo if he could ask Oguntoyinbo "some questions."  Tr. at 33:18-34:2 (Gerson, Bobbitt)(Q: "What did you say to Mr. Oguntoyinbo at this point?"  A: "I asked him if I could ask him some questions."  Q: "What was he doing at that point . . . ?"  A: "He was leaving. . . .  I had already returned [his identification and other materials] to him."). See Traffic Stop Video at 8:27:26-27:35.

26.    Bobbitt asked Oguntoyinbo if he could speak with the vehicle's passenger, to which Oguntoyinbo responded that he could speak with the passenger.  See Tr. at 34:11-14 (Gerson, Bobbitt)("I asked him if he minded if I went and talked to the passenger of the vehicle, his friend. . . .  He said go ahead."); Traffic Stop Video at 8:27:35-28:6.

27.    In response to Bobbitt's question, "you guys ain't hauling anything illegal right," Oguntoyinbo responded "no, no, no, no," and that he would not do something of that nature, because he is "a family man," with "six kids . . . [and] two wives."  Traffic Stop Video 8:27:38-27:52.  Oguntoyinbo explained to Bobbitt that, although having two wives is not possible in the United States, it is possible in Nigeria.  See Traffic Stop Video at 8:27:54-28:00.

28.    Bobbitt then approached the Camry's passenger-side and spoke with Alabi.  See Tr. at 34:15-16 (Gerson, Bobbitt)("I walked up to the vehicle and spoke with Mr. Alabi."); Traffic Stop Video at 8:28:6-30:35.

29.    When Alabi gave Bobbitt permission to ask him questions, Bobbitt and Alabi talked about Alabi's travels, where he was headed, and what kind of business he and Oguntoyinbo were conducting, to which Alabi responded that they were headed to Dallas, Texas to attend an automobile auction.  See Tr. at 34:22-35:2 (Gerson, Bobbitt);[8] Traffic Stop Video at

---

[8]  Bobbitt explained what he discussed with Alabi while questioning him at the

8:28:6-30:35.

30.     After the conversation with Alabi, Bobbitt returned to Oguntoyinbo, who was standing behind the Camry and in front of the police cruiser, and asked Oguntoyinbo if he could search the Camry's trunk.   Oguntoyinbo told Bobbitt that he could search the trunk, and Oguntoyinbo opened the trunk for Bobbitt.   See Tr. at 35:5-14 (Gerson, Bobbitt)("I returned back to Mr. Oguntoyinbo. . . .   I . . . asked him if I could look in the trunk of the vehicle. . . .   He said I could."); Tr. at 35:15-18 (Gerson, Bobbitt)("He went over to the vehicle and opened the trunk for me. . . .   I walked over to the trunk and looked inside."); Traffic Stop Video at 8:30:35-31:02.

31.     While looking into the trunk, Bobbitt asked Oguntoyinbo if he could search the inside of the vehicle, to which Oguntoyinbo responded that he could search the vehicle.   See Tr. at 35:21-36:5 (Gerson, Bobbitt)("I was standing there looking at the trunk, and then I eventually asked Mr. Oguntoyinbo if I could search his vehicle. . . .   He said I could."); Traffic Stop Video at 8:31:02-31:35.

32.     Bobbitt walked to the passenger-side door and asked Alabi if he was carrying drugs, guns, or anything similar.   See Traffic Stop Video at 8:32:01-32:05.

33.      Bobbitt asked Alabi if he could search the vehicle, and Alabi gave Bobbitt permission to search the vehicle.   Bobbitt also asked if Alabi had any luggage in the vehicle;

---

Defendants' vehicle:

> I approached the vehicle and spoke [with] Mr. Alabi, asked him if I could ask him some questions, and he complied, and we sat there and talked about his travels, where he was [headed] to and what kind of business they were conducting, which, basically, if I recall right he said he was headed to Dallas, Texas, to an auto auction.

Tr. at 34:22-35:2 (Gerson, Bobbitt).

Alabi responded that the bags in the backseat were his.  When Bobbitt asked Alabi "if he had a

problem with me searching that stuff, . . . he said no."  Tr. at 36:25-37:6 (Bobbitt).[9] See Traffic

_____

[9] Bobbitt testified:

> I've approached the passenger of the vehicle, Mr. Alabi, and I've asked him if I
> could -- if he minded if I searched the vehicle.  He said I could, and I asked him if
> he had any luggage or baggage in the vehicle that was his, and he told me there
> was some bags in the backseat that was his.
>
>         I asked him if I could search -- if he had a problem with me searching that
> stuff, and he said no.

Tr. at 36:25-27:6 (Bobbitt).  During Alabi's direct testimony, in response to the question: "Do
you recall if you even understood any right to consent or not to consent to search of the vehicle,"
Alabi stated: "I don't recall none was given either."  Tr. at 201:2-4 (Samore, Alabi).  Alabi
asserted: "Officer Bobbitt approached me on the April 6, 2011, and the first question he asked
me [is] how many wives do I have."  Tr. at 201:21-22 (Alabi).  Review of the Traffic Stop
Video, however, contradicts Mr. Alabi's statement.  While the audio portion was not easy to
understand at times, because of the wind, the first question Bobbitt asked Alabi was: "Can I ask
you some questions?"  Traffic Stop Video at 8:28:10-28:14.  After Alabi granted Bobbitt
permission, Bobbitt asks: "Where are you all headed to?  What kind of business do you all do?"
Traffic Stop Video at 8:28:14-28:25.  Bobbitt and Alabi then discuss Alabi's participation in the
"car auction business" for a few moments.  Id. at 8:28:25-8:29:12.  Bobbitt asks if Alabi and
Oguntoyinbo are transporting anything illegal in the car.  See id. at 8:29:15-29-38.  After this
discussion about the Defendants' business and Alabi responding that they do not possess
anything illegal in the Camry, Bobbitt asks Alabi how many wives he has and said that he was
asking such a question only because Oguntoyinbo said that he had two wives.  See Id. at 8:29:40-
29:42.
        After Oguntoyinbo gave Bobbitt permission to search the vehicle, Bobbitt returned to the
passenger-side window, and either asked or told Alabi that he was going to search the inside of
the Camry, and asked Alabi: "Do you have a problem with that?"  Id. at 8:31:59-32:09.
Although the Court cannot hear Alabi's answer in the audio recording, it is reasonable to infer
that Alabi said that he did not have a problem with Bobbitt searching the inside of the car,
because Bobbitt then asked if Alabi had "any bags" in the car that "belong" to Alabi.  Id. at
8:32:10-32:14.  Bobbitt then affirms that Alabi said he has "two in back," to which Bobbitt
responded: "[D]o you have a problem if I search the bags?"  Traffic Stop Video at 8:32:14-
32:20.  Again, although the Court could not make out Alabi's response exactly, the Court
believes that Alabi at the least understood Bobbitt's request for consent, because Bobbitt
responds: "If there ain't nothin' in there, you ain't got nothin' to worry about."  Id. at 8:32:20-
32:28.  The Court finds that Bobbitt is correct in stating that Alabi then consented to Bobbitt's
search of the bags, because immediately afterward, Bobbitt says: "OK, do you want to step out?"
Id. 8:32:28-32:30.  Based on Bobbitt's testimony at the evidentiary hearing and the audio
recording in the Traffic Stop Video, the Court concludes that Bobbitt's testimony about

-14-

Stop Video at 8:31:58-32:37.

      34.    Bobbitt did not ask the Defendants to sign the NMSP consent form, because he

thought that the Defendants' verbal consent was sufficient.  See Tr. at 122:4-22 (Samore,

---

obtaining Alabi's consent is credible and accurate.  Moreover, the audio recording in the Traffic Stop Video contradicts Alabi's testimony that Bobbitt did not ask for Alabi's consent when talking to him through the passenger-side window.  Accordingly, the Court finds that Alabi's testimony that he did not give his consent to search the Camry and/or the bags inside the Camry, is not credible.  The Court finds that Bobbitt obtained consent from Oguntoyinbo to search the vehicle and the trunk, and that Bobbitt also obtained Alabi's consent to search the inside of the vehicle and Alabi's luggage in the vehicle's backseat.

      The Court has had many cases with this exact fact pattern -- an NMSP officer stops a car for a minor traffic violation, writes out a citation or a warning, hands back all the driver's information, tells the driver he or she can go, and then the officer asks the driver if the officer can ask a few more questions, eventually asking for consent to search the vehicle.  The driver consents, contraband is found, the driver is arrested, and the Court is asked to suppress the evidence on one or more grounds.  See e.g., United States v. Harmon, 785 F. Supp. 2d 1146, 1153 (D.N.M. 2011), reconsideration denied, 871 F. Supp. 2d 1125 (D.N.M. 2012)(Browning, J.)(noting that the officer issued a written warning to the plaintiff, Harmon, "returned Harmon's paperwork[,] . . . made sure that Harmon had everything and told him to be careful," and after "Harmon turned away and started walking back to the [car]," the officer "asked whether he could ask a few more questions," and obtained Harmon's consent to search the car); United States v. Rafael Goxcon-Chagal, No. CR 11-2002 JB, Criminal Complaint at 3, filed June 29, 2011 (Doc. 1)(noting that, after issuing the driver a citation, the officer "returned all documentation to Goxcon and advised him he was free to leave," but, "[a]s Goxcon neared his vehicle [the officer] asked Goxcon if he could ask Goxcon some questions," secured Goxcon's oral and written consent to search the vehicle, and found methamphetamine); United States v. Efren Valencia-Montoya, No. CR 11-2990 JB, Criminal Complaint at 2, filed November 14, 2011 (Doc. 2)(noting that the officer "issued Valencia-Montoya a citation[,] . . . returned all of Valencia Montoya's paperwork," and told Valencia-Montoya that he "was free to leave, [the] Officer . . . asked Valencia-Montoya if he was willing to answer some more questions.  Valencia-Montoya agreed and [the] Officer . . . asked for and received verbal and written consent to search" the vehicle, the search of which led to discovery of a package containing 1.14 gross kilograms of methamphetamine).  In these cases, the Court has come to conclude, often, as here, sifting through the record from an evidentiary hearing, that the NMSP are well-versed in the procedure, and obtain valid and effective consent.  It is unlikely that Bobbitt, as an NMSP officer, so well-trained in securing consent, would search without consent.  Moreover, here, Bobbitt's testimony at the evidentiary hearing that he believed Oguntoyinbo's and Alabi's oral consent valid, and thus did not require them to sign the NMSP consent form, was not the first time Bobbitt said that. In reviewing the entire Traffic Stop Video at Alabi's counsel's behest after the evidentiary hearing, the Court twice heard Bobbitt tell the NMSP officers assisting him with the arrest that he obtained valid and effective oral consent from the Defendants.  See Traffic Stop Video at 9:16:00-16:05; id. at 9:17:28-18:33.

Bobbitt)(Q: "[Y]ou had [available] to you a [NMSP} consent form on the day that you stopped

my clients, didn't you?" A: "Yes."  Q: "[Y]ou didn't offer that consent form did you?" A: "No I

didn't."  Q: [Y]ou felt that their [oral] []consent was enough, you didn't need to use the consent

form." A: "Right.").

35.    Bobbitt asked Alabi to exit from the Camry, and had Oguntoyinbo and Alabi

stand to the right of the vehicle -- for Bobbitt's safety while he searched the vehicle, and for

Oguntoyinbo's and Alabi's safety from traffic during the search -- while Bobbitt searched the

car.  See Tr. at 37:9 (Bobbitt)("I asked [Alabi] to exit the vehicle, he did."); Tr. 37:23-38:5

(Gerson, Bobbitt)(Q: "Did the video show where Mr. Alabi and Mr. Oguntoyinbo were after they

came out of the car?" A: "Yes, I asked them to stand out front towards the right front of their

vehicle. . . . It's for my safety and theirs.  I don't want them to run over any more than I want to

be run over . . . .  I began to search the vehicle."); Traffic Stop Video at 8:32:37-34:00.

36.    During the search of the Camry, Bobbitt found

> approximately 67 Walmart cash cards valued at approximately $25.00 each . . . ;
> hidden underneath the spare tire in the trunk.  In the back seat was a (Louis
> Vuitton) bag, which contained a large amount of cash (approximately $5,673.00).
> Inside the vehicle was . . . another Louis Vuitton bag, which contained a laptop
> computer and a bundle of paperwork, which listed approximately 500 different
> names, along with birthdates, social security numbers, addresses, phone numbers.
> Further, there were numerous debit cards listed in both subjects [sic] names and
> five debit cards, which had different names . . . .

State of New Mexico Incident Report at 3, dated April 6, 2011 (United States' Hearing Exhibit

5).  See Tr. at 39:19-25 (Gerson, Bobbitt)(noting that during the course of the Camry search he

found "certain things in the course of that search"); Tr. at 39:16-17 (Court)(admitting Exhibit 5

into evidence).

37.    Bobbitt did not draw or touch his side-arm weapon during his encounter with the

Defendants, and used a conversational, professional, and friendly tone with Oguntoyinbo when

asking for consent to search the vehicle and the trunk.  See Traffic Stop Video at 8:14:06-34:00.

38.     After the Defendants provided Bobbitt consent to search the Camry, the trunk, and the luggage in the Camry, neither Defendant voiced an objection to Bobbitt or any of the other officers about the search at any time.  See Traffic Stop Video at 8:14:06-34:00.

39.     Throughout the day on April 6, 2011, Officers Adrian Salas, Nathan Serum, Joshua Compos, and Sergeant Rigoberto Chavarria assisted Bobbitt on and off with the Defendants' investigation and arrest. See Tr. at 79:22-24 (Samore, Bobbitt)(Q: "[Do you] recall that the two officers that assisted you in this case . . . were officer Chavarria and officer [Salas]?" A: "Yes."); Tr. at 147:1-10 (Elliot)("[O]fficers Nathan [S]erum and Joshua Compos . . . are two of the uniforms that were present providing security, detaining the defendants on the side of the road.").

40.     Chavarria noted in his daily that he "[a]ssisted Officer Bobbitt with two Nigerians who had what appeared to be identification."  Rigoberto R. Chavarria Department of Public Safety Daily Activity Log at 2, dated April 6, 2011 (Defendants' Hearing Exhibit K at 2).

41.     Chavarria testified that he does not note the nationality of Anglo-Americans in his reports, but explained that the reason he used the nationality in this case was so that the government can contact the national consulate.  See Tr. at 133:1-11 (Samore, Chavarria)(Q: "If we were to go through your reports when you arrest white people do you note their nationality on your reports."  A: "No. . . .  [T]he reason they were used is we had [to] find out exactly where they're from.  This way we can go ahead and contact the consulate. . . .  [I]t's a mental note for myself and a note to make sure that the consulate has been notified.").

42.     Chavarria was among the named defendants in two civil lawsuits brought by former NMSP officers, of African-American descent, who alleged claims for racial

discrimination.  Judgment was not entered against Chavarria in either case  See Tr. at 136:1-14

(Samore, Chavarria)(Q: "[D]o you remember that claim being filed by Mr. Jackson?"  A: "Yes."

Q: "Mr. Jackson was a black man, wasn't he?"   A: "Yes."); Tr. at 137:4-17 (Samore,

Chavarria)(Q: "[Do you remember a case] [t]hat involved a gentleman name James Brown . . .?"

A: "I sure do."  Q: "James Brown was a black man?"  A: "That's correct."  Q: "And one of the

allegations against you, no finding of liability ultimately . . . accused you of racial discrimination

didn't it?"  A: "That's correct.").

43.    Quay and Guadalupe Counties are adjacent counties in eastern New Mexico, with

Guadalupe County just west of Quay County.  See Office of the N.M. Sec'y of State, New

Mexico Blue Book 338 (Kathryn A. Flynn, ed., July 2012).[10]  I-40 passes through both Quay and

Guadalupe Counties.  Quay County's county seat is in Tucumcari.  See Quay County, http://

www.quaycounty-nm.gov (last visited May 13, 2013).

44.    From January 1, 2011, to December 31, 2011, there were twenty-three vehicle

searches in Quay and Guadalupe Counties.  Out of the twenty-three searches, based on visual

inspection of the pictures of the subjects, twenty-one of the searches' subjects were of a minority

---

[10] The Court takes judicial notice of this fact. Rule 201 of the Federal Rules of Evidence provides that a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).  "A court has discretion to take judicial notice of such facts, whether requested or not."  In re Thornburg Mortg., Inc. Securities Litigation, No. CIV 07-0815 JB/WDS, 2009 WL 5851089, at *1 (D.N.M. Dec. 21, 2009)(Browning, J.)(citing Fed. R. Evid. 201(c)).  A Court may take judicial notice of facts for evidentiary purposes in motions to suppress.  See United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *3 & n.2 (D.N.M. Feb. 19, 2010)(Browning, J.)(taking "judicial notice that 330 Louisiana Boulevard is located between Lomas Boulevard and Central Avenue," sua sponte so that the Court could "fully analyze whether . . . consent was voluntary").  The Court may properly take judicial notice of New Mexico's counties.  See Coffey v. United States, No. CIV 08-0588 JB/LFG, 2012 WL 5995622, at *5 n.17 (D.N.M. Nov. 25, 2012)(Browning, J.)("That McKinley County is a New Mexico County . . .  meets both of the factors listed in rule 201(b).").

race.  See Tr. at 150:17-20 (Samore, Elliot)(Elliot noting that the chart of pictures -- Defendants'

Hearing Exhibit AB -- was compiled from "[t]he response to my written request from the New

Mexico Department of Public Safety . . . . under the public records act"); T. at 164:7-9 (Gerson,

Elliot)(Q: "[T]his data about automobile searches was derived from your examination of certain

stated New Mexico State Police records?"   A: "New Mexico States Police, court records,

anything that I could find in which a search was identified as having been conducted on the side

of the road."); Tr. at 154:6-155:18 (Samore, Elliot)(Elliot explaining that "for the period of time

that we were looking at I believe there were approximately 23 searches . . . . primarily the county

of Quay County that we addressed . . . .  Of the 23 listed 21 appear to be minority."); Tr. at

170:12-13 (Gerson, Elliot)(Q: "How did you determin[e] the race of these people?"  A: "Looking

at them.").  See also Chart of Twenty-Three Vehicle Search Subjects at 1 (Defendants' Hearing

Exhibit AB); List Chart of  Twenty-Three Vehicle Search Subjects at 1-6 (Defendants' Hearing

Exhibit AG); Rigoberto R. Chavarria Department of Public Safety Daily Activity Log, dated

January 7, 2011 (Defendants' Hearing Exhibit AE)(daily activity log, tickets, and arrest report

for Maurice Grimes/Christopher Maxwell); Compilation of Daily Activity Logs and

Arrest/Citation Reports for Additional Twenty-Two Subjects (Defendants' Exhibit AI)(daily

activity logs, tickets, and/or arrest reports for additional twenty-two subjects pictured on Chart of

Twenty-Three Vehicle Search Subjects); Tr. at 174:21-22 (Court)(admitting Exhibit AB into

evidence); Tr. at 163:9-11 (Court)(admitting Exhibits AE, AG, and AI into evidence).

     45.    If an NMSP officer conducted a consent search of a vehicle after performing a

traffic stop, but did not record the search on the officer's daily activity log, Elliot would have no

way of knowing about the search, and it is not included in the twenty-three subjects he identified.

See Tr. at 166:19-25 (Gerson, Elliot).[11]

46.     There is no information about the demographics or characteristics of the larger category of people who were subjected to NMSP traffic stops in Quay County on I-40 in the first six months of 2011, but the stops likely numbered in the thousands.  See Tr. at 165:7-11 (Gerson, Elliot)(Q: "Do you have any information at all about the demographic characteristics of the category of people that this is a subcategory of, that is, the demographic [characteristics] of the people who had been subject to traffic stops?"   A: "No, sir."); id. at 166:13-18 (Gerson, Elliot)(Q: "Could you estimate for the Court approximately how many  traffic stops total would have taken place in the first half of 2011 along that road in Quay County?" A: "No, sir I could not do that."  Q: "Would you agree that it's hundreds of stops?"  A: "I would estimate thousands of stops.").

47.     There is no information about the demographics or characteristics of the larger category of people who were travelling along I-40 during the first six months of 2011.  See Tr. at 165:22-25 (Gerson, Elliot)(Q: "And you don't have any information, do you about the demographic characteristics of people who are traveling on I-40 during the first six months of 2011?"  A: "No, sir.").

48.     Bobbitt stopped one of the twenty-three individuals subjected to a roadside search

---

[11] During cross-examination, Elliot admitted that, if an officer did not record a consent search, he would not have known about it, and it could not have been included in his charts:

> Q: Now, [isn't it] also true, Mr. Elliott, that if a police officer had conducted a consent search of a vehicle after a stop but hadn't recorded it on his dailies, that you would have had no way to include it in the set of stops that you've identified here in Exhibit AG?

> A: If they did not record it on their daily or someplace else, there's no way I would know about it.

Tr. at 166:19-25 (Gerson, Elliot).

in 2011, Alfredo Ramirez, on I-40 near Tucumcari for tinted windows, told Ramirez to exit the truck, and searched the trunk without first asking for permission.  See Tr. at 194:8-195:10 (Samore, Ramirez)(Ramirez explaining that he recognized Bobbitt leaving the courtroom, because Bobbitt "stopped me for tinted window . . . .  He told me to get out . . . .  [H]e told me to open the trunk of the truck."  Q: "Did he ask you [permission] to search?"  A: "No.").

49.     Bobbitt's daily activity log for the day that he stopped Ramirez states that Bobbitt issued Ramirez a citation for his window tint, searched Ramirez' vehicle, and found less than one ounce of marijuana and paraphernalia in Ramirez' vehicle.  See Chester Bobbitt Department of Public Safety Daily Activity Log and Citations at 1, dated March 2, 2011 (Defendants' Hearing Exhibit AJ).

50.     Bobbitt found marijuana or marijuana paraphernalia in the roadside search of Ramirez' vehicle, and the first time Ramirez learned that Bobbitt reported finding those items was when Elliot interviewed him during his investigation of this case.  See Tr. at 195:14-25 (Samore, Ramirez)(Q: "What did [Bobbitt] do?"  A: "He just searched and he didn't find nothing . . . [H]e just told me to get in the truck.  And I signed a paper tinted window . . . ."  Q: "And did he ever at any time tell you that he had found marijuana?" A: "Actually no. . . .  I barely found out now like a month ago . . . [when Elliot was] saying they found something in my truck. That wasn't true.").

## PROCEDURAL BACKGROUND

On August 24, 2011, a federal grand jury indicted the Defendants for: (i) Count I -- Access Device Fraud in violation of 18 U.S.C. §§ 1029(a)(3) and 2; and (ii) Aggravated Identity Theft in violation of 18 U.S.C. §§ 1028A(a)(1) and 2.  See Indictment at 1-2 (Doc. 2).  On July 3, 2012, Alabi filed his Motion to Suppress, moving the Court to suppress all evidence found

during the search of their vehicle on April 6, 2011, because, according to Alabi, the traffic stop and search were racially selective law enforcement and thus illegitimate at their inception.  See Motion to Suppress at 3.  Alabi points out that "[t]he Constitution prohibits selective enforcement of the law, based on consideration[s] (such) as race."  Motion to Suppress at 3 (quoting Whren v. United States, 517 U.S. 806, 813 (1996).  Alabi notes that "a person making a selective prosecution claim must establish two elements: '1) Federal prosecutorial policy had a discriminatory effect, and 2) it was motivated by a discriminatory purpose.'"  Motion to Suppress at 4 (quoting United States v. Armstrong, 517 U.S. 456, 465 (1996)).

Alabi argues that "[a]n extensive history exists regarding the use and substantial reliance of certain traffic techniques by NMSP officers particularly in Quay and Guadalupe counties to selectively stop black people."  Motion to Suppress at 4.  Alabi asserts that, at the time he filed the Motion to Suppress, he has "located at least ten cases, several of which have resulted in civil lawsuits and settlements over the past five years."  Motion to Suppress at 5.  He contends that "[t]he defense in proving selective enforcement need only 'make a credible showing that [sic] similarly-situated individual of another race could have been, but was not, (stopped or) arrested.'"  Motion to Suppress at 5 (quoting United States v. James, 257 F.3d 1173, 1179 (10th Cir. 2001)).  He argues:

> The Toyota Camry was stopped for racially-based reasons, and that alone is sufficient to warrant suppression of any alleged evidence obtained after the vehicle was stopped.  The evidence indicates the stop appeared to be a pretext, motivated by racial reasons, which elevates the standard for scrutiny of a permissible traffic stop. It is a violation of the Due Process Equal Protection Clause and subject to suppression.
>
> While a pretext stop alone may not be sufficient to vitiate a stop and search, when that stop and search is motivated by racial reasons, the Constitutional standard for propriety of such stop is higher.  Since no valid consent was obtained to search either the trunk or the passenger cab, the search of the vehicle violated the Fourth Amendment. Additionally, the detention of the

passengers was unlawful and the fruit of the unlawful detention (the alleged evidence obtain therefrom) should be suppressed.

Motion to Suppress at 5 (internal citations omitted)(citing United States v. James, 257 F.3d at 1179).

On July 17, 2012, the United States filed the Government's Memorandum in Opposition to Defendant Alabi's Motion to Suppress (Doc. 48)("MTS Response").  The United States points out that the prosecution is vested with broad discretion to charge any defendants with crimes, "so long as the government 'has reasonable cause to believe that the accused committed an offense defined by statute.'"  MTS Response at 2 (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978).  The United States asserts that the Supreme Court of the United States has recognized that the United States' broad discretion to charge defendants with crimes "'is particularly ill-suited to judicial review'" and that "judicial supervision in this area would entail high [opportunity] costs."  MTS Response at 2 (quoting Wayne v. United States, 470 U.S. 598, 607 (1984).  Recognizing that "[s]electivity in the enforcement of criminal laws is, of course, subject to constitutional constraints," according to the United States, "the conscious exercise of some selectivity in enforcement is not itself a constitutional violation so long as 'the selection was not deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'"  MTS Response at 3 (quoting Bordenkircher v. Hayes, 434 U.S. at 364).  The United States asserts that, "'in the absence of clear evidence to the contrary, courts presume that [prosecutors] have properly discharged their official duties.'"  MTS Response at 3 (quoting United States v. Armstrong, 517 U.S. at 464).

The United States argues: "To make a successful claim of selective prosecution, the claimant faces a demanding burden," and must present "clear evidence . . . . that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory

purpose.'"  MTS Response at 3 (citing <u>Wayte v. United states</u>, 470 U.S. 598, 608 (1984)).  For the first prong, the United States contends that, with respect to race specifically, "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted."  MTS Response at 4 (citing <u>United States v. Armstrong</u>, 517 U.S. at 465).  The United States asserts that the Court should look to the United States Court of Appeals for the Eleventh Circuit and the United States Court of Appeals for the Fourth Circuit to construe similarly situated individuals to mean individuals "engaged in the same type of conduct," meaning that the individual "committed the same basic crime in substantially the same manner," so that the "circumstances present no distinguishable legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them."  MTS Response at 4 (internal quotations omitted)(quoting <u>United States v. Smith</u>, 231 F.3d 800, 810 (11th Cir. 2000); <u>United States v. Hastings</u>, 126 F.3d 310, 315 (4th Cir. 1997)).  In relation to the second prong, the United States contends that a discriminatory purpose requires more than knowledge of the disparate consequences of action, but rather "requires that the prosecutor took actions, in part, because of and not merely in spite of its adverse affects [sic] upon an identifiable group."  MTS Response at 4 (citing <u>Wayte v. United States</u>, 470 U.S. at 610).

The United States argues that a selective prosecution claim is not an affirmative defense to the merits of a criminal action, but rather an independent assertion and, thus, court-ordered discovery of documents and materials in support of a selective prosecution is "an extraordinary remedy that may not issue except upon the requisite showing of deprivation of equal protection in violation of the due process clause of the Fifth Amendment."  MTS Response at 5 (citing <u>United States v. Armstrong</u>, 517 U.S. at 463).  The United States contends that, "to obtain discovery, the defendant must present 'some evidence tending to show' the essential elements of

the selective prosecution defense."  MTS Response at 5-6.  It asserts that the United States Court

of Appeals for the Tenth Circuit construes the "'some evidence tending to show' standard as less

than a prima facie case, but it bore in mind the Supreme Court's admonition that 'the showing

necessary to obtain discovery for a selective prosecution defense must itself be a significant

barrier to the litigation of insubstantial claims.'"  MTS Response at 6 (quoting United States v.

James, 257 F.3d at 1178).

      The United States argues that Alabi seeks a suppression hearing "to allow him a vehicle

for taking discovery in connection with his selective prosecution claim."  MTS Response at 6.

The United States asserts that the Court should not grant Alabi the opportunity, because he failed

to make a credible threshold showing of any selective prosecution claim.  See MTS Response at

7.  The United States contends that, to make such a showing, Alabi could: (i) identify similarly

situated individuals, who committed the same crime in the same manner, but were members of a

different race, and spared prosecution; or (ii) present statistical evidence showing that charging

decisions for similarly situated passengers who are subject to prosecution for offenses like those

that the Indictment charges "are meaningfully correlated with race."  MTS Response at 7 (citing

United States v. James, 257 F.3d at 1179).   The United States further contends that, after

presenting this information relevant to the first prong of a selective prosecution claim, Alabi

would then have to present "'some evidence tending to show' a discriminatory purpose."  MTS

Response at 8.

      The United States asserts, however, that, because Alabi has made no credible showing of

discriminatory effect, "the Court need not address . . . discriminatory purpose."  MTS Response

at 8.  The United States argues that, if the Court addresses the second prong, Alabi has made no

showing, let alone produced "'clear evidence' that 'the decision whether to prosecute' 'was

motivated by a discriminatory purpose,'" because, although Alabi contends that he uncovered ten court cases with similar racial animus, several of which resulted in civil court cases, he "does not identify any such cases." MTS Response at 8 (quoting United States v. Armstrong, 517 U.S. at 465). The United States argues: "Even if Alabi successfully identifies 'several' civil lawsuits and settlements in his reply brief, arising from traffic stops in Quay and Guadalupe Counties in which racial animus was alleged, he will not have made a credible showing of discriminatory purposes in the present case." MTS Response at 9.

The United States also points out: "In some parts of his motion Alabi specifically denies that he is making a suppression argument under the Fourth Amendment . . . . Elsewhere in his motion . . . he makes a garden variety search and seizure claim." MTS Response at 9 (citing Motion to Suppress at 4, 5). It asserts: "To the extent that the Court reads Alabi's motion to be a motion to suppress under the search and seizure clause of the Fourth Amendment, the Court should deny the motion without a hearing." MTS Response at 9. According to the United States, the Court should deny any Fourth Amendment claim without a hearing, because Alabi admits in his Motion to Suppress that Oguntoyinbo was driver of the Camry, rented the Camry, that Oguntoyinbo consented to the search, and that Alabi denied ownership of any contraband in the car; thus, "[t]he factual allegations in his motion do not raise any dispute as to whether consent was in fact obtained, or whether the consent was voluntary, or whether the consent was in any other way invalid." MTS Response at 10. The United States contends that Alabi fails to make the requisite showing to warrant an evidentiary hearing, as he has not met his "burden of showing that there are disputed issues of material fact." MTS Response at 10 (quoting United States v. Chavez-Marquez, 66 F.3d 259, 261 (10th Cir. 1995)). The United States argues that Alabi's general "conclusory claims that 'no valid consent was obtained,' or that his investigative

detention was 'unlawful'" do not "constitute the 'sufficiently definite, specific, detained, and nonconjectural' factual allegations required under the applicable caselaw."  MTS Response at 10 (quoting Motion to Suppress at 5; United States v. Barahas-Chavez, 358 F.3d 1263, 1266-67(10th Cir. 2004)).

The United States also argues that the Court should reject any Fourth Amendment grounds for suppression that Alabi may be asserting, because he was merely a passenger in the car, and "[p]assengers lacking a possessory interest in a vehicle typically have no legitimate expectation of privacy therein."  MTS Response at 11 (citing Rakas v. Illinois, 439 U.S. 128, 148-49 (1978); United States v. Worthon, 520 F.3d 1173, 1192 (10th Cir. 2008)).  The United States thus contends that "[t]he Fourth Amendment aspects of this motion should accordingly be denied without an evidentiary hearing."  MTS Response at 11.

On August 15, 2012, Alabi filed Mr. Alabi's Reply Brief Memorandum (Doc. 61)("Reply"), stating: "The primary issue presented throughout Mr. Alabi's Motion is clearly 'selective enforcement[']" and not selective prosecution.  Reply at 1.  He contends that his Motion to Suppress only mentioned selective prosecution and "the seminal Armstrong case . . . only to correctly establish that the elements are essentially the same [in] a selective enforcement case."  Reply at 1.  Alabi asserts that, "[c]ontrary to the mischaracterization of the Government's Response, the issue is not about the prosecutor's decision, presumptive about the prosecutor, or requesting Court-ordered discovery (regarding) selective prosecution."  Reply at 2 (internal quotations omitted).  According to Alabi: "The Government Response completely ignores the issue so clearly laid out in the Motion."  Reply at 2.  Alabi states: "The Defense will assist the Prosecution even more by informing it on this record that there are at least fourteen cases between February 2011 and the date of this incident when NMSP officers stopped only black

drivers under similar, dubious circumstances as Mr. Alabi and the co-defendant."  Reply at 3.

Alabi also states that he intends to seek suppression of the evidence in the case based both on the selective enforcement grounds and on Fourth Amendment grounds: "The Defense argues herein that both the Fourth Amendment and the Equal Protection Amendments have been violated, and either one may prove sufficient to suppress the evidence."  Reply at 3.  To suppress the evidence under the Equal Protection clause, according to Alabi, he "need only make a credible showing that a similarly-situated individual of another race could have been, but was not targeted and stopped for the same (alleged) offense, in order to show a discriminatory affect [sic]," and asserts that "[a]ll he must show for the discriminatory-purpose element is that the discriminatory intent was a 'motivating factor in the decision' to enforce the criminal law against the Defendant."  Reply at 3 (citing United States v. James, 257 F.3d at 1179).

Alabi refers the Court to its previous decision in United States v. Harmon, in which the Court concluded that "race did not play a role for Mr. Harmon, and his only remedy was a civil action under 42 U.S.C. § 1983."  Reply at 4.  Alabi points out that the Court in that opinion noted that "it 'is not aware of a Court that has applied an exclusionary rule for a violation of the Equal Protection clause,'" but asserts that the Court should consider a decision from within this district, that the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, issued, in which he concludes the exclusionary rule applies to selective enforcement.  Reply at 4-5 (quoting United States v. Harmon, 785 F. Supp. 2d at 1170, and citing United States v. Bernard, No. CR 09-2474 RB, slip op. at 10-11 (D.N.M. Dec. 9, 2011)(Brack, J.), vacated by United States v. Bernard, No. CR 09-24744 RB, Order (D.N.M. Apr. 16, 2012)).  Alabi asserts that, given that there is no controlling precedent that has decided whether the exclusionary rule applies to racially based selective enforcement, and given that Judge Brack decided that the

exclusionary rule applies, the Court "still has the option of excluding [the] evidence before it." Reply at 5.

On August 24, 2012, the United States filed the Government's Supplemental Memorandum in Opposition to Defendant Alabi's Motion to Suppress. See Doc. 62 ("Supp. Response").[12]  The United States notes that, while Alabi concedes that the elements of selective prosecution and selective enforcement are the same, he contends that United States' MTS Response was unresponsive, because "he was focused on the conduct and subjective intentions of the New Mexico State Police, not those of the United States Attorney's Office."  Supp. Response at 1-2.  The United States asserts that, given the standards for a selective enforcement claim are identical to those for a selective enforcement prosecution claim, "[i]n either event, the government is entitled to a presumption of regularity, and, in the absence of clear evidence to the contrary, the Court should presume that law enforcement officials -- whether police or prosecutors -- have properly discharged their duties."  Supp. Response at 2 (citing United States v. Armstrong, 517 U.S. at 464).  The United States contends that, similar to the presumption remaining the same, Alabi's evidence has not changed, and "Alabi has made no showing of discriminatory effect, nor has he made any showing of discriminatory purpose."  Supp. Response at 2 (internal citations omitted)(citing MTS Response at 7-9).  The United States asserts that Alabi is therefore still precluded from "court-ordered discovery, whether in the form of an evidentiary hearing or otherwise, because he has not made the requisite credible threshold showing of discriminatory effect.  His Motion should accordingly be denied without a hearing."

---

[12] The United States notes that, in addition to inviting a supplemental response from the United States in the Reply, "counsel for Alabi has expressly consented to the filing of a supplemental memorandum for the government." Supp. Response at 1.  Because Alabi consents to this supplement response, the Court grants leave to the United States to file the response and will consider it in its disposition of this Memorandum Opinion and Order.

Supp. Response at 2.

The United States argues that, even if Alabi "made the requisite threshold showings . . . to establish an equal protection violation, he would still not be entitled to . . . suppression of the evidence," because, "[a]s Alabi himself notes, this Court has previously ruled that suppression of evidence in a criminal case is not available as a remedy for alleged racially discriminatory law enforcement: the remedy, rather, is a civil lawsuit under 42 U.S.C. § 1983." Supp. Response at 3 (internal citations omitted)(citing United States v. Harmon, 785 F. Supp. 2d at 1170; Reply at 4). The United States also points out that Judge Brack vacated his decision in United States v. Bernard, to which Alabi cites in his Reply. See Supp. Response at 3 (citing United States v. Bernard, No. CR 09-2474 RB, Order). In relation to Judge Brack's order to vacate, the United States submits:

> The government filed a Motion to Reconsider [Doc. 165] in Bernard[] on January 9, 2012, arguing that the Court had adopted findings from litigation to which the United States had not been a party, without giving the government an opportunity to controvert them. All parties in Bernard[] subsequently joined in a Motion [Doc. 175], filed April 9, 2012, asking the Court to grant the Motion to Reconsider and to vacate the suppression ruling. The Court granted the Motion to Reconsider and vacated its suppression ruling in its Order [Doc. 177] of April 16, 2012.

Supp. Response at 3 n.1. The United States asserts that the Court should therefore not consider Judge Brack's decision in United States v. Bernard, as "'[t]he general rule is that when a court vacates an order previously entered, the legal status is the same as if the order never existed.'" Supp. Response at 4 (original alterations omitted)(citing United States v. Jerry, 487 F.2d 600, 607 (3d Cir. 1973)). The United States concludes that, "[b]ecause the suppression of evidence is not an available remedy for an alleged equal protection violation, and because Alabi has made no credible threshold showing of discriminatory effect and discriminatory purpose, the Court should deny the Motion." Supp. Response at 4.

On September 3, 2012, Alabi filed the Defendant's Reply to Government's Supplemental Memorandum to Suppress.  See Doc. 64 ('Supp. Reply").  Alabi takes issue with the United States' contention that the Court should not consider Judge Brack's vacated decision in United States v. Bernard, because "he did not reverse his ruling, he merely vacated [it] by agreement of the parties and did so as a courtesy to the Government."  Supp. Reply. at 1.  He contends: "Judge Brack's Ruling [sic] stands, at the very least, as precedent that good district judges can honestly differ on an issue for which the United States Supreme Court has never spoken; the Exclusionary Rule in the instances of racial profiling is one such issue."  Supp. Reply at 1.  He asserts that, in its United States v. Harmon decision, "this Court referred that Defendant to the 'traditional remedy' of a civil right action, which (similar to Judge Brack's reasoning) is absolutely no remedy at all."  Supp. Reply at 2.  Alabi argues that "[t]he fact that a § 1983 claim is an available remedy does not make it the exclusive remedy.  In fact, 'it is highly doubtful that civil remedies would adequately deter police agencies from engaging in this unconstitutional and blatantly reprehensible behavior.'"  Supp. Reply at 2 (quoting United States v. Benitez, 613 F. Supp. 2d 1099, 1002 n.3 (S.D. Iowa 2009)).  Alabi contends that, "[i]n a claim of selective enforcement, the culpability of the law enforcement officer is directly at issue.  As a result, the Exclusionary Rule is the most appropriate remedy."  Supp. Reply at 3 (citing Davis v. United States, 131 S. Ct. 2419, 2426-27 (2011)).  Alabi contends that, because the United States continues to refuse to take a stance in relation to whether the NMSP in Tucumcari has a history of racial profiling, "[t]he Defense investigation continues to meeting [sic] resistance in its efforts to receive disclosures regarding racial profiling records which the State of New Mexico has been required as a matter of law to compile for more than a decade."  Supp. Reply at 4.  He states: "The Defense will continue its effort to support the factual, case-specific references, which it will

present at hearing on this matter with the additional . . . data from the State on whether this kind of racial profiling flows out of Tucumcari to other areas of New Mexico."  Supp. Reply at 4.

On September 12, 2012, the United States, by electronic mail transmission, submitted to the Court and to the Defendants a transmittal letter alongside the Tenth Circuit's decision in Blackwell v. Strain, 496 F. App'x at 836.  See United States' September 12, 2012, Electronic Mail Transmission at 1.  The United States asserts that the decision bears upon the Motion to Suppress, because, although a civil decision arising in the context of a summary judgment motion, the decision "construes a claim of racially discriminatory law enforcement, and the requirement of proof in discriminatory purpose and discriminatory effect."  United States' September 12, 2012, Electronic Mail Transmission at 1.

At the suppression hearing, before the evidentiary hearing took place, the United States requested that the Court hear its "argument that there should be no evidentiary hearing whatever in this matter and that the Court should deny it as a matter of law."  Tr. at 5:5-8 (Gerson).  The United States argued that any remedy to an equal-protection violation does not include suppression, but is appropriately addressed only by filing a civil lawsuit alleging a § 1983 violation.  See Tr. at 5:13-25 (Gerson).  According to the United States, to the extent that Alabi is asserting that the Court should suppress evidence, because there was a Fourth Amendment violation, he has not alleged sufficient facts to demonstrate that the NMSP violated their Fourth Amendment rights.  See Tr.at 6:1-6 (Gerson).  The United States asserted:

> Likewise, the Court should deny an evidentiary hearing as to the garden-variety Fourth Amendment claim because there's no standing, there's no allegation of facts that would give rise to a basis for the Court to find standing, and because there are no disputed facts about the person who does have the driver of the car who was the renter of the vehicle having consented to the search.  So it would . . . be pointless for the Court to engage in an evidentiary hearing about this because . . . Mr. Alabi doesn't have standing and there's no dispute of fact about there having been consent by a person who had authority to give consent.  So I

would ask the Court not hold any evidentiary hearing at all, because it would be
pointless.

Tr. at 6:7-19 (Gerson).  The Court responded that, because neither the Tenth Circuit nor the
Supreme Court have decided whether the exclusionary rule applies to an equal-protection
violation, it is concerned that, without an evidentiary hearing, it may not be doing its job as a
district court to provide the appellate courts with facts upon which they can make an accurate
ruling on the law.  See Tr. at 6:20-7:7 (Court).  The Court added that it does not know how,
absent an evidentiary hearing, Alabi can make out a prima-facie case of racially based selective
law enforcement.  See Tr. at 7:8-15 (Court).  The United States responded that the Court should
limit Alabi to making a proffer about what he expects his evidence would show if the Court
provided him with a suppression hearing, and deny altogether his Fourth Amendment violation
allegation, before any evidentiary hearing, because he lacks standing to attack any violation as a
matter of law.  See Tr. at  7:25-8:8 (Gerson).

Alabi responded that, because the defendant does not have the right to interview the
United States' witnesses, "we do need an evidentiary hearing to establish the prima facie case
and more."  Tr. at 8:18-21 (Samore).  Alabi also pointed out that, whereas the Court in United
States v. Harmon noted that it did not know of any authority applying the exclusionary rule to a
racially based selective enforcement allegation, the Southern District of Iowa in 2009 concluded
that the exclusionary rule would be a proper remedy for selective enforcement in traffic stops.
See Tr. at 9:3-10:2 (Samore)(citing United States v. Benitez, 613 F. Supp. 2d at 1102).  He also
noted that, because the Court in United States v. Harmon found that the enforcement was not
racially based, but then decided the issue notwithstanding that finding, the Court's conclusion
that suppressing the evidence is not an appropriate remedy is dicta, and not controlling in this
case.  See Tr. at 10:3-13 (Samore).

The United States responded by pointing out that Alabi tacitly acknowledged he is seeking the evidentiary hearing for discovery purposes, to which the Supreme Court in United States v. Anderson held a defendant is not entitled unless he can show that there were similarly situated individuals who were not racial minorities and not subjected to a search, which he has not done.  See Tr. at 10:16-11:5 (Gerson).  The Court noted that, while evidentiary hearings related to suppression motions "sometimes . . . turn dangerously close into discovery, . . . they are still a suppression hearing," and also noted that the United States can object to Alabi's conduct which it believes is only for discovery purposes. Tr. at 11:15-22 (Court).  The Court stated that it will allow the suppression motion to also cover material related to Alabi's assertion of a Fourth Amendment violation, because the evidence that comes out in the hearing will likely assist the Court with the disposition of that issue as well.  See Tr. at 11:23-12:2 (Court).

After the evidentiary hearing, Alabi presented his oral argument in support of his Motion to Suppress.  Alabi first asked that the Court review the entire traffic stop video, Alabi's Hearing Exhibit A, after the hearing, because it is important to substantiate, or as he believes, contradict, Bobbitt's testimony both about Alabi's consent to the search and to pulling the Camry over because he heard it speeding past.  See Tr. at 220:6-20 (Samore).  The Court asked whether it misheard Bobbitt, because the Court did not understand Bobbitt to have testified that he stopped the Camry for speeding.  See Tr. at 220:21-22 (Court).  Alabi responded that the Court is correct that he testified that he stopped the car, because the license plate tags were expired, but that Bobbitt also testified that he heard the car speeding, and that is why he began the pursuit in the first place.  See Tr. at 221:3-11 (Samore, Court).  Alabi pointed that it is important to note how improbable it is that he heard the Camry speeding, especially in light of Bobbitt's statement that he was not involved in the interdiction campaign that day.  See Tr. at 221:9-16 (Samore).  He

asserted that Bobbitt asserted for the first time that he heard the vehicle speeding only "in response to getting eyeballed by a defense attorney, who's asking him, you made eye contact, didn't you?"  Tr. at 221:17-20 (Samore).  Alabi contended that the evidence about Bobbitt hearing the Camry speeding by as reason for going after it allows the Court to find that, aside from any statistical evidence about NMSP activities in Quay and Guadalupe Counties, the Defendants' particular stop on April 6, 2011 was racially based.  See Tr. at 222:13-25 (Samore).  Alabi noted that nowhere in the record, in the testimony, in the exhibits, or in the Traffic Stop Video, is there any evidence that the Camry was speeding at any time.  See Tr. at 222:25-223:6 (Samore).

Alabi asserted that, once the Court finds the stop was racially based, he needs more time to submit authority about why suppression of all evidence in the case as fruit of the poisonous tree is the proper remedy.  See Tr. at 223:6-24 (Samore).  He also added that he "want[s] to try to develop . . . . a little bit more and standing and the Court may also want a little bit more on the remedy."  Tr. at 223:23-224:3 (Samore, Court).  The United States responded that, given the Motion to Suppress has already been pending for over half of a year, there has been adequate time to provide any supplemental authority to the Court on both the Fourth Amendment and selective enforcement issues; thus, there is no reason that the Court should provide Alabi any additional time.  See Tr. at 224:21-225:4 (Gerson).  The United States reiterated that Alabi, as the passenger of the vehicle, cannot stage a Fourth Amendment challenge to Bobbitt's search of the Camry.  See Tr. at 225:14-226:3 (Gerson).  It noted that there was unequivocal consent to the search, as the Traffic Stop Video unambiguously shows Oguntoyinbo, the Camry's driver and renter, giving his consent for the search.  See Tr. at 226:4-16 (Gerson).  In regard to whether the search was racially based, the United States pointed out that Bobbitt asked for consent to search

the vehicle only after he noted that Oguntoyinbo's first name was spelled differently on his identification than it was on the rental agreement, understood that Oguntoyinbo was engaged in some sort of car business, asked Oguntoyinbo about where he lived and how long he had been in the country, and reasonably decided that the story did not add up.  See Tr. at 226:17-227:3 (Gerson).  The United States asserted "that's a perfectly valid explanation as to why he might have asked for consent to search the vehicle.  It has nothing to do with the racial, or national origin, or characteristics of these defendants."  Tr. at 227:5-8 (Gerson).

The Court asked whether, given that Alabi now seems to be focusing on the particular stop of the Defendants here, and alleging that this stop was racially based, a discriminatory enforcement argument can rely on one particular stop.  See Tr. at 227:18-228:2 (Court).  The United States responded that it believes it is possible a selective enforcement allegation may be premised on one particular stop and that the standards of the allegation would be the same as that for allegations against NMSP as a whole.  The United States asserted, however, that there is no undisputed evidence upon which a reasonable factfinder could find that Bobbitt's stop of the Defendants' vehicle was racially motivated; regardless whether he believed them to be speeding or stopped them for the Camry's expired license plate tags, neither reason involves any sort of pretext for race.  See Tr. at 228:3-7 (Gerson).  The United States also noted that only three or four of the out of the twenty-one alleged racially based searches are attributable to Bobbitt.  See Tr. 228:15-17 (Gerson).  The United States argued that Alabi's entire Motion to Suppress, from the briefing to the suppression hearing, has focused upon "discriminatory impact . . . at the district wide level."  Tr. at 228:7-9 (Gerson).  According to the United States, Alabi's data about any racially based searches in Quay and/or Guadalupe Counties falls "far short" of making a prima-facie case, as the statistical data does not show anything about similarly situated persons

who were not stopped or whose cars were not searched.  See Tr. at 228:18-229:2 (Gerson).  It asserted that Alabi failed to produce any evidence which may give context for a determination whether the twenty-one alleged racially motivated searches were disproportionate.  See Tr. at 229:2-5 (Gerson).  The United States asserted, however, that the Court on a more limited basis should find that, even if Alabi can show a prima-facie case for selective enforcement, the proper remedy is not exclusion of the evidence, but a later civil action under § 1983.  See Tr. at 230:24-231:8 (Gerson).

The Court then asked whether the United States is contending that, if Alabi cannot allege a Fourth Amendment violation as the passenger in the car, he also cannot, as a matter of law, raise a discriminatory enforcement claim.  See Tr. at 231:9-12 (Court).  The United States responded that position is not what it is contending; he can still raise a discriminatory enforcement argument.  See Tr. at 231:13-15 (Gerson).  The United States asserted "he loses each of those two but for different reasons from [each other]."  Tr. at 231:18-20 (Gerson).

At the suppression hearing's conclusion, the Court noted that both parties had leave to file a supplemental brief after the hearing if they chose to do so.  See Tr. at 233:20-234:1 (Court).  Accordingly, on April 19, 2013, Alabi filed the Supplemental of Defendant Alabi Brief [sic] on His Motion to Suppress.  See Doc. 123 ("Second Supp.").  Alabi argues that the passenger as well as the driver has a Fourth Amendment interest in challenging a traffic stop. See Second Supp. at 1-2 (citing United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)). Alabi points out that he was listed as an additional driver on the Hertz Rental Agreement, "which is all that is required to challenge the search of a rental vehicle."  Second Supp. at 2 (citing United States v. Roper, 918 F.2d 885, 777 (10th Cir. 1990)).

Alabi adds an additional argument in his Second Supp.: He argues that Bobbitt's

detention of him violated his Fourth Amendment rights, which he contends the passenger of a car can legitimately assert.  See Second Supp. at 2 (citing United States v. Nav-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000)).  He contends that Bobbitt's testimony at the hearing shows that the stop was pretextual and was in reality racially based, which makes the stop unconstitutional.  See Second Supp. at 5.  Alabi argues that Bobbitt's detention of him for any length of time was unreasonable, because "the evidence emerged that no reasonable articulable suspicion of any violation had occurred when Mr. Bobbitt took after the Defendants' rented vehicle at extraordinary, dangerous speeds with no warning lights on."  Second Supp. at 5.

Alabi admits that "[n]o federal court has found a remedy of suppression" for an equal protection clause violation, but notes that, in Yick Wo v. Hopkins, 118 U.S. 356 (1886), the Supreme Court found that intentionally discriminatory governmental enforcement is "constitutionally invalid."  Second Supp. at 6.  Alabi again refers the Court to United States v. Benitez as support for his contention that suppression of evidence is the proper remedy for a racially-based selective traffic stop.  See Second Supp. at 7.  Alabi also points out that using § 1983 as the exclusive remedy in no way helps him, because he will be deported if found guilty. See Second Supp. at 7.  He contends that Bobbitt's stop was "obviously" concocted, and the Court should therefore suppress the evidence of the resulting search.  Second Supp. at 7-8.

On April 30, 2013, the United States filed the Government's Memorandum in Opposition to Supplemental Brief of Defendant Alabi on his Motion to Suppress.  See Doc. 126 ("Second Supp. Response").  The United States agrees that Alabi can contest his detention and may thus "accordingly challenge whether the traffic stop conducted by Officer Bobbitt was valid."  Second Supp. Response at 1 (citing United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000)).  The United States asserts, however, that a traffic stop's validity turns on whether the

officer making the stop had reasonable grounds for doing so, and Bobbitt's testimony at the suppression hearing was that he stopped the Defendants' vehicle based upon the vehicle's expired license plate tags, which Alabi admitted, is in violation of New Mexico law.  See Second Supp. at 2.  According to the United States, given that the Camry's tags were expired, Bobbitt had not only reasonable suspicion that there was a violation of law, but had probable cause; therefore, the stop was valid and Alabi's detention was reasonable.  See Second Supp. Response at 2.  The United States asserts: "Because the seizure was reasonable, there was no illegal detention.  Because there was no illegal detention, the Court should deny Alabi's motion to suppress the fruits of the detention."  Second Supp. Response at 2-3.  The United States notes that Alabi asserts "that 'a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution,'" which the United States takes as Alabi's argument that the seizure was illegal.  According to Alabi, Bobbitt's initial pursuit of the vehicle was based on the Defendants' race or alienage.  The United States points out that law enforcement's pursuit of a vehicle is not a seizure and that Bobbitt testified at the suppression hearing that he initially pursued the vehicle because he believed that it was speeding.  See Second Supp. Response at 3 (quoting Second Supp. at 3).  According to the United States, even if the gravamen of Alabi's suppression motion and Second Supp. is "that Officer Bobbitt's real reason for stopping the defendants' car was racial animus," "[t]he constitutional reasonableness of a traffic stop, however, does not depend on the actual motivations of the officers involved."  Second Supp. Response at 3-4 (citing Whren v. United States, 517 U.S. at 813).  The United States thus argues that, although Alabi is correct that he can object to Bobbitt's detention of him as the passenger, because the seizure was lawful and reasonable, he is not entitled to suppression of the fruits of Bobbitt's search.  See Second Supp.

Response at 4.

The United States argues that Alabi cannot object to the vehicle's search, because "Oguntoyinbo was the renter of the vehicle," and the testimony at the suppression hearing established that "the officer obtained Oguntoyinbo's consent to search the contents of the vehicle." Second Supp. Response at 4. The United States asserts that, "[a]s the driver and renter of the vehicle, Oguntoyinbo had a sufficient authority over the automobile to give consent. Alabi therefore cannot be heard to complain of the search of the vehicle." Second Supp. Response at 5. The United States also contends that, as a passenger in the vehicle searched, Rakas v. Illinois establishes that Alabi had no legitimate interest in the area searched and has asserted no interest in the contraband seized:

> "In Rakas, the Court held that defendants who were passengers in a car driven by the owner at the time of the search did not have a legitimate expectation of privacy in the car such that they could raise a Fourth Amendment challenge to the search of the car. . . . The Court held that a 'passenger *qua* passenger' has no reasonable expectation of privacy in a car in which he asserts neither a property interest nor a possessory interest and where he disclaims any interest in the seized object."

Second Supp. Response at 5 (quoting United States v. Jefferson, 925 F.2d 1242, 1249 (10th Cir. 1991)). The United States asserts that, "[w]hile Alabi was listed on the rental agreement as an additional authorized driver, the Court should not find that this gave him a sufficient property or possessory interest in the vehicle" to find that the search implicated his Fourth Amendment rights. Second Supp. Response at 5. The United States also points out that Alabi has disclaimed any interest in any of the property seized and further asserts that, "[i]n the absence of any such claim, Alabi has failed to establish that he had a reasonable expectation of privacy in the particular area searched." Second Supp. Response at 5-6 (citing Rakas v. Illinois, 439 U.S. at 148-49). The United States notes that Alabi's refusal to claim an interest in any of the seized

property does not reflect his Fifth Amendment right to be free from compelled self-incriminating testimony.  See Second Supp. Response at 6 n.4.  The United States asserts: Because the Supreme Court in Simmons v. United States, 390 U.S. 377 (1968), established that statements which a defendant makes in a pretrial suppression hearing asserting ownership interest in property, made to establish the defendant's ability to challenge the government's search or seizure of any such property, cannot be used in a subsequent criminal trial.  See Second Supp. Response at 6 n.4.

Finally, the United States argues that suppression is not a remedy for Alabi's claim of racial animus.  See Second Supp. Response at 6.  The United States notes: "This Court has previously ruled that suppression of evidence in a criminal case is not available as a remedy for alleged racially discriminatory law enforcement: the remedy, rather, is a civil lawsuit under 42 U.S.C. § 1983."  Second Supp. Response at 6 (citing United States v. Harmon, 785 F. Supp. 2d at 1170 n.4).  The United States asserts that United States v. Benitez, the district court decision on which Alabi relies to support his argument that suppression is a proper remedy for racially based law enforcement, found that, "even if an officer's decision to initiate a traffic stop was based on the defendant's race, no Fourth Amendment violation has occurred so long as probable cause existed for the stop."  Second Supp. at 7 (citing United States v. Benitez, 613 F. Supp. 2d at 1101).  The United States also notes that, while the district court in United States v. Benitez discussed suppression as a proper remedy for an equal-protection claim, it ultimately did not suppress the evidence, because it found that the defendant did not prove there was an equal-protection violation:

> The court . . . commented that "[o]ther courts have equivocated on this issue, and this Court sees no need to delve into the debate for the reasons stated below."  Id. The court then went on to make policy arguments in support of suppression as a remedy for Equal Protection violations in the context of criminal prosecutions.

> Id. at 1101-02, n.3.  When the court got to the facts of the case before it, it determined that the defendant had not presented evidence to support his claim that the traffic stop at issue was racially motivated.  Id. at 1102-03.  The court accordingly rejected the defendant's equal protection claim, and stated that it had no need to evaluate whether suppression would be an appropriate remedy.  Id. at 1103.

Second Supp. Response at 7.  The United States argues that United States v. Benitez does not change the Court's analysis, conclusion, or the position that the Court took in United States v. Harmon, as "[t]he language Alabi quotes from this opinion, making policy arguments that would support suppression as a remedy, was plainly dicta."  Second Supp. Response at 7.  The United States concludes by asserting that United States v. Benitez "is simply one more case in which a defendant was unable to surmount Wren's holding that a police officer's subjective intent is irrelevant to the validity of a traffic stop for Fourth Amendment purposes."  Second Supp. Response at 7.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  The Fourth Amendment's protections are enforceable against state actors through the Due-Process Clause of the Fourteenth Amendment to the United States Constitution.  See Mapp v. Ohio, 367 U.S. at 655; United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment.").  "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."  United States v. Jones, 44 F.3d 860,

871 (10th Cir. 1995)(emphasis in original).

"Not all searches require a warrant.   The hallmark of the Fourth Amendment is reasonableness."   United States v. Harmon, 785 F. Supp. 2d at 1157.   See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). The Supreme Court of the United States has stated that "searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

## 1.   Whether a Fourth Amendment Violation Occurred.

"A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information."   United States v. Alabi, No. CR 11-2292 JB, 2013 WL 1876791, at *33 (D.N.M. Apr. 30, 2013)(Browning, J.)(citing United States v. Jones, 132 S. Ct. 945, 947 (2012)("[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test." (emphasis omitted))(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992))).   "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"   Florida v. Jardines, 133 S. Ct. 1409, 1414 (2013)(quoting United States v. Jones, 132 S. Ct. at 950 n.3).   "Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment.'"   Illinois v. Caballes, 543 U.S. 405, 409 (10th Cir. 2005)(quoting

United States v. Jacobsen, 466 U.S. 109, 123 (1984)).

        **a.**        **Trespass-Based Analysis.**

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'"  Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation."  United States v. Jones, 132 S. Ct. at 951 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection."  Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to Katz[v. United States, 389 U.S. 347 (1967)]) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text. . . .  But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 133 S. Ct. at 1414.

        **b.**      **The *Katz v. United States* Reasonable-Expectations-of-Privacy Analysis.**

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"   Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).   "A district court cannot suppress evidence unless the movant proves that a search implicates personal Fourth Amendment interests."   United States v. Jones, 44 F.3d at 871 (emphasis in original).   "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"   United States v. Miller, 425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).   The Tenth Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched."   United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).   Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests depends on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable."   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.).   See United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.   Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(internal citations omitted)(quoting

United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003)).[13]

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court has thus recognized that, rather than determining whether law enforcement conduct was a search, it sometimes is easier to "assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in Katz v. United States. Katz involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches. We held that the Fourth Amendment nonetheless protected Katz from the

_____

[13] The United States and Alabi disagree whether Alabi can object to Bobbitt's search of the Camry and the Louis Vuitton bags that he found inside of the Camry, because of Alabi's status as the vehicle's passenger. See, e.g., Second Supp. at 1-6; Second Supp. Response at 1-6. Both parties refer to Alabi's ability to contest the search as an issue of "standing." E.g., Second Supp. at 1; Second Supp. Response at 1. The Court pointed out in its previous Memorandum Opinion and Order in this case that "[t]he Tenth Circuit refers to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of 'standing,'" United States v. Alabi, 2013 WL 1876791, at *32 (quoting United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)). See United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she ha[d] a reasonable expectation of privacy in the area being searched."). The Supreme Court's two most recent search cases suggest that "the Katz v. United States reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test." United States v. Alabi, 2013 WL 1876791, at *33. The Court pointed out that classifying the test whether a search or seizure violates the defendant's Fourth Amendment interests as a substantive inquiry, rather than one of standing, "is in line with the Supreme Court's guidance that the analysis 'is more properly subsumed under substantive Fourth Amendment doctrine.'" 2013 WL 1876791, at *33. See Minnesota v. Carter, 525 U.S. 83, 87-88 (1998)(noting that analyzing "whether respondents had a legitimate expectation of privacy under the rubric of 'standing' doctrine" is "an analysis that this Court expressly rejected 20 years ago in Rakas," and asserting that, "in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the 'definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing'"). Accordingly, rather than focusing on whether the defendant has standing, the Court focuses the inquiry on whether the government's alleged search or seizure implicates the defendant's Fourth Amendment rights under the Katz. v. United States reasonable-expectation-of-privacy approach.

warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.   As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.   The Supreme Court thus articulated the Katz v. United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed., 2004) --  which posits: "a Fourth Amendment search does not occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"   Kyllo v. United States, 533 U.S. at 33 (emphasis in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"   United States v. Jones, 132 S. Ct. at 951.   See United States v. Harmon, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . .").   In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control."   Rakas v. Illinois, 439 U.S. at 143 & n.12.   While ownership or lawful possession is not determinative under the Katz v. United States reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession."   United States v. Arango, 912 F.2d 441, 445-46 (10th Cir. 1990).

i.    Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  "[T]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.  In determining whether a "legitimate expectation of privacy" existed in such cases, a

normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in <u>Jones v. United States</u>, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).

### ii.   Privacy Expectation that Society is Prepared to Recognize as Reasonable.

Under the second step of <u>Katz v. United States</u>' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable."  <u>United States v. Ruiz</u>, 664 F.3d, 833 838 (10th Cir. 2012)(<u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well

justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. at 122.  Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects.  See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. 170, 181-83 (1984)).  This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, supra, §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

2.      **Traffic Stops**.

To show that a car search implicates the defendant's personal Fourth Amendment interests, "the defendant bears the burden of showing that he had a legitimate possessory interest in or [a] lawful control over the car." United States v. Valdez Hocker, 333 F.3d 1206, 1209 (10th Cir. 2003)(internal quotation marks and citation omitted)(alteration in original).  "Because the focus of the inquiry is on reasonable expectations, however, a defendant need not submit legal documentation showing a chain of lawful custody from the registered owner to himself." United States v. Valdez Hocker, 333 F.3d at 1209 (citation omitted).  The Tenth Circuit has held the following criteria "important[ ] though not determinative" in determining whether a defendant has standing to assert a violation of his Fourth Amendment rights based on the search on objects inside a vehicle: "(1) whether the defendant asserted ownership over the items seized from the vehicle; (2) whether the defendant testified to his expectation of privacy at the suppression hearing; and (3) whether the defendant presented any testimony at the suppression hearing that he had a legitimate possessory interest in the vehicle." United States v. Parada,  577 F.3d 1275, 1280 (10th Cir. 2009)(quoting United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000))(internal quotation marks omitted).

"'A traffic stop is a 'seizure' within the meaning of the Fourth Amendment . . . .'" United States v. Holt, 264 F.3d 1215, 1220 (10th Cir. 2001)(en banc), holding modified on other grounds by United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007)(quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979)).  "For the duration of a traffic stop, . . . a police officer effectively seizes everyone in the vehicle, the driver and all passengers." United States v. White, 584 F.3d 935, 945 (10th Cir. 2009)(quoting Arizona v. Johnson, 555 U.S. 323, 327 (2009)). "This seizure implicates a passenger's Fourth Amendment interests to the same degree as the

driver's."  United States v. Wilson, 96 F. App'x 640, 643 (10th Cir. 2004)(unpublished)(citing

United States v. Erwin, 875 F.2d 268, 270 (10th Cir. 1989)).  "Therefore, both the driver and

passenger have standing to challenge the constitutionality of the initial stop."  United States v.

White, 584 F.3d at 945.    Passengers may challenge their detention during traffic stops.  See

United States v. Wilson, 96 F. App'x 643 ("Wilson does not assert any such interest in the

truck or its contents[;] [n]evertheless, Wilson may, as he does here, 'contest the lawfulness of his

own detention and seek to suppress evidence found in the vehicle as the fruit of the illegal

detention.'" (quoting United States v. Nava-Ramirez, 210 F.3d 1128, 1131 (10th Cir. 2000), and

citing United States v. Gama-Bastidas, 142 F.3d 1233, 1239 (10th Cir. 1998); United States v.

Shareef, 100 F.3d at 1500)).  The Tenth Circuit "reject[s] any notion that a vehicular stop detains

for Fourth Amendment purposes only the driver simply because the passenger may be free to

depart."  United States v. Erwin, 875 F.2d at 270.

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'"

Kentucky v. King, 131 S. Ct. 1849, 1856 (2011)(quoting Brigham City v. Stuart, 547 U.S. 398,

403 (2006)), courts

> assess the reasonableness of a routine traffic stop under the principles laid out for
> investigative detentions in Terry v. Ohio, 392 U.S. 1 (1968), considering "whether
> the officer's action was justified at its inception, and whether it was reasonably
> related in scope to the circumstances which justified the interference in the first
> place."

United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Holt, 264 F.3d at 1220

(quoting Terry v. Ohio, 392 U.S. at 20)).  "A traffic stop is justified at its inception if an officer

has . . . reasonable articulable suspicion that a particular motorist has violated any of the traffic . .

. regulations of the jurisdiction."  United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009).

"[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic

violation . . . ." United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

The Terry v. Ohio framework applies whether the traffic stop is based on probable cause or reasonable suspicion.[14] See United States v. Holt, 264 F.3d at 1230.  A court must examine "both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d at 1230, "keeping in mind that an officer may extend the duration and scope of the initial detention based on 'an objectively reasonable and articulable suspicion that illegal activity has occurred or is occurring,'" United States v. Wilson, 96 F. App'x at 643 (quoting United States v. Caro, 248 F.3d 1240, 1244 (10th Cir. 2001)).  "When the stop is extended based on reasonable suspicion, the further detention must, like the original traffic stop, 'be temporary, lasting no longer than necessary to effectuate the purpose of the [further detention], and the scope of the [further] detention must be carefully tailored to its underlying justification.'" United States v. Wilson, 96 F. App'x at 644 (quoting United States v. Wood, 106 F.3d 942, 945 (10th Cir. 1997)).

"A traffic stop is justified at its inception if an officer has . . . reasonable articulable

---

[14] The Tenth Circuit in United States v. King, 990 F.2d 1552 (10th Cir. 1997), noted: "Terry was the first case to recognize that 'the Fourth Amendment governs 'seizures' of the person . . . [other than] arrests,' and created a 'narrowly drawn' exception to the probable cause requirement for lesser government intrusions into an individual's liberty."  990 F.2d at 1557 (internal citations omitted)(quoting Terry v. Ohio, 392 U.S. at 16, 27).  Thus, Terry v. Ohio

> has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d at 1557 (internal citations omitted)(citing United States v. Sokolow, 490 U.S. at 7; Adams v. Williams, 407 U.S. 143, 147-48 (1972)).

suspicion that a particular motorist has violated any of the traffic . . . regulations of the jurisdiction." United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009). "[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . ." United States v. Williams, 403 F.3d 1203, 1206 (10th Cir. 2005)(citation and internal quotation marks omitted).

**3.     Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements. See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment. United States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412 U.S. at 219). The Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d 685, 690 (10th Cir. 2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances. See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when trying to determine whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii)

the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19, 2010) (Browning, J)(quotations, alterations, and citations omitted).  See United States v. Fox, 600 F.3d 1253, 1258 (10th Cir. 2010); United States v. Ledesma, 447 F.3d 1307, 1314 (10th Cir. 2006); United States v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

Because courts are required to look at the totality of the circumstances in determining whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law-enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232. Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact

it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches." Schneckloth v. Bustamonte, 412 U.S. at 232.

### 4.   United States v. Harmon.

In United States v. Harmon, the defendant, Harmon, an African American, challenged a traffic stop and the resulting search on several grounds, seeking to suppress all evidence found during the resulting search.  Among the contested issues were: (i) whether the search implicated the defendant's personal interests; (ii) whether the traffic stop was legal; (iii) "whether the Court should suppress evidence of the contraband [the officer] discovered in the vehicle's spare tire, because Harmon -- who is an African–American -- alleges that race was the motivating, if not only, factor in [the officer]'s decision to stop him"; and (iv) "whether Harmon voluntarily consented to the search of the vehicle." 785 F. Supp. 2d at 1149.  First, the United States asserted that, although Harmon was driving the car, because Harmon did not own the car, the search did not implicate his Fourth Amendment interests and he could therefore not object to the officer's search of the car. See 785 F. Supp. 2d at 1161.  The Court concluded, however, that the officer's search of the vehicle implicated Harmon's personal Fourth Amendment interests: "Because Harmon borrowed the car from the car's registered owner, Harmon had a legitimate possessory interest in the vehicle." 785 F. Supp. 2d at 1161 (citing United States v. Soto, 988 F. 2d 1548, 1552-53 (10th Cir. 1993)).  Harmon argued that the traffic stop was not a legal stop, contending, among other things, that "the Court should take into account that [the officer] is unsure as to where the alleged infraction occurred -- whether it occurred in the construction zone or before the construction zone -- and thus it is possible that the infraction did not occur and nothing that [the officer] says is credible." 785 F. Supp. 2d at 1162 (internal quotations omitted).

The Court determined, however, that the officer testified that it occurred before the construction zone, and the statement which he made to Harmon at the scene to the contrary, because the officer was nervous, did not make his testimony incredible:

> Harmon argues that [the officer] is unsure where the violation occurred, and that, at worst, nothing he says is credible.  At the hearing, however, the Court had a chance to weigh [the officer]'s credibility.  [The officer] testified that the vehicle swerved over the white line before the vehicle entered the construction zone, that his statement to Harmon that the vehicle swerved in the construction zone was inaccurate, and that he made the inaccurate statement because he was nervous. The Court finds that [the officer] is not unsure of where the vehicle swerved and does not believe that [the officer] was lying in Court.

785 F. Supp. 2d at 1166 n.2.  Because a New Mexico statute made illegal unsafely swerving in one's lane, and because the officer had reasonable suspicion that Harmon violated that statute, the Court concluded that the traffic stop was legal.  See 785 F. Supp. 2d at 1168.

With regard to whether the officers' traffic stop was racially motivated, the Court concluded that "the evidence shows that Harmon's race was not a factor in [the officer]'s decision to stop him," based on the facts that the officer initiated the stop after observing Harmon's vehicle swerving in its lane, and that the officer "did not know that Harmon was driving the vehicle or that an African-American was driving this vehicle . . . [until] he approached the car."  785 F. Supp. 2d at 1169.  The Court found further "that, even if Harmon's race motivated in part [the officer]'s decision to stop Harmon, which it did not, [the officer]'s subjective motivations are irrelevant to whether the traffic stop was reasonable under the Fourth Amendment."  785 F. Supp. 2d at 1169.  Finally, the Court concluded: "Even if there was evidence that [the officer] purposefully discriminated against Harmon in stopping him, the Court does not believe that suppression would be an appropriate remedy; instead, the appropriate remedy for an alleged violation is a 42 U.S.C. § 1983 action."  785 F. Supp. 2d at 1170.  The

Court articulated its reasoning for finding that the exclusionary rule does not extend to racially based selective law enforcement conduct:

> There are powerful arguments against the exclusionary rule. Both scholars and judges have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves. See, e.g., Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 369-70, 442-43 (1999); Akhil Reed Amar, Fourth Amendment First Principles, 107 Harv. L. Rev. 757, 795-800 ("[I]f deterrence is the key, the idea is to make the government pay, in some way, for its past misdeeds, in order to discourage future ones. But why should that payment flow to the guilty? Under the exclusionary rule, the more guilty you are, the more you benefit."); Hon. Malcolm Richard Wilkey, A Call for Alternatives to the Exclusionary Rule, 62 Judicature 351 (1978-1979); Hon. Malcolm Richard Wilkey, The Exclusionary Rule: Why Suppress Valid Evidence?, 62 Judicature 214 (1978-1979). Given the powerful arguments against the exclusionary rule, because of its negative effect on the truth-seeking process, the Court does not believe it should extend the exclusionary rule further, particularly where there is a monetary remedy available for equal-protection violations.

785 F. Supp. 2d at 1177.

Finally, the Court concluded that Harmon voluntarily consented to the vehicle's search. See 785 F. Supp. 2d at 1171-74. The Court noted that "'[t]his Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him.'" 785 F. Supp. 2d at 1171 (quoting United States v. Gonzalez–Lerma, 14 F.3d 1479, 1483 (10th Cir.1994), overruled on other grounds by United States v. Botero–Ospina, 71 F.3d 783 (10th Cir. 1994)). After the officer issued Harmon a warning, "he returned all Harmon's paperwork[,] . . . made sure that Harmon had everything, gave him a warning and told him to be careful." United States v. Harmon, 785 F. Supp. 2d at 1171. The Court then noted that, "[a]s Harmon turned around and started to walk back to his vehicle, Lucero, intending to initiate a consensual encounter, called out to Harmon, and . . . asked him whether there was anything illegal in the vehicle, to which Harmon responded no."

785 F. Supp. 2d at 1172.   The Court concluded that this question initiated a consensual encounter, as "[a] reasonable person in Harmon's situation would not have an objective reason to believe he was not free to end his conversation with Lucero," and Harmon's subsequent signing of the consent-to-search form provided the officer with the necessary consent to search the vehicle without infringing Harmon's Fourth Amendment rights.   785 F. Supp. 2d at 1172-73.

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's constitutional rights, the government will be prohibited from using that evidence in a criminal prosecution of that person. See United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.")(citations omitted).   In addition, a defendant may also suppress any other evidence deemed to be the "fruit of the poisonous tree," because it is evidence which was discovered as a direct result of the unlawful law enforcement activity.   United States v. Olivares-Rangel, 458 F.3d 1104, 1108-09 (10th Cir. 2006).   To suppress evidence that was derived following unlawful activity, the defendant must show that there is a factual nexus between the illegality and the challenged evidence. See United States v. Olivares-Rangel, 458 F.3d at 1109; United States v. Nava-Ramirez, 210 F.3d at 1131.

For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence, a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded.   See United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006). Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that some exception to the exclusionary rule applies.   See United States v. Torres-Castro, 470 F.3d at 999.

-59-

## RELEVANT LAW REGARDING A RACIALLY SELECTIVE LAW ENFORCEMENT CLAIM

"'[T]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.'" Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d 1157, 1166 (10th Cir. 2003)(quoting United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997)). In the civil context, the Tenth Circuit has recognized that "claims asserting selective enforcement of a law on the basis of race are properly brought under the Equal Protection Clause, and that the right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1166. A racially selective law enforcement claim exists where the government conduct had a discriminatory effect and where a discriminatory purpose motivated the conduct. See Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 ("The requirements for a claim of racially selective law enforcement draw on what the Supreme Court has called 'ordinary equal protection standards.' The plaintiff must demonstrate that the defendant's actions had a discriminatory effect and were motivated by a discriminatory purpose.")(quoting United States v. Armstrong, 517 U.S. at 465). "The discriminatory purpose need not be the only purpose, but it must have been a motivating factor in the decision." Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 (citing Villanueva v. Carere, 85 F.3d 481, 485 (10th Cir. 1996)). "Statistical evidence can be used to show both discriminatory effect and discriminatory purpose." Blackwell v. Strain, 496 F. App'x at 839-40 (citing Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168). The Tenth Circuit has recognized that proving discriminatory intent in this context is a high bar, and cases in which this bar is met are rare:

Statistical evidence alone is rarely enough to show discriminatory purpose. Although the Supreme Court "has accepted statistics as proof of intent to discriminate in certain limited contexts," only in "rare cases [has] a statistical pattern of discriminatory impact demonstrated a constitutional violation." McCleskey v. Kemp, 481 U.S. 279, 293 & n.12 . . . (1987); Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 266 . . . (1977)("Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action. . . . But such cases are rare."). This is because, to prevail on an equal protection claim, a plaintiff "must prove that the decisionmakers in his case acted with discriminatory purpose." McCleskey, 481 U.S. at 292 . . . . Examples of "those rare cases in which a statistical pattern of discriminatory impact demonstrated a constitutional violation" include Gomillion v. Lightfoot, 364 U.S. 339, 340-41 . . . (1960), and Yick Wo v. Hopkins, 118 U.S. 356, 373-74 . . . (1886). McCleskey, 481 U.S. at 293 n.12 . . . . In Gomillion, the Supreme Court held a state legislature violated the Fifteenth Amendment when it altered a city's boundaries "from a square to an uncouth twenty-eight-sided figure," thereby excluding 395 of 400 black voters without excluding a single white voter. 364 U.S. at 340-41 . . . . The Court held that "the conclusion would be irresistible, tantamount for all practical purposes to a mathematical demonstration" that the state acted with a discriminatory purpose. Id. at 341 . . . . In Yick Wo, an ordinance required laundry operators to obtain a permit, and all but one of the white applicants received permits while none of the over 200 Chinese applicants received permits. 118 U.S. at 373-74 . . . . The Court determined that the statistical disparity "warrant[ed]" and "require[d] the conclusion" the state acted with a discriminatory purpose. Id. "Absent a pattern as stark as that in Gomillion or Yick Wo," however, "impact alone is not determinative, and the Court must look to other evidence." Vill. of Arlington Heights, 429 U.S. at 266 . . . (footnote omitted); see also Chavez v. Ill. State Police, 251 F.3d 612, 647–48 (7th Cir. 2001).

Blackwell v. Strain, 496 F. App'x at 840.

In the context of a 42 U.S.C. § 1983 claim, the Tenth Circuit in Marshall v. Columbia Lea Reg'l Hosp. noted:

To withstand a motion for summary judgment, a plaintiff in a § 1983 suit challenging alleged racial discrimination in traffic stops and arrests must present evidence from which a jury could reasonably infer that the law enforcement officials involved were motivated by a discriminatory purpose and their actions had a discriminatory effect.

345 F.3d at 1168. The Tenth Circuit explained that, in "the absence of an overtly discriminatory policy or of direct evidence of police motivation," most § 1983 claims for racially selective law

enforcement rely on "statistical comparisons between the number of black or other minority Americans stopped or arrested and their percentage in some measure of the relevant population." 345 F.3d at 1168.  The Tenth Circuit pointed out that "[t]his requires a reliable measure of the demographics of the relevant population, a means of telling whether the data represent similarly situated individuals, and a point of comparison to the actual incidence of crime among different racial or ethnic segments of the population."  345 F.3d at 1168 (internal citations omitted)(citing Chavez v. Ill. State Police, 251 F.3d 612, 640-45; United States v. Armstrong, 517 U.S. at 469-70).  "[A] police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168.

In Blackwell v. Strain, the defendant appealed from the district court's denial of summary judgment based on qualified immunity where the plaintiff alleged that "he was stopped, detained, subjected to a heightened inspection level, and issued a citation . . . because he is black," in violation of his equal-protection rights.  496 F. App'x at 837.  The plaintiff, Blackwell, was driving a tractor-trailer on Interstate Highway 10 when the defendant officer, Strain, at the Point of Entry ("POE") in Lordsburg, New Mexico, asked him to pull his truck to the side, and, during an inspection, discovered alcohol in violation of New Mexico transportation regulations.  See 496 F. App'x at 838.  Strain ordered Blackwell to remove his tractor-trailer from service for twenty-four hours and assessed him a $250.00 penalty.  See 496 F. App'x at 838.  The Honorable M. Christina Armijo, United States District Court Judge for the District of New Mexico, denied summary judgment to Strain, concluding that, based on three statistical sets that Blackwell produced, a jury could reasonably conclude that a discriminatory purpose motivated Strain.  See 496 F. App'x at 840-41.  The Tenth Circuit reversed, however, and ordered the

district court to enter summary judgment in Strain's favor, concluding that the first data was irrelevant, as it did not provide sufficient statistics about Strain specifically, and the other two data sets were insufficient as a matter of law to show discriminatory purpose, as "[e]ven assuming these statistical data sets are valid and reliable, they do not show a pattern of discrimination as stark as that in Gomillion or Yick Wo."  496 F. App'x at 841.

In relation to the first data set, the Tenth Circuit stated that Blackwell's expert was prepared to testify about data which tended to show that law enforcement activities at the POE "produce 'race based differentials in outcomes'" and that "'30.6% of the arrests by Officer Strain at the POE are Blacks, even though Black truckers make up only 14.6% of the truckers passing through the POE.'"  Blackwell v. Strain, 496 F. App'x at 841.  The Tenth Circuit concluded that these statistics were irrelevant based on two grounds.  First, because most of the data was based on law enforcement conduct of "personnel at the POE as a whole, rather than the conduct of Officer Strain individually," the jury could not rely on it to find a discriminatory purpose as "'it would be a gross misuse of statistical data to extrapolate about [a particular officer's conduct] merely from aggregate data that covers many other individuals.'"  496 F. App'x at 841 (alterations in original)(quoting United States v. Coleman, 483 F. App'x 419, 421(10th Cir. 2012)(unpublished)).  Second, the Tenth Circuit concluded that, "of those individuals Officer Strain stops, detains, and subjects to a heightened inspection level, a high percentage he ultimately arrests are black, more than double the percentage of truck drivers passing through the POE who are black."  496 F. App'x at 841.  The Tenth Circuit stated that the statistical evidence did not prove discriminatory purpose, "because there is no reliable measure of the demographics of the relevant population, no means of telling whether the data represent similarly situated individuals, and no point of comparison to the actual incidence of crime among different racial

segments of the population."  496 F. App'x at 841.

Blackwell's second statistical data set showed that,

[a]t the POE, Officer Strain arrests Blacks at a rate that is twice their
representation in the population of truckers passing through the POE, whereas the
percentage of Blacks arrested by Officer Strain as the result of patrolling (where,
as Dr. Williams hypothesized, it is more difficult for Officer Strain to confirm the
driver's ethnicity prior to initiating law enforcement activity) closely corresponds
to the percentage of Black truckers in the population of truckers passing through
the POE.

496 F. App'x at 842 (original alterations omitted).  The Tenth Circuit noted:

[T]he record indicates the arrest data, at least with respect to arrests made while
on patrol, includes individuals who are not truck drivers.  Thus, it appears we lack
a reliable measure of the demographics of the relevant population, i.e., the
percentage of individuals, as opposed to truck drivers, in the areas Officer Strain
patrols who are black.

496 F. App'x  at 843.  The Tenth Circuit went further, however, stating:

This comparison of the percentage of black individuals arrested by Officer Strain
as the result of patrolling with the percentage of black truckers he arrested passing
through the POE is inappropriate.  Even assuming its validity, however, this
statistical comparison does not show a stark pattern of discrimination similar to
that in Gomillion or Yick Wo.  That is, the statistics are not so compelling that the
only explanation for the anomalies therein is intentional racial discrimination.
Thus, standing alone, this statistical evidence is not evidence from which a jury
could reasonably infer Officer Strain was motivated by a discriminatory purpose.

496 F. App'x at 843.

The third statistical data set that the Tenth Circuit held was insufficient as a matter of law

to prove discriminatory purpose was the seven searches that Strain performed the day of

Blackwell's search, which Blackwell asserted showed that Strain subjected black truckers to

more intrusive inspections than others.  See 496 F. App'x at 843.  The Tenth Circuit held that the

sample, although relevant, was, on the one hand, unreliable, as it was based on too small of a

sample, and, on the other hand, even if reliable, was not statistically significant enough to meet

the Gomillion v. Lightfoot or Yick Wo v. Hopkins standard for discriminatory purpose:

> [T]he district court cited to statistical evidence regarding inspections conducted by Officer Strain at the POE:
>
>> [O]n the date that Officer Strain encountered [Blackwell], Officer Strain inspected seven trucks.  Three of the seven truckers (43%), well in excess of their representation (14.6%) in the population of truckers passing through the POE were Black, and every one of the Black truckers was subjected to a Level II inspection, which includes a safe loading check.  The two truckers who were White were subjected to Level III inspections. Two of the truckers were Hispanic: one was subjected to a Level III inspection and one was subjected to a Level II inspection.
>
> (citations omitted).  This statistical evidence, although relevant, is based on seven inspections performed by Officer Strain on a single day and is, therefore, not reliable.  See United States v. James, 257 F.3d 1173, 1180 (10th Cir. 2001) (stating that a sample size may be "too small to provide reliable statistical results"); Chavez [v. Ill. State Police], 251 F.3d at 643 (noting that a sample size must be "sufficiently large to be reliable").  Even assuming its reliability, however, it does not show a stark pattern of discrimination like that in Gomillion or Yick Wo, and, therefore, cannot by itself demonstrate discriminatory purpose.

Blackwell v. Strain, 496 F. App'x at 843.  The Tenth Circuit concluded that, based on the failure of these three statistical data sets to support his contention that Strain acted with a discriminatory purpose, "Blackwell failed to meet his burden."  496 F. App'x at 844.

## ANALYSIS

Bobbitt's search of the Camry did not implicate Alabi's Fourth Amendment interests, because Alabi was a passenger in the Camry, and because any possessory interest Alabi had in the Camry was insufficient to give him a legitimate expectation of privacy in the Camry.  Alabi, therefore, cannot be heard to object to Bobbitt's search of the Camry on Fourth Amendment grounds.  Regardless whether the search implicated Alabi's Fourth Amendment interests, however, Oguntoyinbo's consent to search the Camry, the trunk, and the baggage in the Camry was valid and effective, and Bobbitt's subsequent search did not, therefore, implicate the Fourth

Amendment.  The traffic stop was not an unlawful seizure of Alabi, because Bobbitt had probable cause to believe that the Camry's driver violated New Mexico state law by driving on an interstate highway with expired license plate tags.  Finally, Alabi failed to proffer sufficient direct or statistical evidence to show that Bobbitt's traffic stop and vehicle search was racially selective law enforcement in violation of the Equal Protection Clause.  The Court thus concludes that Bobbitt's traffic stop and search of the Defendants' Camry did not violate Alabi's constitutional rights, and will not exclude the evidence derived from the search.

I.    **BOBBITT'S SEARCH OF THE CAMRY THAT OGUNOTYINBO RENTED, IN WHICH ALABI WAS A PASSENGER AND ON WHICH HE WAS NAMED IN THE RENTAL AGREEMENT AS A SECOND DRIVER, DID NOT IMPLICATE ALABI'S FOURTH AMENDMENT INTERESTS.**

Alabi contends that he can object to Bobbitt's search of the Camry in which he was a passenger, as it implicates his personal Fourth Amendment interests, because "Alabi was listed as an additional driver on the rental contract, with his name right below that of the driver . . ., which is all that is required to challenge the search of a rental vehicle."  Second Supp. at 2.  The United States asserts that, "[w]hile Alabi was listed on the rental agreement as an additionally authorized driver, the Court should not find that this gave him sufficient property or possessory interest in the vehicle" to find that the search implicated any legitimate privacy expectation he may have had in the vehicle or bags searched.  Second Supp. Response at 5.  The Court agrees with the Honorable Monroe G. McKay, United States Circuit Judge, in his concurrence in United States v. Roper, and does not believe that whether a vehicle's search or seizure implicates a person's Fourth Amendment interests "should turn on whether someone is listed as an additional driver on a car rental contract."  918 F.2d at 888 (McKay, J., concurring).  Accordingly, the Court concludes that Alabi, as a "'passenger' has no reasonable expectation of privacy in a car"

-66-

in which he is listed as an additional driver to that of the driver at the time Bobbitt stopped the vehicle, "and where he disclaims any interest in the seized property," and the Bobbitt's search did not therefore implicate his personal Fourth Amendment rights.  United States v. Jefferson, 925 F. 2d at 1249 (quoting Rakas v. Illinois, 439 U.S. at 148-49).

> ### A.   BOBBITT'S SEARCH OF THE RENTED CAMRY IN WHICH ALABI WAS A PASSENGER DOES NOT IMPLICATE ALABI'S FOURTH AMENDMENT RIGHTS UNDER THE TRESPASS-BASED APPROACH, BECAUSE THE CAMRY IS NOT A CONTITUTIONALLY PROTECTED AREA IN RELATION TO HIM.

The Supreme Court in its two most recent search cases has established that the trespass-based search analysis is the "baseline" test for whether a Fourth Amendment search occurred. Florida v. Jardines, 133 S. Ct. at 1417.  It did not repudiate, however, the Katz v. United States reasonable-expectation-of-privacy test.  The Supreme Court held that "it is unnecessary to consider [the Katz test] when the government gains evidence by physically intruding on constitutionally protected areas."  133 S. Ct. at 1417 (quoting United States v. Jones, 132 S. Ct. at 951-52).  While it is indisputable that Bobbitt gained evidence here by physically intruding into the Toyota Camry, and while "[i]t is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment," United States v. Jones, 132 S. Ct. at 949, the rented Camry in which Alabi was a passenger is not a constitutionally protected area in relation to Alabi.

The Supreme Court has not equivocated in recognizing that "'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  Rakas v. Illinois, 439 U.S. at 133-34 (quoting Alderman v. United States, 394 U.S. 165, 174 (1969)).  The Honorable Antonin G. Scalia, Associate Justice for the Supreme Court, who wrote the majority opinions in both Florida v. Jardines and United States v. Jones, has accordingly declared that "[t]he obvious meaning of the [Fourth Amendment's search and

seizure] provision is that <u>each</u> person has the right to be secure against unreasonable searches and seizures in <u>his own</u> person, house, papers, and effects." <u>Minnesota v. Carter</u>, 525 U.S. at 92 (1998)(Scalia, J., concurring)(emphasis in original).  While Oguntoyinbo's status as the renter of the car, or the legal lessee of the property, may mean that the Camry was, at the time of Bobbitt's search, "his own . . . effect[]," 525 U.S. at 92, for Fourth Amendment purposes, because Alabi did not rent the vehicle, it was not his effect.  Similarly, the trespass-based approach looks to property laws to determine whether a government information-seeking invasion amounts to a trespass.  A passenger in the car with a driver who owns or possesses a superior possessory interest in the car cannot object to invasion of the car apart from the driver.  Bobbitt's search was thus not a physical invasion of constitutionally protected area in relation to Alabi.  Bobbitt's search, therefore, did not implicate Alabi's Fourth Amendment interests under the Supreme Court's trespass-based approach.

> **B.** **BOBBITT'S SEARCH OF THE RENTED CAMRY IN WHICH ALABI WAS A PASSENGER DOES NOT IMPLICATE HIS FOURTH AMENDMENT RIGHTS UNDER THE <u>KATZ v. UNITED STATES</u> REASONABLE-EXPECTATION-OF-PRIVACY APPROACH, BECAUSE ALABI DID NOT HAVE A LEGITIMATE PRIVACY INTEREST IN THE CAMRY.**

The conclusion that Alabi's Fourth Amendment interests are not implicated under the trespass-based approach does not end the inquiry whether he can object to Bobbitt's search.  The Supreme Court has recognized that, even where a government investigation of private property does not invade one of the constitutionally protected areas, the intrusion is still subject to the <u>Katz v. United States</u> reasonable-expectation-of-privacy test.  <u>See</u> <u>Florida v. Jardines</u>, 133 S. Ct. at 1414 ("[A]n officer may (subject to <u>Katz</u>) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the

Amendment's text.").  The Court nevertheless concludes that, because Alabi was a passenger in the Camry when Bobbitt initiated the traffic stop and the search, and because Oguntoyinbo rented and was driving the Camry, Bobbitt's search did not invade any legitimate privacy expectation Alabi may have had in the Camry.

The Tenth Circuit has held:

> The personal nature of Fourth Amendment rights imposes on the party seeking to suppress evidence the burden of "'adducing facts at the suppression hearing indicating that [her] own [Fourth Amendment] rights were violated by the challenged search.'"  Two factors are relevant: (1) whether a party has manifested a subjective expectation of privacy in the area searched, and (2) whether society is prepared to recognize that expectation as reasonable.

United States v. Eylicio-Montoya, 70 F.3d 1158, 1162 (10th Cir. 1995)(internal citations omitted)(quoting United States v. Eylicio-Montoya, 18 F.3d 845, 850 (10th Cir. 1994)).  Alabi cites to the Tenth Circuit's decision in United States v. Roper, 918 F.2d 885 in support of the proposition that Bobbitt's search of the Camry implicated his Fourth Amendment interests, because he is a named secondary authorized operator on the rental agreement.  In United States v. Roper, the Tenth Circuit held that the defendant -- the driver of the searched vehicle -- could not object to the search of the vehicle, because "[h]e was not the owner nor was he in lawful possession or custody of the vehicle.  The vehicle had been rented by Griffin's common law wife in California.  Neither Roper nor Griffin[, a passenger,] was listed as an additional driver in the rental contract."  918 F.2d at 888.  The Tenth Circuit in United States v. Roper relied heavily on its decision in United States v. Obregon, 748 F.2d 1371 (10th Cir. 1984), which it noted "is almost on all fours" with United States v. Roper.  In United States v. Obregon, the Tenth Circuit held that, where the government searched a rented car, which the driver have been granted permission to drive the car by the renter, the driver could not object to the search, because the

government search did not implicate his Fourth Amendment interests.  See 748 F.2d at 1374.

The Tenth Circuit approved of the district court's findings:

> Defendant had the keys to the car and may have had permission from the renter of
> the car to use it, but this is not determinative of the standing inquiry in this case.
> Defendant was driving a rented vehicle and was not named on the rental
> agreement or any other documents, either as the renter or as an authorized driver.
> Defendant made no showing that any arrangement had been made with the rental
> car company that would have allowed him to drive the car legitimately. Indeed,
> the defendant testified that he waited outside of Miami airport while an unrelated
> third party arranged the rental of the car.  Defendant's relationship to the rented
> car is too attenuated to support a claim of standing. (R., Vol. I at pp. 55–56.)

United States v. Obregon, 748 F.2d at 1374 (internal citations omitted).

United States v. Roper and United States v. Obregon are distinguishable.  Importantly,

Alabi was not the driver here.  Alabi was the passenger.  The Tenth Circuit has held that, while a

driver can challenge law enforcement's search of a vehicle if the driver is in lawful possession or

custody of the vehicle, the search of a vehicle does not implicate any personal Fourth

Amendment interest of a passenger.  See, e.g., United States v. Lewis, 24 F.3d 19, 81 (10th Cir.

1994)("[A] 'passenger *qua* passenger' has no reasonable expectation of privacy in a car that

would permit the passenger's Fourth Amendment challenge to the search of the car.")(quoting

Rakas v. Illinois, 439 U.S. at 148-49); United States v. Eylicio-Montoya, 70 F.3d at 1162

("[P]assengers lack standing to challenge vehicle searches."); United States v. DiLuca, 269 F.3d

1128, 1145 n.2 (10th Cir. 2001) ("Obviously, a passenger has no standing to directly challenge a

search.")(Seymour, J., dissenting).   In United States v. Eylicio-Montoya, the Tenth Circuit

discussed the requirements to challenge vehicle searches under Rakas v. Illinois and held that

passengers' Fourth Amendment rights are not violated by vehicle searches:

> In Rakas v. Illinois, . . . the Supreme Court considered these factors in
> deciding whether passengers have standing to challenge vehicle searches.
> ["Standing" is really "a shorthand method of referring to the issue of whether the

defendant's own Fourth Amendment interests were implicated by the challenged governmental action." United States v. Kimball, 25 F.3d 1, 5 n.1 (1st Cir.1994).] The Court held that a passenger who asserts neither a possessory nor a property interest in a vehicle "would not normally have a legitimate expectation of privacy" in the vehicle protected by the Fourth Amendment. Id. at 148–49 . . . ; see also United States v. Lewis, 24 F.3d 79, 81 (10th Cir.)("Rakas provides the definitive teaching that a 'passenger qua passenger' has no reasonable expectation of privacy in a car that would permit the passenger's Fourth Amendment challenge to the search of the car."), cert. denied, 513 U.S. 905 . . . (1994); United States v. Martinez, 983 F.2d 968, 973-74 (10th Cir. 1992), cert. denied, 507 U.S. 1056 . . .; United States v. Jefferson, 925 F.2d 1242, 1249 (10th Cir.), cert. denied, 502 U.S. 884 . . . (1991); [United States v. ]Erwin, 875 F.2d[, 268,] 270-71 [(10th Cir. 1989)].  We have applied Rakas to conclude that passengers lack standing to challenge vehicle searches.  See, e.g., Lewis, 24 F.3d at 81; Jefferson, 925 F.2d at 1249 (nonowner passenger lacked standing to challenge search even though he shared in the driving in a long-distance trip); Erwin, 875 F.2d at 271-72 (passenger's possession of key to rear door of car insufficient to establish standing).

United States v. Eylicio-Montoya, 70 F.3d at 1162.

Although Alabi was a named as an "authorized operator" on the Hertz Rental Agreement, Hertz Rental Agreement at 2, the Court concludes that, under Tenth Circuit authority, that is not a sufficient possessory or property interest in, or sufficient control over, the vehicle to find that Bobbitt's search of the Camry in which Alabi was a passenger implicated Alabi's own Fourth Amendment interests.  Although the Tenth Circuit's language may be read to have thrown a blanket over all vehicle passengers and precluded courts in this Circuit from ever finding that passengers may be able to challenge a vehicle search as implicating their personal Fourth Amendment interests, the Tenth Circuit's opinions do not go that far.  The facts from which these holdings arise show situations in which the vehicle searches do not implicate the passengers' Fourth Amendment rights, because the passengers do not have sufficient possessory or property interests in the vehicle searched.  See United States v. Eylicio-Montoya, 70 F.3d at 1162 (holding that the fact that the driver of vehicle borrowed the Dodge from the owner, that

the defendant/passenger had earlier driven the car, or the fact that the owner permitted the defendant/passenger to ride in the car on that occasion "establishes that [the defendant] had a legitimate expectation of privacy in it" sufficient to object to the search).  See also United States v. Sanchez, 376 F. Supp. 2d 1264, 1270 (D.N.M. 2005)(Browning, J.)("A passenger lacks standing to challenge directly a vehicle search unless [the passenger] has a 'possessory or a property interest in a vehicle.'" (original alterations omitted))(quoting Rakas v. Illinois, 439 U.S. at 148).  Alabi's contention is thus that, if United States v. Roper and United States v. Obregon can support finding that a driver being listed on a rental agreement provides a sufficient possessory interest in the vehicle to implicate Fourth Amendment interests when the government searches the vehicle, this possessory interest arising out of being named as an authorized driver on a rental agreement should, by analogy, mean that the search of a vehicle in which that named person is a passenger implicates the passenger's Fourth Amendment interests.  While Alabi's contention may be logically sound, the Tenth Circuit in United States v. Lewis reached the opposite answer, concluding that any possessory interest the passenger may have is insufficient when the driver is the person who rented the vehicle.  See 24 F.3d at 81.  In United States v. Lewis, where the defendant "urge[d] that as a passenger in the rented vehicle he had the required standing to argue the illegality of the search," the Tenth Circuit stated:

> [E]ven were Lewis viewed as having some attenuated possessory interest in the vehicle (a dubious assumption in light of the authorities), his contention does him no good in any event because [the driver who rented the vehicle] (as both lessee of the leased vehicle and in control as its driver) unquestionably had . . . the primary possessory rights in the vehicle.

24 F.3d at 81.  Regardless what possessory interest, if any, Alabi's status as a named authorized operator of the Camry would have given him if Oguntoyinbo -- the lessee of the rented vehicle and in control as its driver -- was not driving, given that Oguntoyinbo was driving when Bobbitt

searched the Camry, and in light of the Tenth Circuit's decision in United States v. Lewis, the Court concludes that Bobbitt's search did not implicate Alabi's personal Fourth Amendment interests.   Alabi, therefore, cannot challenge the constitutionality of Bobbitt's search of the vehicle.

To conclude otherwise -- that a passenger named as an additional authorized driver on the rental agreement has a legitimate subjective privacy interest in the car such that a government search implicates the passenger's Fourth Amendment interests -- would run contrary to well-established precedent.  In United States v. Eylicio-Montoya, for instance, the defendant's son drove the car in which the defendant was a passenger, and the son's father had lent the car to the defendant's son.  See 70 F.3d at 1160.  Moreover, the owner permitted the defendant, his son's mother, to drive the car and ride in it while his son was borrowing the car.  See 70 F.3d at 1162. The distinction between United States v. Eylicio-Montoya and this case, therefore, is that there is a rental agreement here which provides in writing that the vehicle's owner grants Alabi permission to drive it, whereas in United States v. Eylicio-Montoya, there was no written agreement.  The Tenth Circuit in United States v. Eylicio-Montoya did not point to any lack of proof on the defendant's side; accordingly, the Court does not believe that a written agreement provides a sufficient basis to reach a different conclusion.  Moreover, in Rakas v. Illinois, in reaching the conclusion that the defendants had no "legitimate expectation of privacy in the glove compartment or area under the seat of the car in which they were merely passengers," 439 U.S. at 148, the Supreme Court noted that "the owner of the car had been the driver of the vehicle at the time of the search," 439 U.S. at 423.  Given that the driver at the time of the search owned the car, the driver in Rakas v. Illinois could have, at any time, authorized any one of the defendant passengers to drive the car.  The conclusion that Bobbitt's search of the car in which

Alabi was a passenger, and in which Oguntoyinbo as the car's lessee was the driver, implicates Alabi's Fourth Amendment interests to any greater extent than that of the car search in <u>Rakas v. Illinois</u>, in which the car's owner was the driver, only because Alabi was written in as an "additional authorized operator" in the Hertz Rental Agreement, lacks a sound basis in law and fact.  To find that a passenger's designation on a rental agreement as an additional authorized driver for the vehicle, given the Tenth Circuit and Supreme Court's similar decisions, would provide an illogical exception to the well-established law and would exalt form over substance. Without additional guidance from the Supreme Court or the Tenth Circuit, the Court declines to create such an exception in this case.  The Court concludes, rather, like the Tenth Circuit in <u>United States v. Eylicio-Montoya</u> and the Supreme Court in <u>Rakas v. Illinois</u>, which held that "a passenger <i>qua</i> passenger simply would not normally have a legitimate expectation of privacy" that the government's search of the vehicle implicates, <u>Rakas v. Illinois</u>, 439 U.S. at 149, Alabi, as the passenger in the car in which Oguntoyinbo had a superior possessory interest as the lessee, and in which Oguntoyinbo was driving when Bobbitt initiated the traffic stop, did not have a legitimate expectation of privacy which Bobbitt's search implicated.

**II.    REGARDLESS WHETHER BOBBIT'S SEARCH OF THE CAMRY IMPLICATED ALABI'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES, OGUNTOYINBO'S CONSENT WAS VALID AND EFFECTIVE, AND PRECLUDES FINDING THAT BOBBITT'S SEARCH OF THE CAMRY VIOLATED ALABI'S FOURTH AMENDMENT RIGHTS.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search warrant and probable-cause requirements.  See <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 219.  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  <u>United States v. Peña</u>, 143 F.3d at 1366 (10th Cir. 1998)(quoting <u>Schneckloth v. Bustamonte</u>, 412 U.S. at 219).  The

Tenth Circuit has provided a two-part test for determining voluntariness, which requires that the government "(1) 'proffer clear and positive testimony that consent was unequivocal and specific and intelligently given,' and (2) the officers must have used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d at 690 (quoting United States v. Taverna, 348 F.3d at 878).

Determining whether a party's consent was free and voluntary is a question of fact to be determined from the totality of the circumstances.  See United States v. Peña, 143 F.3d at 1366. The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that courts should consider when determining whether a defendant's consent was voluntarily given:

> (i) the threatening presence of several officers; (ii) the use of aggressive language or tone of voice indicating that compliance with an officer's request is compulsory, or, conversely, the officer's pleasant manner and tone of voice; (iii) the prolonged retention of a person's personal effects such as identification, or, conversely, the prompt return of the defendant's identification and papers; (iv) the absence of other members of the public, or, conversely, whether the stop occurs in a public location such as the shoulder of an interstate highway, in public view; (v) the officer's failure to advise the defendant that [he or] she is free to leave; . . . (vi) the display of a weapon[;] and (vii) physical touching by the officer.

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (quotations, alterations, and citations omitted).

Alabi, notably, does not object to Bobbitt's search of the Camry on the basis that Oguntoyinbo's consent was invalid. The United States has "'proffer[ed] clear and positive testimony that [Oguntoyinbo's] consent was unequivocal and specific and intelligently given,' and (2) [that Bobbitt] used no 'implied or express duress or coercion.'"  United States v. Sanchez, 608 F.3d at 690.  The Traffic Stop Video shows Bobbitt issue Oguntoyinbo the warning, hand Oguntoyinbo all of his information, papers, and identification which he had provided to Bobbitt, and tell Oguntoyinbo that he is "free to leave."  Tr. at 33:18-20 (Gerson,

Bobbitt).  See Traffic Stop Video at 8:24:05-27:26.  After Oguntoyinbo turned around to walk

back to the car, Bobbitt, intending to initiate a consensual encounter, and asked Oguntoyinbo if

he could ask Oguntoyinbo "some questions."  Tr. at 33:18-34:2 (Gerson, Bobbitt).  See Traffic

Stop Video at 8:27:26-27:35.  Bobbitt asked Oguntoyinbo if he could speak with the vehicle's

passenger, to which Oguntoyinbo responded that he could speak with the passenger.  See Tr.at

34:11-14 (Gerson, Bobbitt); Traffic Stop Video at 8:27:35-28:6. Bobbitt then approached the

Camry's passenger-side and spoke with Alabi.  See Tr. at 34:15-16 (Gerson, Bobbitt); Traffic

Stop Video at 8:28:6-30:35.  When Alabi gave Bobbitt permission to ask him questions, Bobbitt

and Alabi talked about Alabi's travels, where he was headed, and what kind of business he and

Oguntoyinbo were conducting, to which Alabi responded that they were headed to Dallas to

attend an automobile auction.  See Tr. at 34:22-35:2 (Gerson, Bobbitt); Traffic Stop Video at

8:28:6-30:35.  After the conversation with Alabi, Bobbitt returned to Oguntoyinbo, who was

standing behind the Camry and in front of the police cruiser, and asked Oguntoyinbo if he could

search the Camry's trunk.  Oguntoyinbo told Bobbitt that he could search the trunk, and

Oguntoyinbo opened the trunk for Bobbitt.  See Tr. at 35:5-18 (Gerson, Bobbitt); Traffic Stop

Video at 8:30:35-31:02.  While looking into the trunk, Bobbitt asked Oguntoyinbo if he could

search the inside of the vehicle, to which Oguntoyinbo responded that he could search the

vehicle.  See Tr. at 35:21-36:5 (Gerson, Bobbitt); Traffic Stop Video at 8:31:02-31:35.

The circumstances surrounding Oguntoyinbo's consensual search are substantially

similar to the defendant's consent in United States v. Harmon, in which the Court concluded that

Harmon voluntarily consented to the vehicle's search.  See 785 F. Supp. 2d at 1171-74.  In

United States v. Harmon, after the officer issued a written warning to Harmon, "returned

Harmon's paperwork[,] . . . made sure that Harmon had everything and told him to be careful,"

and after "Harmon turned away and started walking back to the [car]," the officer "asked whether he could ask a few more questions," and obtained Harmon's consent to search the vehicle. 785 F. Supp. 2d at 1153. The Court noted that, whereas "'[t]his Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him,'" the officer had returned all of Harmon's paperwork. 785 F. Supp. 2d at 1171-72. The Court concluded "that Lucero's call out to Harmon when Harmon was near the vehicle he was driving thus did not retract Harmon's freedom to leave. A reasonable person in Harmon's situation would not have an objective reason to believe he was not free to end his conversation with Lucero." 785 F. Supp. 2d at 1172. Similarly, Bobbitt's call out to Oguntoyinbo to inquire whether he could ask Oguntoyinbo a few more questions, after he had told Oguntoyinbo that he was free to leave, did not give Oguntoyinbo a sound reason to believe that he was not free to end his conversation with Bobbitt. The Court in United States v. Harmon additionally took into account in assessing the voluntariness of Harmon's consent that, "[w]hen Lucero asked for Harmon's consent, he did not have his weapon drawn and was speaking in a conversational tone." 785 F. Supp. 2d at 1173. Here, Bobbitt never drew his weapon or touched his weapon during his encounter with the Defendants, and used a conversational tone with Oguntoyinbo when asking for consent to search the vehicle and the trunk. The Court also took into consideration in finding Harmon's consent voluntary that "Harmon was free to call out to Lucero, and withdraw his consent to the search," noting that "Harmon did not object to the search or attempt to withdraw his prior consent." 785 F. Supp. 2d at 1174. Here, not only was Oguntoyinbo standing at a distance within which Oguntoyinbo could have called out to Bobbitt to withdraw his consent, but Oguntoyinbo voluntarily opened the trunk for Bobbitt during Bobbitt's search. Thus, similar to the Court's conclusion in United

States v. Harmon that, under the totality of the circumstances, Harmon's consent was voluntary, Oguntoyinbo's consent was voluntary under the totality of the circumstances here.[15]

Oguntoyinbo's voluntary consent to search the vehicle precludes Alabi from asserting that Bobbitt's search violated Alabi's Fourth Amendment rights.   In United States v. Lewis, where the defendant passenger moved to suppress evidence found in luggage in the trunk of the rented vehicle in which he was a passenger, the Tenth Circuit held that the "voluntary oral consent given by [the driver, as the lessee and person in control of the vehicle as the driver,] to search both the trunk and its contents . . . unquestionably validated the search."  24 F.3d at 81. Moreover, the United States Court of Appeals for the Fifth Circuit has held that "[a] person who has joint control over an automobile may give valid consent to its search."  United States v.

_____

[15] Alabi does not argue that Bobbitt's instruction that Oguntoyinbo and Alabi to stand outside of and to the right of the car while Bobbitt searched the car made the consent involuntary or was otherwise coercive.  Regardless, the Court concludes that it was not.  In United States v. Harmon, Harmon argued that the officer's "actions of having him walk down the shoulder of the interstate after he consented to the search placed him in a position where he could not withdraw his consent, and, thus, [the officer] coerced his consent."  785 F. Supp. at 1173. The Court concluded that the instruction was not coercive, and Harmon's consent was thus valid and effective, because officers are allowed to conduct consensual searches in a safe-manner.  See 785 F. Supp. 2d at 1173-74.  The Court reasoned:

> Once Harmon gave consent, [the officer] had good reason to conduct the search in safe manner. Although [the officer] asked Harmon to walk a little ways from the vehicle so that he could conduct the search in a safe manner, as in United States v. Manjarrez, where the defendant was free to withdraw his consent after the pat-down, Harmon was free to call out to Lucero, and withdraw his consent to the search. Harmon did not object to the search or attempt to withdraw his prior consent. The Court thus finds that an atmosphere or intimidation of coercion did not exist.

785 F. Supp. 2d at 1174 (internal citations omitted)(citing United States v. Manjarrez, 348 F.3d 881, 886-88 (10th Cir. 2003)).  Bobbitt also expressed concern for Oguntoyinbo's safety when he stepped out of the driver seat to view the expired license plate tags, telling Oguntoyinbo that he did not want him to get run over.  See Traffic Stop Video 8:15:14-16:42.  Bobbitt may have been concerned about Alabi's safety as well.

Crain, 33 F.3d 480, 484 (5th Cir. 1994")(holding that lessee of the car, a passenger in the vehicle searched, could not object to the search of the vehicle where the driver, to whom the lessee had given his "permission to drive it on the late night trip," consented to the search).  Cf. Georgia v. Randolph, 547 U.S. 103, 106 (2006)("The Fourth Amendment recognizes a valid warrantless-entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained.")(citing Illinois v. Rodriguez, 497 U.S. 177 (1990); United States v. Matlock 415 U.S. 164 (1974)).  Where Oguntoyinbo, who "unquestionably had at least the primary possessory rights in the vehicle," 24 F.3d at 81, consented to the search, and where Alabi did not object, Alabi's designation as an additional authorized driver does not affect that Oguntoyinbo's consent provided Bobbitt authority to search the Camry.  Because Oguntoyinbo rented the vehicle, was driving the vehicle when Bobbitt initiated the valid traffic stop, and voluntarily consented to Bobbitt's search of the car, to which Alabi did not object, Oguntoyinbo's consent "dooms [Alabi's] basic quarrel with the search itself."  United States v. Lewis, 24 F.3d at 81.  Accordingly, Bobbitt's search premised upon Oguntoyinbo's consent did not violate Alabi's nor Oguntoyinbo's Fourth Amendment rights.[16]

_____

[16] Bobbitt testified at the evidentiary hearing that Alabi told him the two bags in the Camry's back seat belonged to him, but that Alabi gave Bobbitt permission to search the two bags.  Bobbitt testified:

I've approached the passenger of the vehicle, Mr. Alabi, and I've asked him if I could -- if he minded if I searched the vehicle.  He said I could, and I asked him if he had any luggage or baggage in the vehicle that was his, and he told me there was some bags in the backseat that was his.

I asked him if I could search -- if he had a problem with me searching that

### III.   BOBBITT'S TRAFFIC STOP WAS LAWFUL, AND ALABI'S SEIZURE DID NOT VIOLATE HIS FOURTH AMENDMENT RIGHTS.

In Alabi's supplemental brief, which he submitted after the suppression hearing, he challenged for the first time that the traffic stop violated his Fourth Amendment rights to be free from unlawful seizure.  See Second Supp. at 2.  Alabi contends that "the evidence emerged that no reasonable articulable suspicion of any violation had occurred when Mr. Bobbitt took after the Defendants' rented vehicle."  Second Supp. at 5.  The United States concedes that Alabi can object to Bobbitt's traffic stop, as it implicates his personal Fourth Amendment interests, see Second Supp. Response at 1, but notes that, given Bobbitt had reasonable suspicion to believe that the Defendants violated the law by speeding past him, and probable cause to stop the car when he saw that the license plate tags were expired, Bobbitt's traffic stop did not violate Alabi's Fourth Amendment rights, see Second Supp. Response at 2.

---

stuff, and he said no.

Tr. at 36:25-27:6 (Bobbitt).  Although the Court found in footnote 9, supra, that Bobbitt's testimony was credible, and that Alabi consented to the search, because Oguntoyinbo consented to Bobbitt searching the vehicle, and because the Court concludes that he had the authority to do so, Oguntoyinbo's consent gave Bobbitt lawful permission to search the two bags inside the Camry even if Alabi had not consented.  Compare Georgia v. Randolph, 547 U.S. at 103 ("[T]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an occupant who shares, or is reasonably believed to share, authority over the area in common with a co-occupant who later objects to the use of evidence so obtained"), and Georgia v. Randolph, 547 U.S. at 111 ("[C]onsent is sufficient when given by a person who reasonably appears to have common authority but who, in fact, has no property interest in the premises searched.")(citing Illinois v. Rodriguez, 497 U.S. 177, 181-82 (1990)), with Georgia v. Randolph, 547 U.S. at  103 ("[A] physically present co-occupant's stated refusal to permit entry prevails, rendering the warrantless search unreasonable and invalid as to him.").  The Traffic Stop Video shows that Alabi was standing beside the car within earshot of Bobbitt as he searched the car.  If, as Alabi testified at the hearing, he did not own the bags, but if he had objected to Bobbitt's search of the bags during the search, he could have overridden any consent Oguntoyinbo had given by objecting to Bobbitt's search.  Alabi did not object to Bobbitt's search at any point, and thus cannot contend that Oguntoyinbo's consent was not valid to any item that he owned in the Camry.

"'A traffic stop is a 'seizure' within the meaning of the Fourth Amendment . . . .'"
United States v. Holt, 264 F.3d at 1220.  "For the duration of a traffic stop, . . . a police officer
effectively seizes everyone in the vehicle, the driver and all passengers."  United States v. White,
584 F.3d at 945 (quoting Arizona v. Johnson, 555 U.S. at 327).  "This seizure implicates a
passenger's Fourth Amendment interests to the same degree as the driver's."  United States v.
Wilson, 96 F. App'x at 643 (citing United States v. Erwin, 875 F.2d at 270).  "Therefore, both
the driver and passenger have standing to challenge the constitutionality of the initial stop."
United States v. White, 584 F.3d at 945.  "'The validity of a traffic stop under the Fourth
Amendment turns on whether the particular officer had reasonable suspicion that the particular
motorist violated any one of the multitude of applicable traffic and equipment regulations of the
jurisdiction.'"  United States v. Harmon, 785 F. Supp. 2d at 1162 (alterations omitted)(quoting
United States v. Valenzuela, 494 F.3d 886, 888 (10th Cir. 2007)).  See United States v. Williams,
403 F.3d at 1206 ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on
an observed traffic violation . . . .").

Bobbitt's traffic stop of the Defendants' Camry was valid, because the stop was based on
the observed state-law violation of driving with expired license plate tags.  The evidence
establishes that the Camry in which Alabi was a passenger when Bobbitt stopped the vehicle had
expired license plate tags.  When Bobbitt pulled up behind the Camry in the left-hand lane of
traffic, Bobbitt observed that the Toyota Camry's California license plate tag was expired.  See
Tr. at 21:14-23 (Gerson, Bobbitt); Traffic Stop Video at 8:14:06-14:47.  Because N.M.S.A.
1978, § 66-3-1 provides that it is a violation of New Mexico law to drive a vehicle on a highway
in New Mexico without proper registration, Bobbitt's traffic stop was based on an observed
traffic violation.  Accordingly, the traffic stop was valid.  See United States v. Williams, 403

F.3d at 1206 ("[A] traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation . . . .").

Alabi does not provide any explanation about which "facts . . . emerged in Officer Bobbitt's testimony" that "strongly indicate that the pretext grounds for this stop and search were . . . impermissible," or about what "evidence emerged" that showed Bobbitt had "no reasonable suspicion of any violation . . . when Mr. Bobbitt took after the Defendant's rented vehicle." Second Supp. at 5.  The Court believes, however, that Alabi is referring to Bobbitt's testimony about initially giving chase to the Camry when he heard it speed by him.  During oral argument in support of his Motion to Suppress after the hearing, Alabi asked that the Court review the entire Traffic Stop Video, asserting that reviewing the video is important, because it allows the Court to substantiate, or as he believes, contradict, Bobbitt's testimony both about Alabi's consent to the search and to pulling the Camry over because he heard it speeding past.  See Tr. at 220:6-20 (Samore).  Although Bobbitt did not cite Oguntoyinbo for driving over the speed limit, or assert that speeding was the reason that he initiated the traffic stop, he testified at the suppression hearing that he left the side of the road where he was parked in wait, because he heard the Defendants' vehicle speed past him.  See Tr. at 66:18-67:14 (Samore, Bobbitt)(Q: "Do you recall what caused you to pull back on the road that day?" A: "Yes. I noticed them speeding by. . . .  I saw the vehicle as it passed by . . . ."  Q: "Why did you notice [their] car as [it] went past . . . ?"  A: "I heard a noise, I noticed it was speeding.").  First, the suppression hearing was not the first instance that Bobbitt said something about believing that the Defendants were speeding as they passed by him on I-40; when Bobbitt took Oguntoyinbo to the back of the Camry during the traffic stop to show him the expired tags, Bobbitt said to him: "And you were going too fast, too."  Traffic Stop Video at 8:17:48-17:50.  Second, pursuit of a vehicle -- as

opposed to a traffic stop of a vehicle -- is not a Fourth Amendment seizure.  See Latta v. Keryte, 118 F.3d 693, 700 (10th Cir. 1997)("We also hold that [the officer's] unsuccessful pursuit of [defendant] on the interstate was not a 'seizure' within the meaning of the Fourth Amendment. While the pursuit constituted an assertion of authority, the pursuit did not cause [defendant] to submit to the authority or succeed in stopping him.").  The Fourth Amendment seizure which Alabi alleges violated his Fourth Amendment rights was Bobbitt's traffic stop of the Camry.  As Alabi points out, "the Tenth Circuit . . . held 'a traffic stop is valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'"  Second Supp. at 5 (quoting United States v. Botero-Ospina, 71 F.3d 783, 787 (10th Cir. 1995)).  Bobbitt testified, and it is uncontroverted in the record, that the Camry's tags were expired, which is a traffic or equipment violation under New Mexico law.  Bobbitt's traffic stop, and seizure of Alabi, was therefore valid under the Fourth Amendment.

IV.   **BOBBITT'S TRAFFIC STOP OF THE DEFENDANTS' CAMRY WAS NOT RACIALLY SELECTIVE LAW ENFORCEMENT.**

The moving force behind Alabi's Motion to Suppress, from its inception, is that the Court should exclude any evidence found as a result of Bobbitt's traffic stop and/or search of the Defendants' Camry, because the traffic stop and/or search "is clearly 'selective [law] enforcement.[']"  Reply at 1.  The United States contends that Alabi cannot make out a prima facie case for selective enforcement, because he cannot prove that Bobbitt's conduct had a discriminatory effect or that a discriminatory purpose motivated his conduct.   See Supp. Response at 2-3.  The Court concludes that, regardless whether the exclusionary rule applies to racially selective law enforcement, Alabi has failed to prove a prima-facie case of any such

conduct.  Additionally, as Alabi points out, the Court, in <u>United States v. Harmon</u>, concluded that suppressing evidence under the exclusionary rule is not an appropriate remedy for a racially selective law enforcement allegation.  He notes, however, that "in the absence of controlling United States Supreme Court authority," the Court "still has the option of excluding evidence before it . . . . [and] can turn to other United States district courts on the same issue."  Reply at 5. Alabi has not presented to the Court, and the Court has not found, any district court authority, or authority from appellate courts, that convince the Court that it should retreat from its conclusion that the exclusionary rule does not extend to instances of racially selective law enforcement.

A.     **ALABI HAS FAILED TO SHOW THAT BOBBITT'S TRAFFIC STOP OF THE CAMRY WAS RACIALLY SELECTIVE LAW ENFORCEMENT.**

"[T]he right to equal protection may be violated even if the actions of the police are acceptable under the Fourth Amendment."  <u>Marshall v. Columbia Lea Reg'l Hosp.</u>, 345 F.3d at 1166.  <u>See id.</u> ("'[T]he Equal Protection Clause of the Fourteenth Amendment provides citizens a degree of protection independent of the Fourth Amendment protection against unreasonable searches and seizures.'")(quoting <u>United States v. Avery</u>, 137 F.3d at 352).  The Tenth Circuit, recognizing that the Supreme Court has afforded prosecutors a presumption that their conduct does not violate equal protection and finding that many of the same policies on which that presumption is based also exist in the law-enforcement context as well, affords law enforcement the same presumption:

> Police officers and departments should not lightly be put to the expense and risk of trial on charges of racial discrimination that may be easy to make and difficult to disprove.  Not only does litigation divert prosecutorial resources and threaten an excessive judicial interference with executive discretion, but it could induce police officers to protect themselves against false accusations in ways that are counterproductive to fair and effective enforcement of the laws. . . .  Perhaps for these reasons, the Supreme Court has held that "to dispel the presumption that a prosecutor has not violated equal protection, a criminal defendant must present

> 'clear evidence to the contrary.'"  Claims of racially discriminatory traffic stops
> and arrests should be held to a similarly high standard.

Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1167 (internal citations omitted)(quoting

United States v. Armstrong, 517 U.S. at 464).   Thus, a claim for racially selective law

enforcement requires clear evidence that the government actor was motivated by a

discriminatory purpose and the government actor's conduct had a discriminatory effect.  See

Blackwell v. Strain, 496 F. App'x at 839 (noting that, to avoid summary judgment, the plaintiff

must proffer sufficient evidence from which "a jury could reasonably infer Officer Strain was

motivated by a discriminatory purpose and his actions had a discriminatory effect").  "The

discriminatory purpose need not be the only purpose, but it must have been a motivating factor in

the decision."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168 (citing Villanueva v.

Carere, 85 F.3d 481, 485 (10th Cir. 1996)).

In Marshall v. Columbia Lea Reg'l Hosp., the Tenth Circuit noted that, while, "[i]n

general, the absence of an overtly discriminatory policy or of direct evidence of police

motivation results in most claims being based on statistical comparisons," the facts of the case

presented a different theory and a direct method of proving the officer's discriminatory motive:

> This case, however, is different, and perhaps more susceptible to traditional
> modes of proof before a jury.  Here, Mr. Marshall seeks to prove the racially
> selective nature of his stop and arrest not by means of statistical inference but by
> direct evidence of Officer Porter's behavior during the events in question, Officer
> Porter's own statements and testimony (the credibility of which can be evaluated
> by a jury), and Officer Porter's alleged record of racially selective stops and
> arrests in drug cases under similar circumstances in Midland, Texas.

345 F.3d at 1168.

The Tenth Circuit has thus recognized that there are two methods of proving racially

selective law enforcement: (i) direct evidence of the law enforcement officer's behavior during

the events in question; or (ii) using statistical comparisons to draw an inference that a particular

law enforcement action was motived by a discriminatory purpose.   Under the statistical

comparison method, the Tenth Circuit has stated:

> Statistical evidence can be used to show both discriminatory effect and
> discriminatory purpose. To be useful, however, a statistical comparison "requires
> a reliable measure of the demographics of the relevant population, a means of
> telling whether the data represent similarly situated individuals, and a point of
> comparison to the actual incidence of crime among different racial or ethnic
> segments of the population."

Blackwell v. Strain, 496 F. App'x at 839-40 (internal citations omitted)(citing Marshall v.

Columbia Lea Reg'l Hosp., 345 F.3d at 1168).  In relation to the second method, proving more

directly that the particular law enforcement action was racially motivated, the Tenth Circuit held

that "a police officer's pattern of traffic stops and arrests, his questions and statements to the

person involved, and other relevant circumstances may support an inference of discriminatory

purpose in this context."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168.

It is not clear whether Alabi seeks to prove that Bobbitt's traffic stop of the Camry was

racially motivated under the statistical inference method, based on a statistical inference about

NMSP in Quay and Guadalupe Counties, or under the direct proof method, based on Bobbitt's

conduct and history, or under both methods.  Alabi's Motion to Suppress, Reply, and Supp.

Reply, largely focus on the first method of proving discriminatory motive, contending that

Bobbitt's traffic stop and search is the product of "an extensive history . . . regarding the use of

substantial reliance of certain traffic techniques by NMSP officers particularly in Quay and

Guadalupe counties to selectively stop black people."  Motion to Suppress at 4.  See also Supp.

Reply at 4 (alleging that there is a "history of racial profiling in eastern New Mexico by NMSP,"

and that Alabi will "present at [the] hearing on this matter . . . data from the State on whether this

kind of racial profiling flows out of Tucumcari to other areas of New Mexico").   On the other

hand, in his Second Supp. submitted after the suppression hearing, Alabi appears to rely on the

direct proof method, contending that "this Court has sufficient authority to sustain the [Motion to

Suppress], for the particularized showing of bias, without even going to the statistical evidence."

Second Supp. at 8.   Alabi's particularized showing of bias appears to be premised upon Bobbitt's

testimony at the suppression hearing that he pursued the Camry after he heard it speeding by him

while he was on the side of the road.[17]   During oral argument on the Motion to Suppress after the

evidentiary hearing, Alabi asserted that nowhere in the record, in the testimony, the exhibits, or

in the Traffic Stop Video, is there any evidence that the Camry was speeding at any time.   See

---

[17]   The Court's inference that Bobbitt's testimony serves as the basis comes from the
Second Supp., in which Alabi contrasts the facts of United States v. Harmon with the facts of this
base.   The Court is not positive, however, as Alabi appears to have left out a few words that
would have been helpful in clearly articulating what he contends that Bobbitt "obviously
concocted":

> Mr. Harmon was stopped for weaving, but Mr. Alabi's vehicle, after an obviously
> concocted (found in no previous report or sworn statement) was pursued at
> extraordinary speed of 112.5 miles per hour for over approximately four miles
> without reasonable suspicion before being stopped.   All this, according to Mr.
> Bobbitt, on his routine, daily "patrol" . . . .

Second Supp. at 7.   The Court believes that Alabi intended to write something to the effect of:
"Mr. Alabi's vehicle [was stopped for expired tags, which Bobbitt only noticed] after [he
pursued the vehicle based on] an obviously concocted [story about noticing the vehicle speeding
by] (found in no previous report or sworn statement)."   The Court bases its inference about what
Alabi intended to write in the Second Supp. based upon other parts of the Second Supp. and his
oral argument in support of his motion after the evidentiary hearing.   In the Second Supp., Alabi
asserts that, "[u]nlike a case with some similarities that was before this Court several years ago,
the evidence emerged that no reasonable articulable suspicion of any violation had occurred
when Mr. Bobbitt took after the Defendant's rented vehicle."   Second Supp. at 5 (citing United
States v. Harmon, 785 F. Supp. 2d at 1158).   In his oral argument, he asserted that the evidence
about Bobbitt hearing the Camry speeding by as reason for going after it allows the Court to find
that, aside from any statistical evidence about NMSP activities in Quay and Guadalupe Counties,
the Defendants' particular stop on April 6, 2011 was racially based.   See Tr. at 222:13-25
(Samore).   The Court thus infers that Alabi intended to write that Bobbitt's explanation that he
pursued the Camry because he noticed it speeding was obviously concocted.

Tr. at 222:25-223:6 (Samore).   Regardless on which theory or under which method Alabi seeks

to prove that Bobbitt's traffic stop was racially selective law enforcement, Alabi has not

presented "clear evidence" to overcome the presumption that Bobbitt's law enforcement conduct

did not violate equal protection.   Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1167

(internal quotations omitted)(quoting United States v. Armstrong, 517 U.S. at 465).

> **1.   Alabi Did Not Produce Clear Evidence That, Based on Statistical Inference, Bobbitt's Actions Were the Product of a Discriminatory Motive, Because Alabi Failed to Proffer Reliable Statistical Evidence and the Statistical Evidence Which Alabi Proffered did not Provide an Appropriate Basis for Comparison.**

Alabi's pursuit, after the evidentiary hearing, of directly proving that Bobbitt's traffic

stop was racially motivated, rather than relying on the statistical comparison method, was likely

because he realized that the evidence he produced at the hearing did not meet the Tenth Circuit's

requirements for statistical proof in relation to equal-protection violations. By compiling NMSP

records and court records via IPRA requests, and any other source reflecting NMSP vehicle

searches on the side of a state highway from January 1, 2011, to December 31, 2011, performed

primarily in Quay County, Alabi found record of twenty-three vehicle searches.   Out of the

twenty-three searches, based on visual inspection of the subjects' pictures, Alabi's investigator,

Elliot, concluded that, based on visual inspection of the pictures of the subjects, twenty-one of

the searches' subjects were of a minority race.   See Tr. at 150:17-20 (Samore, Elliot); id. at

164:7-9 (Gerson, Elliot)(Q: "[T]his data about automobile searches was derived from your

examination of certain stated New Mexico State Police records?"   A: "[NMSP], court records,

anything that I could find in which a search was identified as having been conducted on the side

of the road."); id. at 154:6-155:18 (Samore, Elliot)(Elliot explaining that, "for the period of time

that we were looking at I believe there were approximately 23 searches . . . . primarily the county

of Quay County that we addressed . . . .  Of the 23 listed 21 appear to be minority."); id. at

170:12-13 (Gerson, Elliot)(Q: "How did you determin[e] the race of these people?"  A: "Looking

at them."); Chart of Twenty-Three Vehicle Search Subjects.  First, this evidence is unreliable at

best; Elliot admitted at the evidentiary hearing that, if an NMSP officer had conducted a consent

search of a vehicle after performing a traffic stop, but did not record the search on the officer's

daily activity log, Elliot would have no way of knowing about the search, and it is not included

in the twenty-three subjects he identified.  See Tr. at 166:19-25 (Gerson, Elliot).  As the Tenth

Circuit recognized in Blackwell v. Strain, any statistical proof used to prove discriminatory

intent via statistical inference "requires reliable comparison data."  496 F. App'x at 843 (citing

Chavez v. Ill. State Police, 251 F.3d at 642-45).  These searches, given that they are only

representative statistics for vehicle searches if NMSP officers recorded the searches in their

dailies, and if Elliot found record of the dailies in which they were recorded, are not reliable

comparison data.

 Second, the statistical evidence about the twenty-three searches "lack an appropriate basis

for comparison."  Blackwell v. Strain, 496 F. App'x at 842.  The Tenth Circuit in Blackwell v.

Strain pointed out as an example of lacking basis for comparison that "there is no statistical

evidence regarding whether a greater percentage of non-blacks passing through the POE could

have been arrested" and noted that therefore "the evidence regarding arrests made by Officer

Strain is only relevant if it can be presumed that arrestable offense were committed

proportionately by all races -- a presumption prohibited by Armstrong."  496 F. App'x at 842.

Here, Alabi did not proffer any evidence or information about the demographics or

characteristics of the larger category of people whom the NMSP subjected to traffic stops in

Quay County on I-40 in the first six months of 2011.  See Tr. at 165:7-11 (Gerson, Elliot)(Q:

"Do you have any information at all about the demographic characteristics of the category of people that this is a subcategory of, that is, the demographic [characteristics] of the people who had been subject to traffic stops?"  A: "No, sir.").  Alabi also did not have any information about the demographics or characteristics of the larger category of people who were travelling along I-40 during the first six months of 2011.  See Tr. at 165:22-25 (Gerson, Elliot)(Q: "And you don't have any information, do you about the demographic characteristics of people who are traveling on I-40 during the first six months of 2011?"  A: "No, sir.").  Alabi, therefore, failed to give any "reliable measure of the demographics of the relevant population" and gave the Court no "means of telling whether the data represent similarly situated individuals, and [no] point of comparison to the actual incidence of crime among different racial or ethnic segments of the [relevant] population."  Marshall v. Columbia Reg'l Hosp., 345 F.3d at 1168 (internal citations omitted).  Thus, the twenty-three searches that Alabi presented are only relevant to his racially selective law enforcement claim if it can be presumed that NMSP in Quay and Guadalupe Counties pulled over the same number people of all races, for the same offenses.  Tenth Circuit and Supreme Court precedent is clear that these presumptions are impermissible.  The Court admits that this fact pattern -- twenty-one out of twenty-three stops were of minorities -- is troubling.  On the other hand, the snapshot is so unreliable, particularly statistically unreliable, that the troubling nature of the snapshot cannot be given much credence.  The Court does not know how many stops there were total, the demographics of the stops, even how many searches there were total, or the demographics of those total searches.  The Court also does not know how many people refused to give consent.  On balance, the snapshot that the Alabi's statistical evidence presents is of little substantial value.  The Court therefore concludes that Alabi's statistical evidence fails to allow the Court to draw a statistical inference that Bobbitt's traffic stop or search of the Camry

was racially based selective enforcement in violation of the Equal Protection Clause.  See Blackwell v. Strain, 496 F. App'x at 842 (holding that statistical information without an appropriate basis for comparison "is not evidence from which a jury could not reasonably infer Officer Strain was motivated by a discriminatory purpose").

> 2. **Alabi Did Not Produce Clear Evidence That, Based on the Circumstances, Bobbitt's Actions Were the Product of a Discriminatory Motive, Because Alabi did not Establish Bobbitt's Pattern of Stops and Searches, or That Bobbitt's Conduct or Statements, Evince Discriminatory Motive in Stopping or Searching the Defendants' Camry.**

To prove that the particular law enforcement action was racially motivated, the Tenth Circuit held that "a police officer's pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances may support an inference of discriminatory purpose in this context."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1168.  In Marshall v. Columbia Lea Reg'l Hosp., the Tenth Circuit reversed the district court's grant of summary judgment in the defendant's favor, concluding that there was evidence from which a reasonable juror could have found that the traffic stop was racially motivated.  In Marshall v. Columbia Lea Reg'l Hosp., the police officer pulled over the plaintiff, a black man, for a traffic stop only after the plaintiff drove by the parked officer, the officer pulled from the side of the road to follow the plaintiff for "several blocks," at one point "pull[ing] up alongside the pickup and 'gaz[ing] intently at [the plaintiff's] face."  345 F.3d at 1160.  The officer asserted that he initiated the traffic stop after the plaintiff allegedly failed to stop at a stop sign, but the plaintiff denied failing to stop at the stop sign or having violated any other traffic laws in the officer's presence.  See 345 F.3d at 1157.  When the officer activated his lights, the plaintiff "continued to drive for more than two miles before coming to a stop at his residence," which the

plaintiff stated he did "because he was fearful to stop his vehicle outside the presence of witnesses, on account of the reputation of the Hobbs Police Department for racist practices." 345 F.3d at 1160.  In regard to the plaintiff's testimony that "he did not fail to stop at the stop sign or commit any other traffic violation in [the officer's] presence," the Tenth Circuit stated that "[t]his testimony was not sufficient to establish lack of probable cause for the ultimate stop and arrest two miles down the road, but if accepted as true by the trier of fact, would be evidence that the officer's initial decision to pull [the plaintiff] over was pretextual."  Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1169.  The Tenth Circuit also pointed out that the plaintiff "testified, and [the officer] did not deny, that the officer made eye contact with him while stopped at the intersection prior to activating his emergency lights," and noted that "[t]he sequence of events is potentially significant, since this was the same intersection at which [the officer] alleges that [the plaintiff] committed the traffic violation (presumably failure to stop at a stop sign)." 345 F.3d at 1169.  The Tenth Circuit reasoned: "If, as it appears, [the officer] took steps to determine [the plaintiff]'s race after he committed the violation but before the police officer activated his emergency lights, it might reasonably be inferred that . . . race played a part in the decision to initiate the stop."  345 F.3d at 1169.  The officer's statements on the day of the traffic stop were "a cryptic accusation that [the plaintiff] was on crack."  345 F.3d at 1169.  The Tenth Circuit specifically noted that "we refer to these exchanges as 'accusations' rather than an 'interrogation' because, as reported by [the plaintiff], the tone and content was accusatory and conclusory rather than interrogative," and noted that the "Defendants failed to offer any evidence explaining why [the officer] made the accusations."  345 F. 3d at 1169-70.  The Tenth Circuit added that, "on the citation form, in the box designated for the gender of the cited driver, [the officer] wrote 'B/M,' making a racial designation where none was called for.  Possibly, this

reflects unwritten police policy or has some other nondiscriminatory explanation, but the Hobbs Defendants have not suggested one."  345 F.3d at 1170.  The Tenth Circuit also stated that "a jury might also think . . . significant -- at least as it bears on [the officer's] credibility" -- that the officer "wrote on the original criminal complaint that [the plaintiff] accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane, but later made no mention of these remarkable corroborating facts in his sworn affidavit in this case about what happened that day."  345 F.3d at 1170.  The plaintiff also "presented evidence regarding extensive alleged misconduct by [the officer] during his prior employment as a police officer in Midland, Texas. In a memo terminating [the officer's] employment, the Midland police chief stated that [the officer] had failed 'to treat people fairly and equally under the law.'" 345 F.3d at 1170.  The Tenth Circuit thus concluded that other documents from the officer's history in Midland, "together with the other facts of record pertaining to the events of December 26, 1996, may be sufficient to create a triable issue on [the] claim of racially selective law enforcement."  345 F.3d at 1171.

The differences between the substantial amount of evidence supporting an inference that the officer's traffic stop in Marshall v. Columbia Lea Reg'l Hosp. was racially motivated, and the lack of evidence that Bobbitt's stop or search of the Defendants' Camry was racially motivated, shows that Alabi lacks clear evidence to overcome the presumption that Bobbitt's conduct did not violate equal protection.  First, the plaintiff who was stopped in Marshall v. Columbia Lea Reg'l Hosp. denied violating any traffic laws before the officer initiated the traffic stop; Alabi has not denied that the Camry's license plate tags were expired when Bobbitt initiated the traffic stop for "[e]xpired tags." Tr. at 22:21-22 (Gerson, Bobbitt).  Moreover, the officer in Marshall v. Columbia Lea Reg'l Hosp. pulled alongside the plaintiff's truck and

"gaz[ed] intently at [the plaintiff's] face," 345 F.3d at 1160; although Alabi tried many times during the evidentiary hearing to show otherwise, Bobbitt did not observe or know the Defendants' race or national origin until he approached the Camry after his cruiser and the Camry were stopped on the side of I-40.  See Tr. at 22:23-23:6 (Gerson, Bobbitt); id. 24:12-25:1 (Gerson, Bobbitt).  Although Alabi tried many times at the hearing to elicit Bobbitt's admission that he made eye-contact with Alabi as the Camry passed by him on the side of I-40, Bobbitt did not waiver, and answered each time that he did not make eye contact, and that the first time he noticed the Defendants' race or ethnicity was when he approached the driver-side window after the cars were parked on the shoulder.  The Court travels on I-40 in eastern New Mexico often, in part because he grew up in Hobbs, New Mexico, and travels to visit family in Dallas.  The Court was on I-40 around Santa Rosa last week, and saw two NMSP cars in the median.  The Court's car was traveling at seventy-five miles per hour, and, of course, looked at the police cruisers.  The Court could did not have time to make eye-contact with the police officers.  The Court is skeptical of Alabi's story that he locked eyes with Bobbitt.  The Court thus credits Bobbitt's testimony, and finds it more credible that Bobbitt did not know Alabi's race when he gave chase to the Camry, and not until he approached Camry's driver-side window.

In relation to Bobbitt's statements and conduct at during the traffic stop and the search, whereas the Tenth Circuit specifically noted in Marshall v. Columbia Lea Reg'l Hosp. that the officer's tone was accusatory in accusing the plaintiff of using crack cocaine, Bobbitt's tone throughout the traffic stop and the search was conversational and respectful.  Bobbitt did not, at any point on the Traffic Stop Video, accuse the Defendants of illegal activities such as drug trafficking or identity theft, but asked them in the negative, making sure they were not carrying drugs, guns, or similar contraband.  See Traffic Stop Video at 8:32:01-32:05.  Although, as Alabi

points out in his Second Supp., Bobbitt asked him how many wives he had when he was speaking with him through the passenger-side window, he did so only after Alabi told him that he was also from Nigeria, and after Oguntoyinbo had previously told Bobbitt that it was "possible" in Nigeria to have two wives.  See Traffic Stop Video at 8:27:54-28:00.  Thus, while such a question may be improper and premised on improper national-origin stereotypes, Bobbitt did not bring up the subject of multiple wives; Oguntoyinbo did.  Oguntoyinbo told Bobbitt that it was possible in Nigeria to have more than one wife.  Moreover, asking Alabi about his family and whether he had multiple wives after learning that Alabi was also Nigerian, and after asking him about what he was doing in the United States and about his business was not accusatory or asked in a tone designed to ridicule Alabi; rather, it was apparent from the Traffic Stop Video that it was designed to continue to engage Alabi in conversation, and ultimately designed to elicit Alabi's consent to search the Camry or bags within.  In reviewing the entire dash camera video recording from Bobbitt's car, beyond the portion that the United States played for the Court during the evidentiary hearing, Bobbitt was respectful of the Defendants.  Throughout the hour-and-a-half recording, even when talking with the other NMSP officers assisting with the traffic stop and arrest, Bobbitt referred to them as "guys"; Bobbitt did not use any derogatory term or refer to their race.  See generally, Traffic Stop Video. Nevertheless, if, as Alabi argued after the evidentiary hearing, Bobbitt "obviously concocted" that the Camry was speeding as pretext for initially giving chase, Second Supp. at 7, such a fabrication may be analogous to the officer's conduct in Marshall v. Columbia Lea Reg'l Hosp., when he wrote "on the original criminal complaint that [the plaintiff] accelerated to 100 miles per hour, drove through a four-way stop, and weaved from lane to lane," and then "later made no mention of these remarkable corroborating facts in his sworn affidavit in this case about what happened that day," which the

Tenth Circuit noted would likely bear on the officer's credibility.   345 F.3d at 1170.   The evidence shows, however, that Bobbitt did not concoct that he pursued the Defendants' Camry because he believed that it was speeding.   Rather, when Bobbitt showed Oguntoyinbo the expired tags during the traffic stop, Bobbitt said to him: "And you were going too fast, too." Traffic Stop Video at 8:17:48-17:50.   Bobbitt testified at the evidentiary hearing that he noticed the vehicle was speeding by hearing it speeding by him. The Court found Bobbitt to be a credible witness.   While the Court likely would not be able to notice that a car was going over or under seventy-five miles per hour, and does not opine whether hearing a car speeding would be probable cause for a traffic stop, the Court does not believe it strains credulity that a NMSP officer, whose career consists of patrolling an interstate highway to ensure traffic laws, including speed limits, are enforced, could hear a car pass by him on the side of the road and notice that the car was speeding.   The Court has heard cars go by and thought that the car was speeding, going too fast, simply by the sound; the Court does not think that it is unlikely, as Alabi apparently does, that a police officer on the sound of the car alone can tell that a car is driving over the speed limit.   Finally, of the twenty-three vehicle searches Alabi proffered at the evidentiary hearing, of which Alabi concluded twenty-one were searches of minority races' vehicles, Bobbitt performed only seven, including the Defendants' search.   See List Chart of Twenty-Three Vehicle Search Subjects.   Beyond the problems with the reliability and validity of these twenty-three searches as statistical evidence, Bobbitt's searches represent only one-third, or thirty-three percent, of the alleged race-based searches.   The Tenth Circuit in Blackwell v. Strain, faced with evidence consisting of seven searches that the defendant officer performed, where "[t]hree of the seven truckers (43%), well in excess of their representation (14.6%) in the population of truckers passing through the POE were Black, and every one of the Black truckers was subjected to a

Level II inspection," concluded that the evidence "does not show a stark pattern of discrimination like that in <u>Gomillion</u> or <u>Yick Wo</u>, and, therefore, cannot by itself demonstrate discriminatory purpose."  496 F. App'x at 843 (emphasis in original).  Similarly here, evidence that seven of the allegedly twenty-one searches of minatory persons' vehicles does not show a stark pattern of discrimination sufficient to infer that Bobbitt's stop or search of the Camry was the product of a discriminatory motive.  Thus, Alabi has not proffered sufficient evidence of Bobbitt's "pattern of traffic stops and arrests, his questions and statements to the person involved, and other relevant circumstances [which] may support an inference of discriminatory purpose in this context." <u>Marshall v. Columbia Lea Reg'l Hosp.</u>, 345 F.3d at 1168.  The Court therefore concludes that Alabi failed to prove that Bobbitt's specific acts of stopping or searching the Camry had a discriminatory purpose.  Alabi has thus failed to make out a prima facie case of racially selective law enforcement in violation of the Equal Protection Clause.

**B.    THE COURT'S PREVIOUS CONCLUSION THAT SUPPRESSION IS NOT AN APPROPRIATE REMEDY FOR AN EQUAL PROTECTION VIOLATION -- INCLUDING SELECTIVE LAW ENFORCEMENT -- REMAINS SOUND.**

Even if Alabi had been able to prove that Bobbitt's conduct was racially selective law enforcement, the Court would conclude that suppression is not the proper remedy for the conduct.  Alabi has not referred the Court to any controlling precedent from the Tenth Circuit or from the Supreme Court which counsels that the Court should reconsider its previous conclusion that, "[e]ven if there [i]s evidence that [a law enforcement officer] discriminated against [a defendant], . . . suppression would not be an appropriate remedy; instead, the appropriate remedy for an alleged violation is a 42 U.S.C. § 1983 action." <u>United States v. Harmon</u>, 785 F. 2d at 1170.  Alabi directs the Court instead to two district court opinions concluding that suppression

-97-

may be an appropriate remedy for law enforcement's equal-protection violations.

First, Alabi directs the Court to a decision from this district, United States v. Bernard, No. CR 09-2474 RB, in which Judge Brack concluded that evidence allegedly "obtained though discriminatory law enforcement" should be "suppressed as fruit of the poisonous tree." Slip op. at 11. As the United States pointed out, however, Judge Brack vacated this opinion. See United States v. Bernard, No. CR 09-2474 RB, Order (D.N.M. Apr. 13, 2012). Accordingly, the legal status of Judge Brack's opinion is as if it was never written. See United States v. Jerry, 487 F.2d at 607 ("[T]he general rule [is] that when a court vacates an order previously entered, the legal status is the same as if the order never existed."). Nevertheless, the Court respects Judge Brack's work, and takes into consider his position opposite that of the Court's in United States v. Harmon. See United States v. Bernard, No. CR 09-2474 RB, slip op. at 9-10 (citing to United States v. Harmon for the position "that the exclusionary rule has been criticized as too high a price to pay for an unknown degree of deterrence, but noting that he "is convinced that civil remedies would be woefully inadequate to deter future racial discrimination at Lordsburg POE. . . . [T]his is an extraordinary case that cries out for an extraordinary remedy."). Beyond Judge Brack's having vacated his opinion, however, the Tenth Circuit's decision in Blackwell v. Strain, 496 F. App'x at 836, also counsels against giving significant weight to Judge Brack's reasoning in United States v. Bernard. In United States v. Bernard, Judge Brack concluded that the search of the investigating officer, Officer Strain -- the same Officer Strain whom the Tenth Circuit concluded was entitled to summary judgment based on qualified immunity in Blackwell v. Strain -- was racially selective law enforcement. See United States v. Bernard, No. CR 09-2474 RB, slip op. at 2 (noting that the case was held in abeyance "until resolution of a civil matter that arose from an inspection of a Black trucker by Officer Strain at the Lordsburg POE," and citing

the case that, on appeal, led to the Tenth Circuit's decision in <u>Blackwell v. Strain</u>).  Given that Judge Brack concluded that Strain's search of the tractor-trailer in <u>United States v. Bernard</u> was racially selective law enforcement, and given that the Tenth Circuit in <u>Blackwell v. Strain</u> held that the evidence presented about Strain's history of racially selective law enforcement was insufficient as a matter of law for a reasonable jury to find racially selective law enforcement, <u>United States v. Bernard</u> does not sway the Court's conclusion that the exclusionary rule is not a proper avenue to address racially selective law enforcement.

The second decision that Alabi suggests should give the Court pause in concluding suppression of evidence is not a proper redress for an officer's racially selective law enforcement is <u>United States v. Benitez</u>, in which the Honorable Robert W. Pratt, then-Chief United States District Judge for the Southern District of Iowa, dropped a footnote to "note, though, that exclusion would seem to be the proper remedy" for an equal protection violation in criminal cases.  613 F. Supp. 2d at 1101 n.3.  Judge Pratt concluded, however, that the officer's traffic stop did not violate the defendant's Equal Protection Clause rights, because the officer had probable cause to stop the vehicle, and the defendant failed to prove a prima-facie case of racially selective law enforcement.  <u>See</u> 613 F. Supp. 2d at 1102.  In the footnote, Judge Pratt opines that suppression would seem to be the proper remedy, because "it is highly doubtful that civil remedies would adequately deter police agencies from engaging in this unconstitutional and blatantly reprehensible behavior."  613 F. Supp. 2d at 1101 n.3.  Judge Pratt reasons that "[t]his concern is especially true in the context of a traffic stop where the law imposes a nearly impossible burden on Defendant to show that the officer did not stop other motorists committing the same offense."  613 F. Supp. 2d at 1101 n.3.  Judge Pratt also quotes a footnote in an unpublished opinion from the United States Court of Appeals for the Sixth Circuit, to provide

support for extending the exclusionary rule to cover equal-protection violations:

> "It is a touchstone of Fourth Amendment jurisprudence that evidence obtained by law enforcement officers in violation of certain guarantees of the Constitution is inadmissible in state or federal criminal trials upon objection by a proper party. The exclusionary rule serves the primary purpose of deterring unlawful police conduct by compelling respect for the constitutional guaranty in the only effectively available way -- by removing the incentive to disregard it. This deterrence rationale applies also to evidence tainted by violations of the Fourteenth Amendment. Arguably, the exclusionary rule as applied to Fourth Amendment violations advances nondeterrence ends, too. For example, by keeping tainted evidence out, the exclusionary rule prevents courts from becoming accomplices in the willful disobedience of a Constitution they are sworn to uphold. Further, suppression of tainted evidence will assure the people -- all potential victims of unlawful government conduct -- that the government would not profit from its lawless behavior, thus minimizing the risk of seriously undermining popular trust in government. Presumably, these salutory effects would accompany the application of the exclusionary rule to the Equal Protection Clause of the Fourteenth Amendment as well."

United States v. Benitez, 613 F. Supp. 2d at 1102 n.3 (quoting United States v. Jennings, 985 F.2d 562, 1993 WL 5927, *4 n. 2 (6th Cir. 1993)).

The Court disagrees with Judge Pratt's assertion that "it is highly doubtful that civil remedies would adequately deter police agencies from engaging in this unconstitutional and blatantly reprehensible behavior." United States v. Benitez, 613 F. Supp. 2d at 1101 n.3. First, most of the cases that make up this law are civil cases -- not criminal cases. While some judges may not see civil remedies as effective, the civil bar is not so dismissive. There seems to be civil lawyers who think there are good cases, and are willing to work hard for many months or years bringing these cases. Second, criminal cases are poor vehicles for litigating fully and effectively racial discrimination cases. As anyone who has tried racial discrimination cases -- whether Title VII or § 1983 -- knows, they require lots of discovery; intentional discrimination in the twenty-first century is difficult to prove, and without wide-ranging discovery, plaintiffs' cases usually fail. Criminal cases do not offer the discovery needed to effectively litigate these cases well. It

should say everything, to Judge Pratt's contention that civil remedies are inadequate, that in <u>no</u> criminal case, including his, has racially selective law enforcement been proved and the evidence suppressed -- none.  Despite the rhetoric of some about the virtues of the exclusionary rule, it remains to date no relief in Equal Protection Clause cases for criminal defendants.  Third, the Supreme Court has recognized that Congress, in the Civil Rights Act of 1871 -- also known as the "Ku Klux Klan Act" -- enacted 42 U.S.C. § 1983 specifically to address the problem of racially selective law enforcement by penalizing state actors.  <u>Monroe v. Pape</u>, 365 U.S. 167, 174-75 (1961)("It was not the unavailability of state remedies but the failure of certain States to enforce the laws with an equal hand that furnished the powerful momentum behind this . . . bill."), <u>overruled on other grounds by</u> <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658 (1978).  The Supreme Court in <u>Monroe v. Pape</u> recognized that Congress created § 1983 to ensure that persons were provided a remedy against state actors who "in some capacity were . . . unwilling to enforce a state law," and a remedy against state actors for "'[t]he outrages committed upon loyal men [in Virginia specifically] . . . under the forms of law."  365 U.S. at 175-76 (quoting Cong. Globe, 42d Cong., 1st Sess. App. 653 (1871)).  Thus, Congress, faced with racially selective law enforcement against African-Americans chose as the remedy civil actions in federal courts designed to penalize state actors.  Judge Brack distinguished the Court's decision in <u>United States v. Harmon</u> by stating his conviction "that civil remedies would be woefully inadequate to deter future racial discrimination at Lordsburg POE," as that case was "an extraordinary case that cries out for an extraordinary remedy."  <u>United States v. Bernard</u>, No. CR 09-2474 RB, slip op. at 9-10.  Congress faced with the extraordinary situation in 1871, however, in which, because of the Ku Klux Klan, "'murder is stalking abroad in disguise, while whippings and lynchings and banishment have been visited upon unoffending American citizens,

the local administrations have been found inadequate or unwilling to apply the proper corrective,'" determined that a civil remedy via § 1983 against the local administrations and other state actors was adequate to deter future racial discrimination. Monroe v. Pape, 365 U.S. at 477 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 166-67). The inescapable conclusion is that the exclusion remedy is no remedy at all, because the decision to make exclusion available to remedy equal-protection violations in a criminal case is Congress', and Congress decided that § 1983 is the only effective remedy for race based selective law enforcement.

The Court does not, of course, have any disagreement with Judge Brack's opinion that "the law should not leave such a grievous constitutional violation without an effective remedy." United States v. Bernard, No. CR 09-2474 RB, Slip op. at 10. The Court's footnote in United States v. Harmon providing the Court's reasoning for declining to extend the exclusionary rule to equal-protection violations did not take issue with Judge Brack's premise. In United States v. Harmon, the Court was not oblivious to deterrence as a policy underlying the exclusionary rule, but rather specifically acknowledged that an important argument in support of the exclusionary rule is the "degree of deterrence that exclusion achieves." 785 F. Supp. 2d at 1170 n.4. The Court, however, sided with "[b]oth scholars and judges [who] have posited that exclusion of probative, reliable evidence of a defendant's guilt is too high a price to pay for the unknown degree of deterrence that exclusion achieves." 785 F. Supp. 2d at 1170 n.4. This conclusion is not to say that civil remedies in a § 1983 action is an effective remedy from a defendant's perspective or that such a remedy adequately deters racially selective law enforcement. The Court's belief that the exclusionary rule should not be extended to equal protection issues where a § 1983 action provides some remedy to the affected individual and deterrence to law enforcement means that the Court believes the remedial and deterrence value in the "exclusion of

probative, reliable evidence of a defendant's guilt," given its "negative effect on the truth-seeking process," is "too high a price to pay for the unknown degree of deterrence that exclusion achieves." 785 F. Supp. 2d at 1170 n.4. This conclusion that the exclusionary remedy should not extend to equal-protection violations also finds support in § 1983's congressional history. As Congress enacting § 1983 decided that the proper avenue to redress the "failure of certain States to enforce the laws with an equal hand" was to subject the state administration and actors participating in racially selective law enforcement to civil liability, Monroe v. Pape, 365 U.S. at 174, Congress' goal was to ensure that criminal laws were being enforced; the burden society as a whole bore for that remedy was taxpayer dollars going to pay these civil remedies. Although the exclusionary rule provides some redress for improper law enforcement, it also places a large burden on society and on the truth-seeking role courts play in society by exacting as payment the exclusion of probative, reliable evidence. Because Congress specifically created § 1983 to redress racially selective law enforcement, and left out any criminal law remedies for state actors acquiescing, or private citizens participating, in the criminal acts Congress sought to prevent, it is not the courts' province to decide -- to the detriment of the truth-seeking process in criminal cases -- that Congress did not do enough. The Tenth Circuit has acknowledged, in the § 1983 context, that, while "[i]t is one thing for law enforcement administrators to identify the problem and to undertake administrative steps to eliminate the improper use of racial and ethnic stereotypes in law enforcement," it is another for the judiciary to take on responsibility for attempting to eliminate racially selective law enforcement, as "[i]t is more difficult to craft judicially manageable standards" to penalize law enforcement. Marshall v. Columbia Lea Reg'l Hosp., 345 F.3d at 1167. The Court thus continues to believe that it should not "extend the exclusionary rule further, particularly where there is a monetary remedy available for equal-

protection violations." 785 F. Supp. 2d at 1170 n.4.

In conclusion, the Court will deny Alabi's Motion to Suppress, because Bobbitt's traffic stop and search of the Defendants' Camry did not violate Alabi's constitutional rights. Because Alabi was a passenger in the Camry, and because any possessory interest Alabi had in the Camry was insufficient to give him a legitimate expectation of privacy in the Camry, Bobbitt's search of the Camry did not implicate Alabi's Fourth Amendment interests. Regardless whether the search implicated Alabi's Fourth Amendment interests, Oguntoyinbo's consent to search the Camry, the trunk, and the baggage in the Camry was valid, and Bobbitt's search subsequent to the consent did not, therefore, implicate the Fourth Amendment. The traffic stop was not an unreasonable seizure in violation of Alabi's Fourth Amendment rights, because Bobbitt had probable cause to initiate the traffic stop based on his observation that the Defendants violated New Mexico law by driving on an interstate highway with expired license plate tags. Finally, Alabi failed to proffer sufficient statistical or direct evidence to show that Bobbitt's traffic stop or vehicle search violated the Fifth Amendment, because it was racially selective law enforcement.

**IT IS ORDERED** that Mr. Alabi's Motion to Suppress, filed July 3, 2012 (Doc. 36), is denied. The Court will not exclude the evidence that was the fruit of the search of the Toyota Camry in which the Defendants Oladipo Alabi and Kehinde Oguntoyinbo were travelling.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Kenneth J. Gonzales
  United States Attorney
Jonathon M. Gerson
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

 *Attorneys for the Plaintiff*

John F. Samore
Albuquerque, New Mexico

 *Attorney for Defendant Oladipo Alabi*

Donald Kochersberger
Streubel, Kochersberger & Mortimer LLC
Albuquerque, New Mexico

 *Attorneys for Defendant Kehinde Oguntoyinbo*